L-3.7.6 YAEC Waste Contracts JMB for File

# MEMORANDUM

## YANKEE ATOMIC - FRAMINGHAM

To R. M. Grube/R. A. Rich

Date October 19, 1983

From J. M. Buchheit

Group #

W.O. # NMG 83-647

Subject SEPTEMBER 27, 1983 UNWMG DOE CONTRACT TASK FORCE MEETING

I.M.S. #

ATTACHMENTS

1. Potential Issues to be Addressed in a Rulemaking Proceeding on the DOE Disposal Contracts
2. Attendance List

The meeting convened with a brief discussion on whether or not to go forward with a rulemaking proceeding. At the September 7, 1983 Steering Committee meeting, it was my understanding that the group's opinion was unanimous to go ahead subject to EEI Executive Advisory Committee approval. UNWMG attorneys estimated that it would take one to two months to prepare the petition to DOE, and that it would take three to four months more for the various committees within EEI to pass judgment on the petition.

The procedure for rulemaking was briefly described. Under the Administrative Procedures Act, virtually anyone can file for a rulemaking. A party must merely identify itself and what the issues are. DOE in turn can deny the petition. If DOE denies the petition, the reasons for such denial must be published in the Federal Register. If DOE goes ahead with a rulemaking proceeding, the proceeding must be published for comment in the Federal Register. DOE will probably allow a comment period of 30 to 60 days. DOE will make its decision after reviewing the comments. No public hearings are required. However, DOE could choose to have hearings as a means of encouraging public participation.

Possible adverse problems were discussed. A rulemaking procedure would open the contract to intervenors, and DOE could come up with a worse contract. However, an intervenor could challenge the contract at almost any time so we are not necessarily opening up the contract for challenge.

Prior to a rulemaking proceeding, we would discuss our petition with DOE. It was noted that DOE could publish a notice in the Federal Register requesting further comments before opening the contract to a rulemaking. It was also noted that DOE can select the issues it desires to address and ignore the others.

Concerning timing, it could be argued that because we have had little experience with the present contract, we should wait until we see how things work. On the other hand, we may not get favorable treatment from the DOE if

DEFENDANT'S EXHIBIT 092A

YDK045589



YDK045589

we delay on our petition for a rulemaking if, for example, a new administration takes office in 1984. A discussion of some of the issues addressed in Attachment 1 follows.

1. Contract as a Regulation:

In UNWMG's initial comments to DOE on the waste contract, we disagreed that the contract should be a regulation. We disagreed on the basis that this allows the intervenors to come in at any point in time and attempt to amend the contract, and that there is not enough flexibility in such a system. We cited the enrichment contracts as an example, stating they are not a regulation, that they have been workable, and can be amended without difficulty. It was noted that DOE itself has already been inconsistent in that a number of the Appendices to the contract were changed without prenotification in the Federal Register.

BFD, the "public" is not a party to the contract!

There are no signs, however, that DOE desires to accede to this change. DOE is likely to argue that if the contract is not a regulation, the public will not be able to participate in the contract in the future.

2. Lack of Milestones:

DOE's only requirement in the present contract is to take fuel by January 31, 1998. There are no specific performance standards. DOE is required to publish a Mission Plan in April 1984, which is to be approved by Congress. It was generally agreed that some statement concerning the Mission Plan should be incorporated into the contract with attendant dates. Also, the contract should be changed to incorporate receiving rates into the 1998 schedule.

3. The Gross Versus Net Issue:

Although Wisconsin Electric Power Company, et al., have sued the DOE over this issue, UNWMG counsel still felt that it would be useful to make this issue part of a rulemaking proceeding. The lawsuit and the rulemaking proceeding would leverage each other. In other words, the DOE may choose to Proceed directly with the rulemaking rather than go to Court. If it appears that it will be a long time before a decision is made on a rulemaking, we could go ahead with a lawsuit. As a matter of interest, OMB may have pressured DOE to select gross instead of net over concerns for balancing the budget.

