**Department of Energy**
Washington, DC 20585

June 3, 1997

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Nebraska Public Power District
Attn.: Eugene Lanning, Nuclear Fuel Manager
P.O. Box 499
Columbus, NE 68601

Nebraska Public Power District
Contract DE-CR01-83NE44397
Contract DE-CR01-83NE44475

Dear Mr. Lanning:

This letter follows up on my letter to you dated December 17, 1996, in which I informed you of the Department's anticipated delay in beginning spent nuclear fuel disposal by January 31, 1998, and on the responses from contract holders to the Department's request for comments on how best to accommodate the delay. The Department has reviewed the comments received, and I am attaching to this letter a summary of those comments and the Department's responses to them. The purpose of this letter is to advise you how the Department intends to proceed in light of the anticipated delay.

The Department has determined that two different provisions of the Standard Contract are applicable in the present circumstance: Article IX - Delays, and Article XV - Amendments. Article IX deals specifically with how the parties are to proceed in the event either the Department or the contract holder experiences a delay in its ability to deliver, accept or transport spent fuel or high level waste in accordance with an applicable schedule. Article XV recognizes the "uncertainties necessarily attendant upon long-term contracts" and provides a means by which the parties can mutually agree to amend the contract "as the parties may deem to be necessary or proper to reflect their respective interests." While the Department believes the Article IX remedy governs the presently anticipated delay, we also recognize that the delay may create particular hardships for certain contract holders. Accordingly, in addition to proceeding under the Delays clause, we are inviting any interested contract holder to propose to the Department, in accordance with Article XV, particularized contract amendments that may assist it in dealing with hardships it may experience as a result of the Department's delay in accepting its spent fuel on the contract holder's presently scheduled delivery date.

Printed with soy ink on recycled paper

**Article IX - Delays**

A number of the contract holders submitted comments in response to the Department's December 17, 1996 letter indicating that they believe the Department's delay in accepting spent fuel was avoidable and that an adjustment of fee or other compensation would therefore be appropriate. The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have preliminarily determined that this delay was unavoidable. (A copy of that preliminary determination is attached.) Because of the difference of views regarding whether or not the delay was avoidable, I have determined that a dispute exists within the meaning of Article XVI-Disputes, regarding whether or not the Department's anticipated delay was avoidable. Therefore, I am hereby providing you with 60 days within which to respond to my preliminary determination by submitting a written statement, supported by any relevant documentation, setting forth the factual and legal basis for any contention that the delay was avoidable. After considering any such submissions, I will issue a final determination that will be appealable to the Board of Contract Appeals as described in Article XVI.

If you wish to contest my preliminary determination that the Department's delay in beginning disposal of spent fuel was unavoidable, please submit on or before August 4, 1997, written statements and documentation supporting your position to the following address:

U.S. Department of Energy
Office of Headquarters Procurement Services
ATTN: Ms. Beth Tomasoni, HR-542
1000 Independence Avenue, S.W.
Washington, D.C. 20585

**Article XV - Amendments**

While the Department believes that the delay at issue was unavoidable, and that the Department is therefore not obligated to provide a financial remedy for the delay, as noted above, we recognize that such delay may have resulted in hardship to certain contract holders. Therefore, the Department is prepared to address individual contract holders' spent fuel storage concerns through negotiation of amendments to individual contracts. Specifically, the Department is willing to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel. Possible amendments could include, for example, compensation for onsite storage costs.

If you are interested in proposing amendments to your contract, please contact Mr. David Zabransky at (202) 586-9198 to schedule a meeting for the purpose of discussing such amendments.

Sincerely,

Beth A. Tomasoni
Contracting Officer
Office of Headquarters Procurement Services

Attachments

cc: William R. Mayben (w/o attachment)

**Department of Energy**
Washington, DC 20585

June 3, 1997

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Jerry Hastings
Accounting Department
Sacramento Municipal Utility District
P.O. Box 15830
Sacramento, CA 95852

Sacramento Municipal Utility District
Contract DE-CR01-83NE44415

Dear Mr. Hastings:

This letter follows up on my letter to you dated December 17, 1996, in which I informed you of the Department's anticipated delay in beginning spent nuclear fuel disposal by January 31, 1998, and on the responses from contract holders to the Department's request for comments on how best to accommodate the delay. The Department has reviewed the comments received, and I am attaching to this letter a summary of those comments and the Department's responses to them. The purpose of this letter is to advise you how the Department intends to proceed in light of the anticipated delay.

The Department has determined that two different provisions of the Standard Contract are applicable in the present circumstance: Article IX - Delays, and Article XV - Amendments. Article IX deals specifically with how the parties are to proceed in the event either the Department or the contract holder experiences a delay in its ability to deliver, accept or transport spent fuel or high level waste in accordance with an applicable schedule. Article XV recognizes the "uncertainties necessarily attendant upon long-term contracts" and provides a means by which the parties can mutually agree to amend the contract "as the parties may deem to be necessary or proper to reflect their respective interests." While the Department believes the Article IX remedy governs the presently anticipated delay, we also recognize that the delay may create particular hardships for certain contract holders. Accordingly, in addition to proceeding under the Delays clause, we are inviting any interested contract holder to propose to the Department, in accordance with Article XV, particularized contract amendments that may assist it in dealing with hardships it may experience as a result of the Department's delay in accepting its spent fuel on the contract holder's presently scheduled delivery date.