No surprise.

4. Program Review Rights:

In our previous comments on the waste contract, we requested that utilities be given the right to audit the DOE program. If we petition the DOE for a rulemaking, it was suggested that we use the word review instead of audit. It was considered that it would be very difficult to perform an adequate audit and that the DOE may be more receptive to a review of their program rather than an audit.

dk045591 (2544x3377x2 tiff)



5. Credits:

It was generally felt that the manner of credits was a sticky issue. There was some concern that rights to credits may encourage DOE to impose additional charges if costs for handling certain types of fuel exceeded the norm. There was general agreement that credits should not be addressed as a matter for the rulemaking.

The remaining issues in Attachment 1 were briefly addressed. We agreed that in addition to the Credit issue, Priorities and Allocations (6), Delays (13), and Separate Payment Schedules (14), need not be considered as part of this rulemaking.

J. H. Buchheit
Senior Fuels Engineer
Nuclear Materials Group

JHB/bal

Attachment

cc: P. A. Clark
J. T. Pearson
A. R. Soucy

YDK045591

# MEMORANDUM

To A. R. Soucy | COMPANY OR LOCATION | May 17, 1983 DATE

From R. M. Grube | COMPANY OR LOCATION | File FCM 83-42

Subject NUCLEAR WASTE POLICY ACT FACT SHEET

Attached is the subject information which you requested. In addition, we have provided two pages of back-up data summarizing the Waste Policy Act and its financial implications to Yankee.

R. M. Grube
Fuel Cycle Department Manager

RMG/saj

Attachment

cc: R. A. Rich
E. E. Pilat
K. W. Ludwig
[redacted]

DEFENDANT'S EXHIBIT 102

YDK013697

YDK013697

NUCLEAR WASTE POLICY ACT
YANKEE MILESTONES

1983:

Jan 7 -- President signed Waste Act

June 30 -- Yankee signs DOE disposal contract

July 31 -- Yankee makes first quarterly payment on new spent fuel

1985:

Jan 1 -- DOE recommends 3 candidate repository sites

June 30 -- Yankee selects payment option for old spent fuel

1987:

March 31 -- President selects first repository site

1989:

Jan 1 -- NRC approves construction at first site

1998:

Jan 31 -- First repository operational


YDK013698

NUCLEAR WASTE POLICY ACT OF 1982

o Passed by Congress on December 20, 1982; signed by the President on January 7, 1983.

o The Act sets a schedule for repository development in deep geologic formations.

- President decides on first site by March 31, 1987.
- Decision on second site is required by March 31, 1990.
- Final NRC decisions on construction of the two repositories are required by January 1, 1989 and January 1, 1992, respectively.
- DOE is required to submit a proposal for monitored retrievable storage (MRS) to Congress by July 1985.

o "Interim Away-From-Reactor (AFR) storage of up to 1900 MTU spent fuel will be allowed at existing federal facilities, but only after all other alternatives have been exploited; a separate user's fee for AFR storage will be developed; after a permanent repository is operating, AFR storage must be phased out within three years.

o A state or Indian tribe may veto the selection of a repository site, MRS, or AFR with greater than 300 MT capacity; a majority vote of both House and Senate is needed to overturn the veto.

o Both high level waste (HLW) and spent fuel will be accepted for disposal in the repository. HLW is defined as the highly radioactive material resulting from reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste.

o A 1 mill per killowatt hour (M/kwh) fee is established for future spent fuel and an equivalent one-time per kg heavy metal (HM) fee for existing spent fuel will be developed; the fee will cover the repository, MRS, and transportation.

o The Federal government will take title to spent fuel at the reactor site and will transport it to either an AFR or repository.

o Each owner or generator of spent nuclear fuel or high level waste is required to sign a contract with the U.S. Government by the later of June 30, 1983, or date on which reactor commences operation.