PENGAD-Bayonne, N.J.
DEFENDANT'S
EXHIBIT
0758

SMUD 061139

d paper

**Article IX - Delays**

A number of the contract holders submitted comments in response to the Department's December 17, 1996 letter indicating that they believe the Department's delay in accepting spent fuel was avoidable and that an adjustment of fee or other compensation would therefore be appropriate. The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have preliminarily determined that this delay was unavoidable. (A copy of that preliminary determination is attached.) Because of the difference of views regarding whether or not the delay was avoidable, I have determined that a dispute exists within the meaning of Article XVI-Disputes, regarding whether or not the Department's anticipated delay was avoidable. Therefore, I am hereby providing you with 60 days within which to respond to my preliminary determination by submitting a written statement, supported by any relevant documentation, setting forth the factual and legal basis for any contention that the delay was avoidable. After considering any such submissions, I will issue a final determination that will be appealable to the Board of Contract Appeals as described in Article XVI.

If you wish to contest my preliminary determination that the Department's delay in beginning disposal of spent fuel was unavoidable, please submit on or before August 4, 1997, written statements and documentation supporting your position to the following address:

U.S. Department of Energy
Office of Headquarters Procurement Services
ATTN: Ms. Beth Tomasoni, HR-542
1000 Independence Avenue, S.W.
Washington, D.C. 20585

**Article XV - Amendments**

While the Department believes that the delay at issue was unavoidable, and that the Department is therefore not obligated to provide a financial remedy for the delay, as noted above, we recognize that such delay may have resulted in hardship to certain contract holders. Therefore, the Department is prepared to address individual contract holders' spent fuel storage concerns through negotiation of amendments to individual contracts. Specifically, the Department is willing to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel. Possible amendments could include, for example, compensation for onsite storage costs.

If you are interested in proposing amendments to your contract, please contact Mr. David Zabransky at (202) 586-9198 to schedule a meeting for the purpose of discussing such amendments.

Sincerely,

Beth A. Tomasoni

Beth A. Tomasoni
Contracting Officer
Office of Headquarters Procurement Services

Attachments

cc: Ms. Jan Schori (w/o attachment)

June 3, 1997

# CONTRACTING OFFICER'S PRELIMINARY DETERMINATION THAT THE DEPARTMENT OF ENERGY'S DELAY IN BEGINNING SPENT FUEL DISPOSAL WAS UNAVOIDABLE

## BACKGROUND

In Indiana Michigan Power v. DOE, 88 F.3d 1272 (D.C. Cir. 1996), the Court held that section 302(a)(5)(B) of the Nuclear Waste Policy Act of 1982, as amended (Amended NWPA), creates an obligation in the Department of Energy (DOE), in return for payment of fees by utilities that contracted with DOE for disposal services, to start disposing of spent nuclear fuel no later than January 31, 1998. The Court remanded the matter to DOE for further proceedings consistent with the court's opinion. DOE advised contract holders that it anticipated that it will be unable to begin acceptance of spent nuclear fuel for disposal by January 31, 1998. The Office of Civilian Radioactive Waste Management (OCRWM) contends that the delay in disposing of the contract holders' spent fuel is an "unavoidable delay" as defined in Article IX of the Contract, and, accordingly, DOE is not liable for damages caused by failure to perform under the terms of the Contract. In keeping with the mandate of the Court, DOE's Office of Procurement has been requested to review the relevant provisions in the Contract and preliminarily determine whether or not the delay in beginning disposal of spent fuel is unavoidable within the meaning of Article IX.

Article IX provides, in brief, that neither the Government nor the contract holder shall be liable for damages caused by failure to perform its obligations if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. This article indicates that an unavoidable delay includes circumstances beyond the reasonable control of a party to the Contract, such as acts of God, of the public enemy, or of Government in either its sovereign or contractual capacity. In the event of an unavoidable delay, the parties are to readjust schedules as appropriate to accommodate the delay.

## PRELIMINARY DETERMINATION

The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have reviewed the record provided by OCRWM, and I preliminarily find that this delay was due to circumstances beyond the reasonable control of DOE and therefore the anticipated delay was "unavoidable" within the meaning of Article IX of the Standard Contract.

SMUD 061142

June 3, 1997

## BACKGROUND OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM

In order to understand the context within which the delays described below have occurred and the basis for my preliminary determination, it is helpful to review the history of the program and how DOE's statutory authority for the implementation of its disposal obligation has evolved over time.

While spent fuel discharged from nuclear power reactors has been safely stored for decades with no discernible adverse effects on the health and safety of the public, spent fuel will remain radioactive, and thus must be isolated, for thousands of years. Consistent with the views of other nations, United States policy has been that our responsibilities to future generations are better discharged by a strategy of final disposal than by reliance on storage. Deep geologic disposal is internationally recognized as a safe and viable means of disposing of spent nuclear fuel. OCRWM, DOE, Mission Plan 3, DOE/RW-0005 (1985), Environmental and Ethical Basis of Geologic Disposal 8,18, Nuclear Energy Agency, OECD, Paris, France. However, there is not yet any permanent disposal facility for spent nuclear fuel anywhere in the world.