SUMMARY OF FINANCIAL IMPLICATIONS

o A 1 M/kwh fee will be assessed by the Secretary of Energy (Secretary) for electricity generated beginning April 7, 1983.

o For existing spent fuel and fuel in the reactor core prior to April 7, 1983, a one-time fee per Kg HM in spent fuel has been established which is equivalent to an average charge of 1 M/kwh for the electricity originally generated by the spent fuel.




YDK013699

- Procedures for the collection and payment of the fees have been set forth in the Standard Contract Published by DOE on April 18, 1983.

- All fees shall be paid to the U.S. Treasury and deposited in the Nuclear Waste Fund.

- Once spent fuel or HLW is delivered to the Government, the utility will have no financial obligation beyond payment of the fee.

- The Secretary will review the 1 M/kwh fee annually to decide whether full cost recovery will be achieved or whether excess funds are being collected. If the Secretary determines there is a need for an adjustment, he shall transmit his proposal for adjustment to Congress, which has 90 working days to reject the proposal.

- In return for payment of the above fees, the Secretary, beginning no later than January 31, 1998, will dispose of the high level radioactive waste or spent fuel.

FINANCIAL IMPACT ON YANKEE

- Quarterly payments for 1 M/kwh due by the end of month following each calendar quarter.

- Approximate annual payment for the 1 M/kwh fee based on Yankee's average annual gross electrical generation is $1,200,000.

- The approximate fee for existing spent fuel and for fuel in-core prior to April 7, 1983 is $12,600,000.

  - Spent fuel 264 assy x 235 kg/assy x $184 = 11,400,000
    1 assy x 235 kg/assy x $80 = 19,000

  - In-core at 1 M/kwh estimate = 1,200,000

- Three (3) payment options for existing spent fuel and in-core fuel prior to April 7, 1983. Yankee must select its option by June 30, 1985.

  - Lump sum with no interest if paid on or before June 30, 1985.

  - Quarterly payments for 10 years with interest at T-bill rate with final payment to be made prior to first shipment to repository.

  - Lump sum payment with interest at T-bill rate at any time prior to first shipment to repository.



YDK013700

YDK013700

Yankee Atomic v. U.S. No.: 98-126C July 14, 2004

Page 574 to Page 793

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

Case Nos.: 98-126C, 98-154C, 98-474C
Consolidated

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, July 14, 2004

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
MICHAEL R. MINER, ESQ.
VIVEK H. HATTI, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY

GERALD GARFIELD, ESQ.
General Counsel
Day, Berry & Howard, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0182



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **



P R O C E E D I N G S

MR. SHAPIRO: Your Honor, we're ready to proceed with Dr. Bartlett.

THE COURT: Good.

MR. SHAPIRO: The plaintiffs call John Bartlett.

THE COURT: Okay.

Whereupon,

JOHN WESLEY BARTLETT

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

MR. SHAPIRO: Your Honor, once again, we have a notebook with some documents we would like to provide the witness and to provide copies to you as well, and to government counsel.

I know we have the fan, Your Honor, which is pleasant. But, obviously, if you have any trouble hearing, let us know.

THE COURT: I'm more worried about the reporter.

DIRECT EXAMINATION

BY MR. SHAPIRO:

Q Would you state your name for the record, please.

A My name is John Wesley Bartlett.