The Nuclear Waste Policy Act of 1982 was enacted (NWPA) against this background and consistent with federal policy to utilize deep geologic disposal as a permanent solution to spent fuel and high level radioactive waste management (hereinafter used interchangeably). The NWPA established the Office of Civilian Radioactive Waste Management (OCRWM) within the Department of Energy (DOE) to develop and implement a spent fuel management and disposal system for the nation.

DOE recognized in its 1985 Mission Plan the difficult technical and institutional challenges that must be overcome during the course of this program. The technical challenges are great because the isolation of spent fuel involves long time periods not often considered in other human endeavors. The institutional challenges are complex because a few states, and possibly Indian Tribes, have been and will be, asked to host, for the good of the nation, spent fuel disposal or storage facilities. Many states will be traversed by shipments of spent fuel to one or more centralized facilities. Mission Plan 3. The NWPA not only requires extensive consultation and cooperation with potential host jurisdictions, but also requires grants to be made to such jurisdictions for the purpose of conducting scientific oversight and public information activities. One of the findings of the NWPA is that "State and public participation in the planning and development of repositories is essential in order to promote public confidence in the safety of disposal." Section 111(a)6) of the NWPA.

The original NWPA required DOE to site, obtain a license, construct, and operate two geologic repositories. The NWPA gave DOE 180 days to issue general guidelines for the recommendation of sites, which were published in final in November 1984 after extensive public review and concurrence by the Nuclear Regulatory Commission (NRC). Draft environmental assessments (EA) for nine potential sites were issued in December 1984. More than 20,000 comments were received. As required by the NWPA, after public briefings and hearings on the draft EA's, in

1986, DOE issued five final EA's and selected five potentially acceptable sites for the first repository in Mississippi, Nevada, Texas, Utah, and Washington. DOE then recommended to the President, as required by the NWPA, that three sites (Yucca Mountain, Nevada; Hanford, Washington; and Deaf Smith County, Texas) be characterized to determine their suitability as repositories. The NWPA also required that DOE select potential sites for the second repository. In 1986, DOE issued a draft area recommendation report that identified potentially acceptable sites for the second repository in 12 areas of seven states and an additional eight backup candidate areas in the same seven states. That report was not finalized because DOE suspended work on the second repository so that information gained in the first repository program could be applied to the second repository. OCRWM, DOE Mission Plan Amendment 49-50, DOE/RW-0128 (1987).

In compliance with section 141 of the NWPA, DOE completed a study on the need for a Monitored Retrievable Storage facility and submitted a timely proposal to Congress in 1987 for authorization to construct and operate a licensed temporary storage facility in Oak Ridge, Tennessee. DOE stated in 1987 that its plan to start storage operations in 1998 would allow the system to receive spent fuel a full five years sooner than without the storage facility under then-current schedules. OCRWM, DOE Monitored Retrievable Storage, Submission to Congress Volume 1, page 3 (March 1987), DOE/RW-0035/1-Rev 1.

The Nuclear Waste Policy Amendments Act of 1987 made significant changes to the program. The amendments directed DOE to characterize only the Yucca Mountain site for its suitability as a repository site and prohibited site-specific activities for a second repository. With regard to temporary storage for the spent fuel, the amendments: 1) established an independent Monitored Retrievable Storage (MRS) Review Commission to report to Congress in 1989 on the need for an MRS facility; 2) prohibited MRS siting until the site for the first repository has been recommended to the President and prohibited MRS construction until the issuance of an NRC construction authorization for the repository; 3) limited the capacity of the MRS facility to no more than 10,000 metric tons of heavy metal; 4) nullified DOE's recommendation to site an MRS facility in Tennessee; 5) prohibited siting an MRS facility in Nevada; and 6) established the Office of Nuclear Waste Negotiator for the purpose of finding a volunteer site for an MRS facility. Furthermore, the amendments established an eleven-member Nuclear Waste Technical Review Board to be appointed by the President to evaluate the technical and scientific validity of the program activities.

Although the amendments were intended to ease the task of the geological repository program by limiting site characterization activities to one site, the singling out of Nevada as the only potential site caused the State, which strongly opposed that decision, to greatly increase its efforts to halt the program. Shortly thereafter, the Nuclear Waste Technical Review Board recommended that the major component of the site characterization program at Yucca Mountain be reevaluated.

And the statutory prohibition on siting a temporary storage facility before a site for a repository has been recommended to the President made it virtually impossible for DOE to begin spent fuel acceptance by 1998.

## BASIS FOR DETERMINATION

When Congress passed the Nuclear Waste Policy Act in 1982 (NWPA), it prescribed a complex and cumbersome process for the construction and operation of a first-time, state-of-the-art, deep geologic facility for the permanent disposal of the Nation's spent nuclear fuel and high-level waste. Because such a facility had never been constructed before, either in this country or elsewhere in the world, there was no established blueprint for achieving this goal. Congress, nevertheless, established the expectation that a repository could be sited, licensed, constructed and operating by January 31, 1998. Experience has shown that the schedule established by the NWPA for an operational geologic repository was overly optimistic and underestimated the technical, regulatory and institutional challenges that would confront such effort. I conclude that the Department's inability to meet the date established by Congress was the result of unavoidable delay and that the causes for that unavoidable delay fall into six broad and overlapping categories:

1. Technical problems
2. Regulatory delays
3. Roadblocks to implementation of interim or monitored retrievable storage
4. Funding restrictions
5. Litigation delays
6. Consultation requirements

The discussion that follows demonstrates how each of these causes contributed to the delay.