you wouldn't be disrupting operations?
A You would generally not operate that way for optimal purposes at the reactor. You would campaign more on an 18 month or more schedule.
Q And you would want to pick up more than 1 cask –
A Yes.
Q – worth of fuel, wouldn't you?
A Yes. Yes.
Q Okay. I want to talk to you now, sir, about what you had been discussing or you had discussed on direct examination about eliminating the need for additional at-reactor storage.
When you were director of OCRWM, you did not do any calculation of what rate of acceptance would be necessary in order to preclude the need for additional at-reactor storage, correct?
A I did not, no.
Q And now as the Yankees' expert witness, you have not done any calculation of what rate of acceptance would be necessary to preclude the need for additional at-reactor storage; is that correct?
A I have not, no.
Q Okay. You have not done any calculation of what rate of acceptance would be necessary to preclude



the need for additional at-reactor storage and work off the backlog, right?
A I have not done any direct calculation, but I would refer you back to the mission plan which established a 3,000-ton per year rate of acceptance to avoid the buildup of must-move fuel.
Q And you're talking about the 1985 mission plan?
A Yes.
Q You've told us today – and I'm going to come back to that in a second. You've told us today that 3,000 MTU acceptance rate that you advocate is designed, and I think this dovetails with what you're saying, is designed to remove part of the backlog that exists because of continuing generation of spent fuel.
A Yes.
Q Have I summarized that correctly?
A Yes.
Q The aggregate amount of fuel that's produced by all reactors each year is actually 2,000 MTU per year.
A That's right.
Q So that's what contributes to the backlog; is that right?
A That's right. Prior years of operation.



Q But in order to eat away at that backlog, DOE would really just need to make sure that they accept more than 2,000 MTU per year; is that correct?
A An appropriate rate to maintain receipt of constant – or current generation and eat away the backlog is 3,000 MTU per year.
Q I understand that you feel that way, sir.
A Yes.
Q But what I actually want to find out about is, if DOE were to make sure that they accepted just more than 2,000 MTU per year, they would be eating away at the backlog, wouldn't they?
A At a very minor rate.
Q But they would?
A Yes.
Q So if they accepted, say, 2,100 MTU per year, they would be eating away at the backlog?
A At a very minor rate, yes.
Q They would be eating away at the backlog if they accepted, say, 2,500 MTU per year; is that right?
A Yes.
Q I want to ask you, sir, about one of the documents that you discussed with Mr. Shapiro. So if I could have you look back at your binder of exhibits that Mr. Shapiro gave you. Do you still have that?



A I don't have that.
MS. HERRMANN: Mr. Shapiro, do you still have that?
BY MS. HERRMANN:
Q And I'm going to ask you, sir, about tab 1. Are you with me?
A Almost.
Q Okay. Take your time. I'm sorry.
A I'm stuck. Tab 1.
Q Okay. Looking at tab 1, which is Plaintiffs' Exhibit 175, the Civilian Radioactive Waste Management System Throughput Rate Analysis?
A Yes.
Q Does this document, sir – does this – let me put it this way: Is this document a system study –
A Yes, it is.
Q – as you defined it?
A Yes, it is.
Q Yes, it is. Am I correct that your testimony about this document was that you reviewed a draft of this document prior to the end of your tenure as director?
A No.
Q You –

Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, & 98-474C July 16, 2004

TRANSCRIPT FILED ~~UNDER SEAL~~

Page 1066 to Page 1322

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

June 1st, 2004 letter you also identify NAC International's assumption that actions taken to comply with the subpoenas, quote, will not give rise to an organizational conflict of interest, end quote. As you know the Department of Justice is not involved in any future procurements relating to this litigation in which NAC International may have an interest and, as a result, has no basis for evaluating conflicts of interest that may exist in such procurements. Accordingly, although we acknowledge your representation regarding conflicts of interest, we have no basis to take any position upon that representation.

THE COURT: Thank you, Mr. Lester.

Whereupon,

CHARLES W. PENNINGTON

having been previously duly sworn, was examined and testified further as follows:

*VOIR DIRE EXAMINATION*

BY MR. LESTER:

Q Mr. Pennington, I just have a couple of quick questions for you. I understand from your testimony yesterday that you have dealt a lot with dry storage casks and cost estimating for those; is that

Page 1150

Page 1152

Page 1151

.... We understand how much fuel is discharged every year by every reactor in the United States. And it's somewhere between 1500 metric tons and 2,000 metric tons.

Page 1153