## 1. TECHNICAL PROBLEMS

As a state-of-the art scientific and engineering project grounded in geoscience, hydrology and other scientific endeavors, and one that must project through mathematical modeling of facility performance of a natural and engineered system for at least 10,000 years, the site characterization program ran into many technical difficulties that led to unavoidable delay in commencement of repository operations. Examples of these technical problems include:

> **Delay in development of prototype dry drilling equipment.** Characterization of the unsaturated rocks at Yucca Mountain required the collection of undisturbed samples from boreholes up to 2,500 feet deep. Then-current drilling technology methods used for environmental, water well, or oil field drilling could not be utilized to obtain the required undisturbed samples. Thus, special, first-of-a-kind drilling systems had to be designed, procured and tested by DOE before drilling could proceed.

Moreover, air had to be used as the circulating medium, rather than mud, to assure that samples were representative of the in situ rock. Air is not a particularly efficient circulation medium for removing cuttings from the bottom of a hole, and a special reverse/vacuum assist system had to be developed. Penetration rates were lower than expected; equipment development time was longer than anticipated; and the cost of borehole drilling and sampling was greater than expected. As a result, the sampling and analysis of the rock at Yucca Mountain was delayed. Acquisition Technical Specifications for the LM-300 Drill Rig, the LM-300 Vacuum System, and the Venturi Reverse Air Circulation Drill Bits.

**Available methods to address volcanism and faulting were inadequate.** Defining the potential hazards posed by volcanoes and earthquakes requires age-dating of soil and rock deposits. Available methods proved to be inadequate to characterize the age either of the Lathrop Wells cinder cone, a volcanic upwelling near Yucca Mountain, or the earthquake faulting at Yucca Mountain. This led to unprecedented scientific debate over the age and origin of the deposits in and around the Yucca Mountain area. As a result, new age-dating techniques had to be pioneered for use in the Yucca Mountain area. Several age-dating techniques were developed, used and then revised based on the scientific debate. We expect to reach closure with Nuclear Regulatory Commission staff on this issue this year. OCRWM, DOE, Characterization Progress Report: Yucca Mountain, Nevada, Number 15, pages A52-A55, DOE/RW-0498 (April 1997)

**Groundwater Debate--The Szymanski Reports.** The vein-like deposits of calcite and silica exposed in the walls of Trench 14 at the Bow Ridge Fault at Yucca Mountain and extending to the floor of the trench have been the subject of extensive scientific debate. The debate concerns the origin of the water responsible for depositing the minerals in the veins. Most scientists believe the deposits were formed by downward percolating rainwater that dissolved carbonate minerals and silica as it moved through the soils and redeposited them when the waters evaporated at lower levels. However, some scientists, including Jerry S. Szymanski, a scientist employed by DOE at Yucca Mountain, believed that these deposits could have been placed by an upward movement of the groundwater aquifer caused by seismic activity. OCRWM, DOE, FY 1992 Annual Report To Congress 20, DOE/RW-0422 (July 1993)

Mr. Szymanski published two reports on this problem, in 1989 and in 1992. Because of the potentially serious impact of the concerns raised on the suitability of Yucca Mountain as a geological repository for spent fuel, DOE concluded that it was necessary to accept Mr. Szymanski's recommendation for "an external and independent peer review" of his 1989 report. In January 1990, a five-member panel was selected. The reports resulting from the peer review were completed in 1991. Those reports prompted still further debate, and additional reviews were performed, one by a panel of 17 scientists at the National Academy of Sciences, and one, at the request of the NRC, by the Center of

Nuclear Waste Regulatory Analysis. The second report was reviewed by the United States Geological Survey and the Los Alamos National Laboratory. These reviews were submitted to OCRWM's Yucca Mountain office in 1992 and indicated the scenarios for such an occurrence were not plausible. Szymanski History Report 2-4, TRW Environmental Safety Systems, Inc. (December 31, 1992). However, DOE had to utilize substantial resources to address these concerns, which diverted resources from other necessary scientific work.

**Delay in hydrologic testing at Hanford.** While DOE was still required by the NWPA to characterize multiple sites for a possible repository, in order to preserve data pertaining to the local groundwater flow system after shaft construction at Hanford, changes had to be made in the hydrologic testing program. This resulted in a delay of about one year in the exploratory shaft schedule for that site. Furthermore, in consultation with the NRC, DOE decided that the hydrologic tests to be conducted before the start of exploratory shaft construction should be far more comprehensive than originally planned. This delayed shaft construction for approximately two years. Mission Plan Amendment 7, 8.

## 2. REGULATORY DELAYS

Because of the nature and potential severity of the risks associated with radioactive waste disposal, the difficulty of the technical challenges posed by a program designed to safely isolate material for 10,000 years, and the resulting public concerns, the spent fuel disposal program is subject to regulation or oversight by a large, perhaps unprecedented number of agencies and organizations. Each brings its own perspectives and expertise to the task. The challenges of meeting all of the applicable regulatory requirements and expectations and of attempting to build consensus where different regulators have had different approaches to the same or related problems have led to significant and unavoidable delays in the Department's ability to begin to accept spent fuel for disposal.

The following is a description of some of the regulatory, oversight and advisory bodies with whom DOE must work to reach a consensus on the safety and environmental soundness of siting and constructing a repository, and some examples of regulatory issues that have delayed development of a geologic repository.

**Nuclear Regulatory Commission.** The NRC is responsible for approving any OCRWM storage or disposal facility site and its design. It must license the facility and inspect it during construction and operation. The development of criteria for a deep geologic disposal facility has required the NRC to move well beyond its normal scope of activities, which focus primarily on engineered, not natural, systems. The Commission is also responsible for setting packaging standards and regulates the shipment and containment

security of spent nuclear fuel shipments to and from commercial nuclear power plants. Examples of issues raised by the NRC that have unavoidably delayed site characterization for the geologic repository include:

**Inferred fault in the proposed location of the exploratory shaft at Yucca Mountain.** The NRC expressed concern regarding an inferred fault (one that appears to exist but cannot be definitively determined) in the vicinity of the proposed location of the exploratory shafts at Yucca Mountain. In response, DOE had to undertake a technical assessment review in order to further study the possible fracturing of rocks when sinking shafts. Progress Report, Number 2, page 11.

**Unprecedented application of NRC quality assurance standards for reactors to scientific investigations for a repository.** NRC regulations require DOE to implement a quality assurance (QA) program for repository site characterization that is based upon the criteria in 10 CFR Part 50, Appendix B, which was promulgated for use in nuclear power reactor license applications. NRC defines quality assurance as all of those planned and systematic actions necessary to provide adequate confidence that the geologic repository and its subsystems will perform satisfactorily in service. 10 CFR 60.150. Applying the NRC's quality assurance approach for reactors to both the engineered features and the scientific investigation of natural features in a geoscience program at the cutting edge of technology proved to be very difficult. The quality assurance concerns of the NRC were not completely resolved until 1991. OCRWM, DOE, Annual Report to Congress 29, DOE/RW-0144 (April 1987); OCRWM, DOE, FY 1992 Annual Report To Congress 5-6, DOE/RW-0422 (July 1993)

**Design control objections to the Site Characterization Plan.** The NWPA requires DOE to issue a general plan for its site characterization activities. Section 112(b)(1)(A) of the NWPA. In 1988, DOE issued a Consultation Draft Site Characterization Plan (SCP) and submitted it to NRC for review. NRC indicated 5 areas of potential objections. DOE and NRC worked to resolve these issues and the SCP was issued in 1988. In July 1989, NRC issued objections to the design control portions of the SCP that resulted in an on-going series of interactions with the NRC. In March 1993, NRC lifted the design control objections, allowing DOE to proceed with the Exploratory Studies Facility design and construction. The three and one-half year period of delay in the start of construction following issuance of the SCP overlapped the development of the QA plan and was primarily driven by the inability to bring about resolution on the QA requirements for Exploratory Studies Facility co-located with a repository.

June 3, 1997

**U.S. Environmental Protection Agency.** The Environmental Protection Agency (EPA) is responsible for regulating offsite releases of radioactive material repositories. NWPA, Section 121(a). EPA promulgated such standards in 1986 (40 CFR Part 191), but they were held invalid and remanded to EPA for reconsideration. Natural Resources Defense Council v. EPA, 824 F.2d 1258 (1st Cir. 1987). The Energy Policy Act of 1992 required EPA to develop separate site-specific radiation standards for a repository at Yucca Mountain. EPA has not yet proposed new radiation protection standards. Once EPA promulgates them, the NRC must incorporate the new EPA standards in its repository licensing regulations. The lack of clearly-defined standards has complicated the Department's ability to focus its site investigation activities on clearly-defined regulatory requirements.

**Nuclear Waste Technical Review Board.** As noted above, the 1987 amendments to the NWPA established the Nuclear Waste Technical Review Board to oversee DOE's work at Yucca Mountain. In the late 1980's, the Board recommended that DOE review alternatives to DOE's then-current plan to construct two exploratory shafts and a small underground facility for site characterization. The Board also recommended that DOE conduct more extensive underground investigations than previously planned and maximize the use of the most modern mechanical excavation techniques and tunnel construction methods. DOE reviewed 34 options for the configuration and construction of the Exploratory Studies Facility and concluded that it should use ramps instead of shafts for the Studies Facility. DOE also initiated procurement of state-of-the-art tunnel-boring equipment. The Facility was not completed until April 1997. The significant increase in the extent of underground investigations undertaken since the development of the Mission Plan in 1985 has resulted in a seven-year delay from the schedule originally set in the 1985 Mission Plan. First Report to the U.S. Congress and the U.S. Secretary of Energy from the Nuclear Waste Technical Review Board 12,13 (March 1990); Third Report to the U.S. Congress and the U.S. Secretary of Energy from the Nuclear Waste Technical Review Board 9-11,13 (May 1991); Mission Plan 59.

**Department of Interior (Bureau of Land Management, Fish and Wildlife Service, Bureau of Indian Affairs, U.S. Geological Survey).** The Bureau of Land Management(BLM) is responsible for approval of plans to site waste management facilities on Federal lands over which it has jurisdiction. BLM has provided DOE access to Yucca Mountain for site investigation. As discussed below, BLM's grant of a right-of-way has been challenged at the Interior Board of Land Appeals and in court. The Fish and Wildlife Service, which is responsible for implementation of the Endangered Species Act, announced its emergency listing of the desert tortoise, which inhabits areas of Yucca Mountain, as an endangered species. As a result of the listing, DOE had to restrict the access to the Yucca Mountain site, and prepare a biological assessment to evaluate the Project's potential effects on the tortoise and alternatives for avoiding or minimizing impacts. OCRWM, DOE, Progress Report on the Scientific Investigation Program for the

Nevada Yucca Mountain Site, Number 2, page 11, DOE/RW-0292P (1990)(Progress Report). The Bureau of Indian Affairs (BIA) is the Federal agency with primary responsibility for working with federally-recognized Indian Tribal governments, including administration and management of land held in trust by the United States for Indians. BIA is the agency responsible for making the determination whether particular Indian tribes are affected tribes under Section 2(2)(B)of the NWPA. The U.S. Geological Survey (USGS) serves as a technical advisor to DOE and the NRC. Under a memorandum of understanding with DOE, USGS conducts geologic investigations of the Yucca Mountain site.

**Department of Transportation (Federal Railroad Administration, Federal Highway Administration, Motor Carrier Safety Program).** The Department of Transportation (DOT) regulates the shipment in commerce of all radioactive material, including spent nuclear fuel shipped under the NWPA, by all modes of transport. DOT is responsible for developing and enforcing regulations covering the labeling, classification, and marking of all spent fuel packages, as well as routing choice and carrier qualifications. DOT regulations on the use of preferred routes for highway shipments will affect the selection of routes for OCRWM shipments of spent nuclear fuel and high-level radioactive waste. The Federal Railroad Administration (FRA) was created to promote and enforce safety throughout the U.S. railroad system. The Office of Motor Carriers within the Federal Highway Administration (FHA) administers the Motor Carrier Safety Assistance Program to enhance commercial motor vehicle safety on the Nation's highways. This program develops policies, standards, and procedures to comply with Federal safety and hazardous materials regulations and monitors field inspection, investigation, and enforcement activities.

**Department of Labor (Occupational Safety and Health Administration).** The Occupational Safety and Health Administration (OSHA) regulates worker health and safety for workers involved in the construction of the Exploratory Studies Facility and site characterization at Yucca Mountain. When operation of the repository begins, conditions for all workers involved in transportation, temporary storage, or burial of the wastes will have to be in compliance with OSHA regulations.

**General Accounting Office.** The General Accounting Office (GAO) is the investigative arm of Congress, headed by the Comptroller General. Responsible for examining matters relating to the receipt and disbursement of public funds, it conducts audits and evaluations of Federal Government programs and activities, including OCRWM. Section 304(d) of the NWPA requires the Comptroller General to conduct an annual audit of the OCRWM program.

**Advisory Committee on Nuclear Waste.** The Advisory Committee on Nuclear Waste (ACNW) was established by the NRC in 1988 to provide the NRC with independent

reviews of, and advice on, nuclear waste facilities, including disposal of spent nuclear fuel and high-level radioactive wastes for geologic repositories. In performing its work, the ACNW reviews and reports on those areas of concern referred to it by the NRC and will undertake other studies and activities on its own initiative related to areas of regulatory activity identified by the NRC.

**Nevada Division of Environmental Protection and Nevada State Engineer.** The Yucca Mountain project, like other federal actions, is subject to extensive state environmental regulation. Because Nevada is an unwilling host for this project, the need to obtain state environmental permits has engendered considerable unavoidable delay. In 1988 and 1989, DOE submitted applications to Nevada for air, underground water withdrawal, and underground injection permits in order to begin site characterization at Yucca Mountain. The State failed to act on those applications. Instead, the State returned the permit applications to DOE on the grounds that: (i) Nevada law made it illegal to store high-level radioactive waste in Nevada, and (ii) recent State legislative resolutions opposed the siting of a radioactive waste repository anywhere in the State and prohibited a repository at Yucca Mountain.

A location was originally selected in Area 25 of the Nevada Test Site to conduct prototype drilling in order to develop a drilling system for Yucca Mountain site characterization. Test drilling at Yucca Mountain was delayed because Nevada refused to issue an operating permit required by Nevada air-quality regulations. In order to proceed, DOE moved the test drilling to a site in Utah to test the prototype dry drilling equipment. Progress Report, Number 1, page 11.

In 1990, DOE, through the Department of Justice, brought suit to force the State to act on the permit applications and to prohibit Nevada from unlawfully interfering with its site characterization activities. The State's interference with site characterization continued until May of 1991 when the court ordered Nevada to process the air and underground injection permits. In July 1991, after issuance of the two permits, DOE began the first surface disturbing work at Yucca Mountain since 1986. In March 1992, following a lengthy hearing, the State issued a water permit to DOE to withdraw water at the Yucca Mountain site. Progress Report Number 5, pages 2-3, DOE/RW-0307P-5(June 1992)

## 3. Roadblocks to Implementation of Interim or Monitored Retrievable Storage

The Department recognized early in the life of the program that it would be extremely difficult to have an operating geologic repository ready to accept spent nuclear fuel by January 31, 1998, and it made two different efforts to provide for temporary storage by that date. The first effort was rebuffed by the utilities; the second effort was blocked by Congress. In fiscal year 1994, DOE was barred from providing funding assistance to facilitate the separate efforts of the Nuclear Waste Negotiator.

**A. Federal Interim Storage.** Beginning in January 1984, DOE offered to provide a Federal Interim Storage Program to utilities as authorized by Subtitle B of the NWPA. OCRWM, DOE, Initial Implementation Plan for Deployment of Federal Interim Storage Facilities for Commercial Spent Nuclear Fuel DOE/RW-0003(1984); OCRWM, DOE, Implementation Plan for Deployment of Federal Interim Storage Facilities for Commercial Spent Nuclear Fuel DOE/RW-0019(1985); Id., DOE/RW-0045(1986); Id. DOE/RW-0120(1986); Id. DOE/RW-0186(1988). The Department considered a number of alternative storage methods, potential sites, and transportation arrangements; it analyzed the need for FIS; and it developed a plan for deployment of FIS, including estimated costs and schedules. Nuclear Waste Policy Act Project Office, DOE, Federal Interim Storage Fee Study for Civilian Spent Nuclear Fuel: A Technical and Economic Analysis, DOE/S-0023(1983). No utility elected to participate in this program. Thus, the program terminated in accordance with the NWPA on January 1, 1990.

**B. Monitored Retrievable Storage.** In 1987, DOE recognized that it could not begin to dispose of spent fuel in a repository before 2003. In light of the statutory and contractual provisions calling for spent fuel acceptance to begin in 1998, the Department announced that its preferred strategy was "to meet the terms of the contract ... based on a waste-management system that includes an integral MRS [monitored retrievable storage] facility." However, DOE was prevented from siting, constructing and operating an MRS facility, first as the result of litigation initiated by the State of Tennessee, which temporarily blocked submission of a proposal to Congress to locate a storage facility in that State, and subsequently by action of Congress in the 1987 amendments to the NWPA.

Section 141(b) of the NWPA directed DOE to complete a detailed study of the need for and feasibility of an MRS and to submit to Congress on or before June 1, 1985, a proposal for construction and operation of one or more MRS facilities for receiving and storing spent nuclear fuel. Pursuant to this direction, DOE completed a study on the need for an MRS and timely prepared a proposal to Congress for authorization to construct and operate a licensed MRS at Oak Ridge, Tennessee. Congressional Proposal EC-1022, 100th Congress. The schedule proposed by DOE called for an MRS facility to be licensed, constructed, and operational at the Oak Ridge site by January 31, 1998.

In 1985, Tennessee sued to block the submission of the proposal to Congress. In 1986, the U.S. District Court in Tennessee granted an injunction preventing submission of the MRS proposal to Congress. That decision was subsequently overturned in Tennessee v. Herrington, 806 F.2d 642 (6th Cir. 1986). The Supreme Court denied review in 1987. Two years were lost in litigation. Moreover, by that time, Congress stepped in to permanently block use of the Oak Ridge site for an MRS and to impose new restrictions with respect to siting an MRS facility at any other site, thus virtually assuring that DOE would not have an operational MRS facility by January 31, 1998. First, Congress nullified DOE's proposal to site, construct and operate an MRS at Oak Ridge, Tennessee. Section

142(a) of the amended NWPA. Second, Congress linked authority to site, construct and operate an MRS to significant progress on the geologic repository, and provided that no MRS could be constructed in the State of Nevada. Sections 142 and 148 of the Amended NWPA.

The 1987 amendments to the NWPA established within the Executive Branch the Office of the Nuclear Waste Negotiator, which was authorized for five years to attempt to locate and recommend for Congressional approval a voluntary candidate site for an MRS. Although the Negotiator's Office was reauthorized for one more year after its original expiration date, it never achieved its purpose of finding a voluntary candidate site. The failure to site an MRS was likely due in part to the provision in DOE's FY 1994 appropriations (Energy and Water Development Appropriations Act, 1994, Pub. L. No. 103-126, October 28, 1993) that prohibited DOE from providing grants to States and Tribes for the purpose of studying the feasibility of siting an MRS.

4. ***Funding Restrictions.***

OCRWM's waste disposal and storage program activities are funded through fees paid by Standard Contract holders to the Nuclear Waste Fund. The Nuclear Waste Fund was established to ensure that funds would be available as needed to implement commitments in the NWPA. H.R. Rep. No. 785, 97th Cong., 2d Sess., pt. 1, at 77(1982). Congressional appropriations are required, however, as a prerequisite for OCRWM expenditure of Nuclear Waste Fund monies.

Congressional appropriations matched funding requests during the first several years of the Program. However, deficit control legislation enacted in 1985, the Gramm-Rudman-Hollings deficit control legislation, began to constrain funding requests and appropriations, thus resulting in unavoidable delays in the program. The Waste Fund was not exempted from the unified budget of the U.S. Government as a whole. From FY 1986 through FY 1990, DOE requested increased appropriations for site characterization, but appropriations declined from $499 million to $295 million.

Passage of the Omnibus Budget Reconciliation Act of 1990 resulted in additional budget pressures on the OCRWM's program. Under this legislation, overall budget constraints on DOE discretionary funds resulted in amounts requested for OCRWM operations at levels well below amounts needed to maintain OCRWM's planned schedules. Further exacerbating the funding problem, Congress appropriated amounts significantly below the requested levels. The total appropriations shortfall from FY 1988 through FY 1994 amounted to about $850 million.

From time-to-time, Congress has also restricted spending on particular activities. For example, in an attempt to meet the 1998 deadline, DOE had initiated innovative approaches to repository development, such as the integration of the exploratory shafts into the construction of the repository. However, the conference report accompanying the Department's FY 1987

appropriations directed the Department not to spend any FY 1987 funds for drilling exploratory shafts. H.R. Rep. No. 99-1005, 99th Cong., 2d Sess. 651 (1986). This single action alone added a year to the schedule for sinking shafts.

In 1994, OCRWM reconfigured its program planning under a method designated the Program Approach in order to more effectively deal with the budget constraints. Congress supported it with an FY 1995 appropriation of $522 million. (The Administration had requested $532 million.) For FY 1996, the Administration requested $630 million for OCRWM to continue the new Program Approach, but Congress appropriated only $400 million and earmarked $85 million of that for interim storage. Because there is no statutory authority to site and construct a storage facility, the effective FY 1996 funding level was $315 million, which represented a forty percent reduction in the level of effort from FY 1995. In response, DOE was required to reduce OCRWM's Yucca Mountain operations by one-third. Work on waste acceptance activities and interim storage facility design efforts were also reduced.

**5. Litigation Delays**

As described above, some of the regulatory delays have also entailed litigation. The spent fuel and high level radioactive waste management program has been subject to approximately two dozen different lawsuits. Many--but not all--of those lawsuits were brought by Nevada, reflecting its strong and continuing opposition to the siting of a spent fuel and high level radioactive waste disposal facility within its borders. Regardless of who initiated the suits, however, they have required considerable management attention, thus diverting resources that could otherwise have been devoted to program progress.

1. Wisconsin Electric Power Co. v. DOE, 778 F.2d 1 (D.C. Cir. 1985) Held: The fee charged by DOE for disposal of nuclear waste applies only to electricity generated by a civilian nuclear power reactor and sold on or after April 7, 1983. The fee does not apply to electricity that a generating plant consumes itself.

2. General Electric Uranium Management Co. v. DOE, 584 F. Supp. 234 (D.D.C. 1984), aff'd, 764 F.2d 896 (D.C. Cir. 1985) Held: The court of appeals has exclusive jurisdiction to review rules adopted pursuant to the NWPA; DOE's one-time fee based on nuclear fuel burnup for disposal of nuclear spent fuel used to generate electricity prior to April 7, 1983 was reasonable exercise of discretion.

3. Nevada ex rel. Loux v. Herrington, 777 F.2d 529 (9th Cir. 1985) The Court employed an expansive reading of NWPA funding provisions to grant State of Nevada funding for pre-site characterization studies.

4. Texas v. DOE, 764 F.2d 278 (5th Cir. 1985), cert. denied, 474 U.S. 1008 (1985) Held: Designation by the Secretary of Energy of two sites in Texas as potentially

acceptable sites for a nuclear waste repository was not a "final order" for purposes of review under the NWPA. The Court noted that designation of sites would be revisited in the repository nomination process.

5. Tennessee v. Herrington, 806 F.2d 642 (6th. Cir. 1986) Held: The court of appeals has exclusive and original jurisdiction to review actions of the Secretary of Energy regarding compliance with National Environmental Policy Act; DOE was not required to consult with Tennessee before sending Congress its proposal for location and construction of an MRS facility.

6. Nevada v. Herrington, 827 F.2d 1394 (9th Cir. 1987) Held: The NWPA does not require that DOE provide funding to finance litigation by Nevada.

7. National Assn. of Regulatory Utility Commissioners v. DOE, 851 F.2d 1424 (D.C. Cir. 1988) Held: DOE did not abuse its discretion in denying petitions for rulemaking for a "notice" tentatively establishing a method for allocating waste disposal costs between government defense and commercial waste producers.

8. Consolidated Edison Co. of N.Y. v. DOE, 870 F.2d 694 (D.C. Cir. 1989) Held: The fee payable on electricity generated and sold on or after April 7, 1983 may not include a charge for electricity lost in transmission and distribution.

9. Commonwealth Edison Co. v. DOE, 877 F.2d 1042 (D.C. Cir. 1989) Held: The court of appeals has original and exclusive jurisdiction to hear Nuclear Waste Fund cases; DOE's determination that the formula calculating interest paid by utilities into the Nuclear Waste Fund is to be based on market or investment yield of Treasury Bills instead of the lower "discount rate" was lawful.

10. Nevada v. Watkins, 914 F.2d 1545 (9th Cir. 1991), cert. denied, 111 S. Ct. 1105 (1991) Held: The Secretary of Energy's decision to continue site characterization of a potential radioactive waste repository in Nevada was not unconstitutional or otherwise contrary to law; Nevada's attempted legislative veto of the Secretary's site characterization activities stood as an obstacle to the accomplishment of Congress' purposes and objectives under the NWPA and was preempted under the Supremacy Clause.

11. Nevada v. Jamison, 918 F.2d 854 (9th Cir. 1990), cert. denied, 111 S. Ct. 2052 (1991) Held: Nevada did not have standing to challenge BLM's 1988 grant of a 13 year-right-of-way over public lands near Yucca Mountain for site characterization.