June 3, 1997

12. Counties of Inyo, California, and Esmeralda, Nevada v. DOE, 925 F.2d 1216 (9th Cir. 1991) Held: The Secretary of Energy's decision not to designate the counties "affected units of local government" was inconsistent with the NWPA.

13. TRW Environmental Safety Systems v. U.S., 18 Claims Court 33 (Cl. Ct. 1989) Held: DOE was enjoined from awarding the systems engineering and development contract for the management of the repository program to Bechtel Systems Management, Inc.

14. Nevada v. Watkins, 943 F.2d 1088 (9th Cir. 1991) Held: Claims under the National Environmental Policy Act challenging the adequacy and selection of repository sites were moot in light of the 1987 statutory designation of Yucca Mountain as the sole site for characterization.

15. Nevada v. Watkins, 939 F.2d 710 (1991) Held: The promulgation of siting guidelines for repositories (10 CFR Part 960) was preliminary decisionmaking under the site nomination provisions of Section 112 of the NWPA; judicial review was barred until the Secretary made his final recommendation on the Yucca Mountain site.

16. In The Matter of DOE Application 52338 (March 2,1992) Held: The State Engineer of Nevada found that there was sufficient unappropriated water at the proposed source to appropriate 94.83 acre feet of water per year (.2 cubic feet per second flow) for ten years from Nevada Test Site well J-13 for use at Yucca Mountain for site characterization; the appropriation would not conflict with existing water rights; and the proposed use does not threatened the public interest. The Nevada Engineer also concluded that the monitoring plan proposed by DOE and approved by the Park Service is sufficient to protect all adjacent water related resources, including those of the National Park Service at Devil's Hole National Park.

17. United States v. Nevada, Case No. CV-S-90-065-HDM (D.Nev. May 13, 1991) Held: Nevada was required to process the DOE applications for permits; the air and surface permits were to be issued forthwith.

18. Nevada v. Watkins, No. 92-70055, 993 F.2d 1442 (9th Cir. 1993) Held: DOE's interpretation of the payments-equal-to-taxes (PETT) provisions of the NWPA was reasonable; DOE's procedures allowed the State to make its own estimate of PETT and furnished an appeal process through DOE's Office of Hearings and Appeals.

19. In re State of Nevada, IBLA 88-229 (June 22, 1994) Held: The State had no standing before the Department of Interior Board of Land Management to question Bureau of Land Management's issuance of 13 year right-of-way-reservation over public lands near Yucca Mountain for site characterization purposes.

20. Nevada v. O'Leary, 57 F.3d 1078 (9th Cir. 1995) Held: Section 113 of the NWPA committed site characterization to the Secretary's discretion, and the Secretary did not have a duty to determine at the earliest possible moment whether the calcite-silica deposits at the site were disqualifying. Because the Secretary was not required to promulgate the siting guidelines as rules, judicial review of the siting guidelines was unavailable.

21. Nevada v. O'Leary, 63 F.3d 932 (9th Cir. 1995) Held: The Court of Appeals updated the district court determination that Nevada had not made a showing under Rule 27 of the Federal Rules of Civil Procedure that there was sufficient to preserve the testimony of 27 scientists.

22. Indiana Michigan Power Co. v. DOE, 88 F. 3d 1272 (D.C. Cir. 1996) Held: In return for the payment of fees by utilities, DOE is obligated to begin disposing of the utilities' spent nuclear fuel by January 31, 1998.

23. Nevada v. O'Leary, No. 96-70774 (9th Cir.) Nevada is seeking an order to compel the Secretary to make payments to the State for FY 96 oversight and monitoring activities under Sections 116 of the NWPA. This case is still pending.

6. **Consultation Requirements.** DOE and its predecessor agencies were founded in the spirit of a war emergency with the development of atomic weapons as a principal mission. This led to a culture of secrecy and a priority on national security that sometimes overshadowed safety, environmental and public participation concerns. The NWPA adopted a sharply different approach. Section 111(a)(6) recognized that "State and public participation in the planning and development of repositories is essential to promote public confidence in the safety of disposal." Not only is any repository or storage facility constructed under the NWPA subject to NRC licensing and the public hearing process that entails, but virtually every element of DOE's spent fuel management program is subject to extensive consultation and public comment requirements. As is appropriate for a program of this magnitude and controversial nature, the Mission Plan, the siting guidelines, environmental assessments, and consultation and cooperation agreements must all be based on public input. Such consultation is nevertheless time consuming and has given rise to a number of unavoidable delays.

The following are some of OCRWM program stakeholders with whom consultation is either required by statute or carried out pursuant to various formalized arrangements entered into in order to implement the NWPA mandates for openness and consultation:

State officials–Sections 101, 116, and 117 of the NWPA require DOE to consult with a state in which it is investigating a site for a potential high-level waste and spent fuel storage or disposal facility. A state also has the right to disapprove the siting of a high-level waste repository once a site has been selected by DOE and recommended to

Congress by the President. A state's veto can be overturned only by enactment of a new law by Congress. DOE provides grants to a state to oversee DOE's work when the Department is investigating a potential site for a repository or storage facility in the state. DOE also provides grants to a state to assess and mitigate the social and economic impacts of site investigation. Nevada refused to enter into a consultation and cooperation agreement with DOE and has continued to oppose the program. Although DOE has provided funds to the State for oversight of DOE activities at Yucca Mountain, the State has used a portion of those funds to oppose DOE's efforts. U.S. General Accounting Office, Nevada's Use of Nuclear Waste Grant Funds, GAO/RCED 96-72 (1996).

County officials--Under Section 116(c) of the NWPA, DOE provides oversight grants to counties and other local governments that it has designated as "affected" by a potential high-level waste storage or disposal facility. DOE must make the following payments to a local government whose jurisdiction contains a repository or monitored retrievable storage facility site: payments equivalent to the taxes that would have been paid if the eligible jurisdiction could tax federal activities at a repository or storage facility; impact assistance payments necessitated by the facility siting, construction, and operation; and payment for an on-site representative, designated by the local government in which the site is located, to oversee DOE activities at the site.

Indian Tribes--Treaties, case law, executive orders, and agreements between the Federal Government and Native American tribal governments guarantee specific rights to the tribes and provide the basis for a government-to-government relationship. Under the NWPA, tribes that are designated by the Secretary of the Interior as "affected" by a potential site (as defined in Section 2 of the NWPA) have the same rights as affected states. Although the Secretary of the Interior has not designated any tribes "affected," DOE has had extensive discussions with tribes on the issue of their designation.

Regional and National Organizations Representing Tribes (Nevada Indian Environmental Coalition, National Congress of American Indians, Intertribal Transportation Association)--Many individual tribes and tribal organizations have become involved in spent nuclear fuel and high-level radioactive waste policy decision-making, including repository siting and the OCRWM transportation program. For example, the National Congress of American Indians, which has a cooperative agreement with OCRWM, monitors and reviews legislation on the OCRWM program and advises the Department and other Federal agencies on potential impacts to the tribes from spent nuclear fuel and high-level waste transportation.

Regional Organizations & National Organizations Representing States, including Council of State Governments (Eastern Regional Council and Midwest Council), Southern States Energy Board, Western Interstate Energy Board, National Conference of State Legislatures--Regional and national organizations representing states foster intergovernmental cooperation through the promotion of regional as well as individual and state responses to common issues. Through various cooperative agreements with OCRWM, regional concerns pertaining to the transportation of commercial spent nuclear fuel and high-level radioactive waste are articulated and presented to OCRWM at organizational and DOE-sponsored meetings.

Transportation External Coordination Working Group (TEC/WG)--Disposal of spent fuel in a repository or centralized temporary storage facility will require transportation of tens of thousands of tons of spent fuel on public highways, railroads and waterways. The Transportation External Coordination Working Group, whose members represent organizations of state, tribal and local governments, and professional and industrial organizations that historically have followed DOE transportation activities, provides a mechanism for continuing and improved coordination between appropriate DOE elements, other levels of government, and outside organizations having a role in preparing for the required transportation activities.

National Transportation Organizations (American Association of State Highway Transportation Officials, Commercial Vehicle Safety Alliance, Association of American Railroads)-- These are national transportation organizations that promote the safety of commercial truck and rail shipping nationwide. The Commercial Vehicle Safety Alliance (CVSA) maintains a cooperative agreement with OCRWM that focuses on developing a commercial truck inspection package for spent fuel. All three organizations participate in the TEC/WG.

National Technical Organizations (National Association of Regulatory Utility Commissioners, Conference of Radiation Control Program Directors)--The chief objective of the National Association of Regulatory Utility Commissioners (NARUC) is to serve consumers by seeking to improve the quality and effectiveness of public utility regulation in the United States. NARUC's Nuclear Waste Program was established with the objective of bringing together the nuclear industry, regulators, environmentalists and others so that site characterization studies leading to the establishment of a high-level nuclear waste repository could proceed. The Conference of Radiation Control Program Directors (CRCPD) is a nonprofit professional organization comprising individuals in state and local governments who regulate and control the use of radiation sources, and of individuals--regardless of affiliation--who have expressed an interest in radiation protection. Both NARUC and CRCPD maintain cooperative agreements with OCRWM.

Emergency Management/Response Groups--Emergency management/response groups have provided input into policy decisionmaking for implementation of the Section 180(c) grant program of the NWPA. A number of these groups are members of the TEC/WG.

In addition to the foregoing formal consultation arrangements with governmental and technical organizations, the Department must consult with a large number of other stakeholders on a less structured or more intermittent basis. Citizens, contract holders, utility industry trade organizations, educational and professional organizations with an interest in high level radioactive waste disposal, equipment suppliers, and labor unions are noteworthy among those stakeholders who have been active participants in reviewing, commenting on and participating in various ways in the high level radioactive waste and spent fuel disposal program. With particular respect to citizens, their perspectives about the OCRWM program reflect their roles as taxpayers, consumers (and ratepayers) of electric power, community residents, workers' rights advocates, environmentalists, public health advocates or concerned parents. Citizens have become involved in the OCRWM program by participating in OCRWM-run public participation events, by using grassroots organizing methods, by communicating their views to their elected officials on how to amend the NWPA, and by commenting on rulemakings and NEPA documents. As an indication of the level of citizen interest, DOE's EA's on nine candidate repository sites generated 20,000 public comments. The more recent scoping notice announcing DOE's intention to prepare an Environmental Impact Statement on Yucca Mountain has generated comments from 1,000 different individuals and organizations to date, and more are continuing to come in even though the deadline for comments has passed.

As noted above, it is a fundamental premise of the NWPA that consultation with this broad range of stakeholders is necessary to build public confidence in the high level radioactive waste disposal program. Moreover, input from these stakeholders has played an integral role in shaping the program and allowing it to move forward. Nevertheless, carrying out the required consultation has contributed to the unavoidable delays that the program has experienced.

## CONCLUSION

For all the foregoing reasons, I have preliminarily determined that the Department's delay in beginning acceptance of spent fuel was unavoidable within the meaning of Article IX of the Standard Contract.

**SUMMARY OF COMMENTS AND RESPONSES TO THE DEPARTMENT'S DECEMBER 17, 1996 LETTER TO CONTRACT HOLDERS**

Comment: A number of respondents indicated their belief that the Department has a statutory and contractual obligation to begin spent fuel acceptance in 1998.

Response: The Department recognizes that Section 302 of the Nuclear Waste Policy Act authorizes the Department to enter into contracts for the disposal of spent nuclear fuel. The Department further recognizes that Section 302 specifies that the contracts shall provide for the Department to begin to dispose of spent fuel not later than January 31, 1998. The Department believes that the Standard Contract adopted by the Department pursuant to Section 302 and entered into by the contract holders specifies the available remedies in the event the Department is unable to meet the January 31, 1998 date.

Comment: Many respondents stated their belief that the Nuclear Waste Policy Act does not allow for claims of delay in the commencement of waste acceptance and, therefore, the Department cannot utilize the Delays provision of the Standard Contract as a remedy for the delay. Other respondents stated their belief that neither the Delays provision nor any other Standard Contract provision limits their legal rights and remedies or governs the nature and amount of damages, nor limits the options available to DOE for mitigating the harm caused by the delay.

Response: While the Nuclear Waste Policy Act authorized the Department to enter into contracts for the disposal of spent nuclear fuel, it did not prescribe the consequences of a potential inability by DOE to satisfy its obligation to begin disposal by January 31, 1998. The Standard Contract, however, addresses this potential and provides an administrative remedy for such a delay. The Department believes that Article IX - Delays, of the Standard Contract is applicable. As explained in the accompanying letter, the Department believes Article XV - Amendments, can also be applied to the current circumstances to mitigate the impacts of the delay on particular contract holders.

Comment: A number of respondents indicated that any delay in beginning waste acceptance was avoidable, not unavoidable, as they believe that DOE suggested in the Contracting Officer's letter of December 17, 1996.

Response: After reviewing the record of Office of Civilian Radioactive Waste Management activities, the Department has reached the preliminary determination that the delay in waste acceptance is unavoidable as defined under Article IX.A of the Standard Contract. This issue is discussed in further detail in the Contracting Officer's Preliminary Determination which accompanies this Summary of Comments and Responses.

Comment: Many respondents expressed their concern that the Department's December 17, 1996 letter inappropriately attempts to shift the responsibility for dealing with the delay to the Purchasers.

Response: Through its letter of December 17, 1996, the Department was seeking input from the Purchasers on actions the Department could take to address the delay. The Department recognizes that, under the terms of the Standard Contract, it bears the responsibility of determining the contractual consequences of any delay on its part.

Comment: Some respondents asserted that the Department's position that it lacks the authority under the Nuclear Waste Policy Act to provide interim storage is incorrect, and that it must immediately begin a program that will allow it to begin spent fuel acceptance by January 31, 1998. One respondent suggested that the Department immediately begin the design and construction of an interim storage facility.

Response: Under Section 145(b) of the Nuclear Waste Policy Act, the Secretary may not select a site for a Monitored Retrievable Storage Facility until the Secretary recommends to the President the approval of a site for the development of a repository. The Secretary's recommendation, in turn, must be preceded by scientific characterization analyses, which as yet have not been completed. Under current circumstances, the Department believes it lacks the authority to provide interim storage services. Nevertheless, it has begun generic design work for an interim storage facility, which activity is permitted under the Act.

Comment: Some respondents argued that, if the Department determines that it lacks authority to provide interim storage, it must immediately act to seek authority from Congress. In addition, a number of respondents requested that the Department support ongoing legislative efforts to amend the Nuclear Waste Policy Act.

Response: The Administration is committed to resolving the complex spent fuel storage issue in a timely and sensible manner, consistent with sound science and the protection of public health, safety, and the environment. The Administration believes that the pending legislation would undermine the scientific credibility of the Nation's nuclear waste disposal program by, in effect, designating a site for an interim storage facility before the viability of that site as a permanent geologic repository has been assessed, and therefore it does not support such legislation.

Comment: A number of respondents suggested that some form of compensation might be appropriate to address the impact of the delay, but that compensation would not be a substitute for performance. It was also suggested that the source of the compensation must not be from the Nuclear Waste Fund. One respondent noted the Department is precluded from preferential or discriminatory treatment in implementation of the contracts.

Response: The Department remains committed to accepting spent fuel as soon as practicable under the authority provided by the Nuclear Waste Policy Act. As noted above, the Department has made a preliminary determination that the delay in beginning waste acceptance was unavoidable, as defined in the Standard Contract. Therefore, the appropriate remedy under the Standard Contract is an adjustment of schedules for waste acceptance. The Department also recognizes however, that it has a contractual relationship with each contract holder; consistent with Article XV of the Standard Contract, DOE is willing to discuss with individual contract holders amendments to their own contracts that can address the delay in a mutually-agreed manner. While each contract holder faces unique circumstances, the Department also recognizes it has an obligation to treat all contract holders in a fair and equitable manner. The Department understands the industry's concern regarding use of the Nuclear Waste Fund for compensation for its delay, and will take this concern into account as we move forward.

Comment: A number of respondents cited the recent Department actions, such as the return of highly-enriched foreign research reactor fuel and the settlement with Public Service of Colorado (PSC) which resulted in the Department's taking title and responsibility for PSC's Fort St. Vrain spent fuel, as examples of the Department's ability to begin spent fuel acceptance. They suggested that the Department consider similar actions with respect to implementing its waste acceptance obligation under the Standard Contract.

Response: The Department's action seeking the return of U.S. Government-provided highly-enriched uranium spent fuel from foreign research reactors was made to further the Nation's long-standing policy of reducing weapon proliferation risk of strategic nuclear materials pursuant to the responsibility of the Department under the Atomic Energy Act. There is no parallel between that action and the current situation with commercial reactor spent nuclear fuel. The NWPA grants specific authority for DOE to dispose of commercial spent fuel; the particular limits in the statute on storage and disposal preclude reliance on any more general authority in the Atomic Energy Act. The actions taken with regard to PSC's Fort St. Vrain spent nuclear fuel were the result of a 1965 agreement between the Atomic Energy Commission and PSC under which the government agreed to take title to spent fuel from the Fort St. Vrain reactor demonstration project in connection with the research and development purposes associated with this demonstration project, which was undertaken pursuant to the Atomic Energy Act.

Comment: A number of respondents suggested that the Department consider various arrangements for taking title to spent fuel that is subject to delayed waste acceptance and, in some cases, storage facilities that were constructed due to delayed waste acceptance.

Response: As indicated in the accompanying letter, the Department is inviting contract holders to propose possible amendments to their individual contracts pursuant to Article XV of the Standard Contract to relieve the particular hardships they will experience as the result of the Department's inability to commence spent fuel acceptance on the dates in their current delivery schedules.

Comment: One commentor suggested the establishment of a customer oversight group to monitor the Program's progress. Another suggested that the Department develop a proposal for resolving the current impasse within 30 days, and meet with stakeholders within 60 days.

Response: Subsequent to the submission of comments, Secretary Peña met with representatives of nuclear utilities to discuss the delay in spent fuel acceptance and possible remedies therefor. He also offered to establish working groups to develop options for addressing the delay and to provide additional information to contract holders on the Program's progress. Subsequently, the Department held similar meetings with representatives of stakeholder groups and members of the National Association of Regulatory Utility Commissioners. A meeting is being scheduled for July to follow up on the Department's commitment to keep contract holders apprised of the Program's recent progress and to discuss the technical aspects of some of the remedies that may be available to address the Department's delay.

Comment: One commentor suggested that the Department revise the basis for allocation of waste acceptance capacity from the current "oldest-fuel-first" basis to a methodology that is based upon the need of the contract holder. Another suggested that the Department grant priority waste acceptance capacity to shutdown reactors.

Response: The Department is willing to discuss with individual contract holders amendments to their individual contracts that may address their particular needs. With respect to the issue of delivery schedules, however, the Department remains concerned that in granting priority to any one contract holder or in changing the basis for waste acceptance allocation, it may adversely impact the waste acceptance status of other contract holders.

Comment: Some respondents requested that the Department expedite work at Yucca Mountain to complete the repository as soon as possible.

Response: The Department remains committed to completing work at Yucca Mountain to assess its viability as a permanent geologic repository in 1998 and, assuming that it is viable, to proceed as expeditiously as possible toward a suitability determination, licensing, and operation.

Sacramento Municipal v. U.S No. 98-488C March 29, 2005

Heritage Reporting Corporation

Page 1826 to Page 2214

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2134

Clinton.
Q. And what type of facility did that propose or envision?
A. That was, as I mentioned earlier, strictly a storage facility, one that could be deployed very quickly and was relatively inexpensive to build, and I should mention, in one of the jobs, as I went through my resume in the program, where I headed a division to develop a topical safety analysis report for such a centralized interim storage facility, what we called it at the time.
That was in response to the legislation that was winding its way through Congress, such that if the Department did receive authorization, then we would basically go build the facility, as soon as we had a site from Congress and deploy that as quickly as possible.
Q. Now, I neglected to ask you this immediately before. When we were talking about the Nuclear Waste Negotiator, you indicated there was a provision in the '87 Amendment Act regarding the term of service of the Negotiator?
A. Yes.
Q. And when did that term of service expire?
A. In early 1995, I believe.

Page 2135

Q. And was there any other office of Nuclear Waste Negotiator after that point?
A. No, there was not.
Q. Now, you had referenced earlier, in your testimony regarding the MRS, a lawsuit or litigation brought by the state of Tennessee regarding the Department's MRS submission, and we can refer to the period of time you were in OCRWM, 1985 through 1998. Was there other instances of litigation involving the OCRWM program?
A. Well, there were many, many lawsuits that were filed by the state of Nevada, by various utility organizations. You know, in terms of one that affected the program, I would say there was a lawsuit brought by NRDC against the Environmental Protection Agency's standard for repositories, if you will, health and safety standard, where in 1987 that standard was remanded.
And as a result, that did affect the Department's ability to move forward and site a repository, since we didn't have an underlying environmental rule in place that had to be adopted by the Nuclear Regulatory Commission, and from that point, the Department would also use those, use that standard as a guide to make a site suitability

Page 2136

determination, which leads to a site recommendation.
So it wasn't until Congress stimulated the process in 1992, in the Energy Policy Act of that year, of 1992, which directed the Environmental Protection Agency to contract with the National Academy of Sciences for them to do a study on specific standards for Yucca Mountain.
After the Academy finished their report, we eventually got standards out of the Environmental Protection Agency in the year 2001, and shortly thereafter, the NRC adopted those, we made our site recommendation, and we're now moving forward to submit a license application for Yucca Mountain.
Q. And you had mentioned that -- that particular piece of litigation you just mentioned, that started in 1987?
A. The standard was remanded in 1987, yes.
Q. Now, you had also just referenced an EPA standard. Are there, are there other federal agencies or departments that are involved in the program for disposal of commercial spent nuclear fuel?
A. Yes, there are various federal agencies that have an impact on it.
Q. What type of federal agencies are, have an

Page 2137

impact or affected the OCRWM program?
A. Well, certainly, the Nuclear Regulatory Commission, the Act requires that any of our facilities be licensed by the Nuclear Regulatory Commission, so certainly, they have an impact on our ability to proceed. The Department of Transportation has regulations in effect for movement of high-level radioactive waste materials. The U.S. Navy's involved from the standpoint of they're providing us our fuel.
The Department of Air Force is involved from the standpoint of we have their land, we want part of their land in order to build Yucca Mountain, the same thing is true for the Bureau of Land Management. So those are the federal agencies that come to mind.
Q. Now, you had mentioned the NRC. What role do they play in the Department's efforts to site and operate either MRS or a repository?
A. As I mentioned earlier, the Act requires that all of our facilities be licensed by the Nuclear Regulatory Commission, so without their approval, we cannot proceed to construct or operate any facilities.
Q. And you also mentioned the EPA, I think,

Page 2138

during your testimony about other litigation. What impact has the EPA had on the Department's Civilian Radioactive Waste Management program?

A. Well, they, by the Act, are required to provide the repository long-term isolation standards, if you will, and without those in place, the Department, again, cannot – the Nuclear Regulatory Commission cannot adopt those standards within their implementing regulations, and as such, the Department, the NRC would not be able to issue a construction authorization or an operating license for any facility that we have, any repository facility.

Q. And your work with OCRWM, has the involvement of the federal agency like EPA actually affected the progress that DOE has been able to make with the radioactive waste program?

A. Absolutely. As I mentioned earlier, we could not move forward with the site recommendation until we had the regulations in place, and from 1987 to 1991 – to 2001 was the period in time that it took the Environmental Protection Agency to finalize standards, which you might be familiar with the fact that part of that standard was remanded by another lawsuit last year, which is, again, something that

Page 2139

the Environmental Protection Agency is in the process of attempting to correct.

Q. Thank you, Mr. Kouts. Now, the OCRWM waste management program, can you describe for the Court how the program is actually funded?

A. It's, it's funded essentially by two appropriations. One is the Nuclear Waste Fund which, again, there's a – when the Act was passed, they directed the Department to enter into contracts with the utilities. Basically, the utilities were to pay one mil per kilowatt hour of energy produced and sold. That's one funding stream, if you will, for the program.

The other goes to the fact that President Reagan, after recommendation by then Secretary Hodel, made the decision that we would not have a separate military repository or a repository for military waste, and that they would all be colocated in one. As a result, we have another funding stream which comes out of the defense appropriations, we call it the 050 account, where we get funding also for the program, which can only be used for disposal purposes at Yucca Mountain.

So we have two funding sources. One is the Nuclear Waste Fund receipts that come in and then

Page 2140

also the defense appropriation that comes in every year.

Q. Now, you had mentioned appropriation. How does the Department address its appropriation for Congress on annual basis?

A. We follow the same process as other federal programs. We submit – our budget is part of the Department of Energy's budget, and that's part of the President's budget, which goes to Congress for its disposition, so it's a fairly standard budget process that any other federal program would have.

Q. And can you describe what's been the history of Congressional appropriations or Congressional funding for the OCRWM program, say, since 1985?

A. Since 1985, I think, if you looked at what we requested and what we received, it's roughly about 1.7 billion dollars less than we asked for over that time period. If you want to look at, say, up to the point of 1998, there were, that was about half of that, so about 850 million was not appropriated by Congress – well, 850 million less than what the Department requested was appropriated by Congress.

Q. Is there a, for a particular year, can you give the Court an example of what you mean, the

Page 2141

funding was less, the appropriation was less than what was requested?

A. Sure. An example, for instance, in the 1996 time frame, and I'm very much familiar with this, we requested 630 million, we received 315 million, and that caused the program to basically go through a rather substantial reduction in its contractor resources. And actually, if you remember the time frame, there was a great deal of interest in Congress to try to abolish the Department of Energy. And there was a bill that was submitted which would basically take our program, take the repository program and all activities related to it, and give it to the Army Corps of Engineers. At that point in time, at that point in time, we – that's how the viability assessment was born. It was essentially a proposal from the program as to how we would go and complete the work, the site recommendation, and a license application, hoping that Congress would fund the Department to do it, and not take it away and give it to the Army Corps of Engineers.

Q. And what was the outcome of this viability assess ment, was that actually submitted to Congress?

A. Yes, it was. That was the first big job I

Page 2142

had when I became a Yucca Mountain liaison. That was a document that was submitted to Congress, and basically, it was fairly well received, that we had a path forward in terms of getting to a site recommendation for Yucca Mountain, so we survived that crisis.

Q. Now, in your view, Mr. Kouts, did the Congressional appropriations that you describe have any effect on DOE's efforts to begin acceptance of spent nuclear fuel in 1998?

A. Well, I think – certainly, if you look over the history of the program, we did not have the resources, have all the resources that we requested, to do the work that we wanted to do. It's difficult to say whether or not we had gotten all the resources, whether that would have made a difference. My sense is it probably would have helped somewhat our ability to do that, but that's something you'll never know.

THE COURT: Are you in competition with this private entity that's a project out there in Utah? I mean, how realistic is that?

THE WITNESS: Well, "competition" is an interesting word. I think that my understanding of that project, and I'll go back to the site

Page 2143

recommendation time frame, there was a great deal of concern, and there has been, that that project will become kind of a de facto repository, if there's no progress made on Yucca Mountain.

And I think the Department's view, the Department has absolutely no involvement in it, and it is totally privately funded. We do learn from it, from the standpoint of we have attended the licensing hearings, and we have seen how they've dealt with technical issues such as airplane impacts, if you, will on the storage field, et cetera, but the Department has taken a very hands-off attitude in relation to that.

We believe that the best remedy, and this has been stated in the testimony before Congress by Secretary Abraham and other DOE officials, that the best way to make sure that that is not a permanent facility is to make progress on Yucca Mountain. And at the time of the site recommendation, there were a variety of meetings with the senators from Utah to try to encourage them to vote for Yucca Mountain from the standpoint of it would help make sure that the PFS project would not be permanent and would not be implemented, if we made enough progress on Yucca Mountain.

Page 2144

So I don't think we were in competition, I think, I think that was an effort that was undertaken by utilities to – some believe it was an issue to put pressure on to the Department to perform. Others believe that it was a good-faith effort for them to store their fuel if they can't put it on-site any longer. But I never really felt that we were in competition with them, but we have learned from them.

MR. DAMELIN: If I may have a moment, Your Honor?

THE COURT: Sure.

MR. DAMELIN: Thank you, Your Honor. I have no further questions for Mr. Kouts at this time.

THE COURT: I have, I'm curious about a couple things. The money that is paid by the utilities, the taxes as it were basically, that went into the fund basically, that was supposed to be used for Yucca Mountain and everything else, you can't take money out of that unless Congress authorizes it?

THE WITNESS: That's correct.

THE COURT: How is that so, is it in legislation, where is it in legislation?

THE WITNESS: The – I think that decision was made in the early days of the program, that we would go through the standard budgeting process of

Page 2145

the government.

THE COURT: Uh-huh.

THE WITNESS: And there are a lot of people within the program who felt we shouldn't have gone that way. But the way we're structured now is we are just like any other executive branch organization. We submit our budget, the Office of Management and Budget reviews it, makes their own judgment. We have to compete for funding within the Department's cap, if you will, what the Department of Energy is going to get in any one year, we have to compete with.

THE COURT: What OMB puts on you?

THE WITNESS: What OMB puts on us. And also, there have been instances where even though we would come out with additional funds, from an OMB perspective, we've gotten less because they wanted to –

THE COURT: So that money is sitting someplace in an account, accumulating interest essentially?

THE WITNESS: That's correct. It sits in the Treasury, and there's roughly about 16 billion of it right now.

THE COURT: So new briefing project for everybody, I wonder what my authority is to issue an

**Tennessee Valley Authority v. U.S No. 01-249C July 11, 2005**

**Heritage Reporting Corporation**

**Page 1264 to Page 1560**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1420

document, sir, whether this is a document that was adopted by the Department of Energy?
A. Well, if we go to the top, if you go to the upper left corner, you can see, "DOE/RW, revised reprint," so it's basically, yes, it's basically a Departmental document.
Q. Okay. Now, if you turn to page PNL 473, Mr. Kouts. Under the heading, "methodology and Assumptions," do you see that?
A. Yes.
Q. And can you remind us what is meant by that term, "Methodology and Assumptions"?
A. It reflects the methodology and the principal assumptions, the key assumptions about the implementation of the program at that time, under which the analysis was undertaken.
Q. Now, at the, that page goes on, those bullets, assumptions goes on to the next page. I wonder if you could turn to the next page, please? And if you stop right there? Thank you. The first bullet says, "Operational start-up dates for the repositories," and then it says, "First repository 1998, second repository in 2008." Do you see that?
A. Yes.
Q. And then below that is another bullet. It

Page 1421

says, "First repository receipt dates for spent nuclear fuel," and there are some rates there. It says, "400 MTU for three years, 900 MTU in year four, 1,800 MTU in year five, and then 3,000 thereafter." What is your understanding, Mr. Kouts, of those two bullets under the heading, "Methodology and Assumptions," in this case?
A. Well, the assumptions used in the analysis were essentially that the first repository would begin operation in 1998, that it would have the ramp-up rates, target ramp-up rates that you see just below that, the 400, 900, 1,800, 3,000, and second repository would also begin operation in this case in 2008.
Q. Now, Mr. Kouts, in looking at these bullets, I don't see a reference to the MRS. Do you know why that is?
A. Essentially because this was reflecting the authorized system and the MRS was not authorized.
Q. Mr. Kouts, if you could please turn to DX, now, 48? And this is a document entitled, "Monitored Retrievable Storage Submission to Congress, Volume One, the Proposal," dated March 1987. Do you see that?
A. Yes, I do.

Page 1422

Q. And, Mr. Kouts, what is this document?
A. This is volume one of the proposal that I mentioned earlier. This was the summary document. It was -- an aside here, that when you submit large documents to Congress, it's always nice to have a small document that summarizes it because it's probably the only one that they read. So this was basically a summary of the proposal, and the other two volumes, which were rather massive, accompanied this, if someone cared to read it.
Q. And what was your personal involvement with this document then, sir?
A. I was one of the staff people who developed it, along with other aspects of the other two volumes.
Q. And I notice in the upper right-hand portion here, there is a number. It says, "DOE/RW," and then several numbers after that.
A. Right.
Q. What does that mean?
A. That essentially is reflective of the fact that these are DOE documents and that they were issued by the Department, and that's the DOE identification number.
MR. LO RE: Your Honor, at this time, we

Page 1423

would move for the admission of Exhibit DX-48.
THE COURT: Mr. Small?
MR. SMALL: We have no objection, Your Honor.
THE COURT: Admitted.
(Defendant's Exhibit Number 48 was received in evidence.)
BY MR. LO RE:
Q. If you would turn, Mr. Kouts, to page 311 of this document, and it says, "Executive Overview," there, and I think you mentioned that a minute ago.
A. Yes.
Q. What was the purpose of this?
A. Again, it's a summary of what the, what's contained in the proposals and what it's being done in fulfillment of, which is to respond to Section 141 of the Nuclear Waste Policy Act of 1982.
Q. Now, Mr. Kouts, if you turn to the next page here, which is 312, the first full paragraph there starts with the sentence, "The DOE's proposal was ready for submittal to the Congress in February 1986, but litigation has delayed the submittal for more than a year." Do you know what that sentence means?
A. Yes, I do.

Page 1424

Q. And what is that?
A. Back in early 1986, when the Department was prepared to submit the proposal, the state of Tennessee filed a suit in District Court of Tennessee basically requesting that the Department be prohibited from submitting the proposal to Congress. A local district judge in Tennessee issued a temporary restraining order and later an injunction. That was appealed by the Department with the Justice Department, and basically, the injunction was overturned on appeal, and essentially, the state then appealed to the Supreme Court, and the Supreme Court denied certiorari, I believe that's the term, and after that process had gone through, then the Department was free to submit the proposal, which was more than a year later.
Q. Now, right after that, it says, "Since the planned submittal date, the DOE's Civilian Radioactive Waste Management program, CRWM, has pro guessed and undergone various changes. These changes range from the programmatic changes and proposals outlined in the January 1987 draft mission amendment, to further refinements of the program's analytical database." Do you see that, sir?
A. Yes.

Page 1425

Q. Okay. Now, before I ask you about that, I'd like to jump down, and if you could leave the highlighting on there, I'd appreciate it. And if you could just jump the next sentence and go to the following sentence that says, "The programmatic change"? And it reads, "The programmatic change that most affects the DOE's planning for the MRS facility is an extension of the date for the start of operations of the first repository. This date is extended from January 31st, 1998, to 2003, to allow time to carry out necessary technical program activities and to provide additional opportunity for consultation and cooperation with affected states and Indian tribes." Mr. Kouts, I wonder if you could describe for the Court what those two sentences that I've just read into the record meant?
A. Well, since at the point in time we were prepared to submit the proposal, a variety of internal changes had happened to the program. We had come to the conclusion that we needed more time to implement the first repository, and we needed more time to do a lot of the site characterization work that we needed for Yucca Mountain or that we needed for repositories in general because we didn't -- this

Page 1426

was prior to the Amendments Act. So essentially, what this did was announce that the, the fact that the Department was now working toward 2003 schedule for the implementation of the first repository.
Q. And was there any effect that you recall upon the rate of acceptance, based upon this proposed change?
A. Well, certainly, for the authorized system, the only acceptance under that system would be at a repository, so what we had been essentially expecting to receive at a repository in 1998 was delayed to 2003.
Q. And was there an effect upon the amount that could be accepted under that scenario?
A. I believe it would probably have been the same ramp-up rates, the 4 and then 9 and then 18 and then 3,000 eventually.
Q. And this is at the MRS?
A. No, this would be at the repository.
Q. Okay. Now, maybe I misunderstood. When I asked you about the status, the programmatic change here, based upon this sentence that we just read, the programmatic change that most affects DOE's planning, did DOE have any plans to start the MRS prior to the

Page 1427

repository?
A. Yes, this was, with the delay in the first repository, the MRS would be the only mechanism that the Department would have under its command, assuming it was authorized to receive spent fuel from nuclear reactors, from commercial reactors in advance of the repository.
Q. Okay.
A. So it would be the primary waste acceptance vehicle facility.
Q. And as the MRS being the primary acceptance facility beginning in 1998, did that have any effect on the acceptance rates at which DOE could accept spent nuclear fuel?
A. They were totally dependent on what we could do at an MRS facility.
Q. And when you say, "totally dependent," what do you mean by that?
A. That the only acceptance capability was at the MRS, so the capability to receive at an MRS would be the acceptance rates that we would use for the system, assuming it was authorized.
Q. Now, Mr. Kouts, if you could turn to page 315 of this document, and this is the second full paragraph starting with, "Some potential." There's a

Page 1512

that I just read relates to the approval process for an increase or change in the DCS amount?

A. No, it is not.

Q. Is there any provision in the FDS clause that accounts for the DOE's right to approve or disapprove the DCS final request? And maybe it'll help if we turn back to the previous page. It says, "Purchaser shall have the right to adjust quantities."

A. Right.

Q. You see?

A. Right.

Q. "Until the submission of the final delivery schedule."

A. Yes.

Q. So is there any interplay, in your mind, between the approval of the final delivery schedule and the plus or minus 20 percent provision?

A. I would hope so, that there would be some interplay, but it's not called for in this provision.

Q. And when you say you'd hope there would be some interplay, what does that mean?

A. Well, the very fact that someone comes in and asks for more allocation, the Department would have to look at what it has available. If it doesn't

Page 1513

have any more available capacity, then there's no other way to deal with this than to adjust someone else's allocation.

Q. And is it your understanding that the Department could reject the request to change?

A. If we don't have the capability, then my sense is the Department would have to either adjust someone else's allocation or disapprove the addition.

Q. That's fine. Mr. Kouts, could you turn back now to DX-50? And this was the 1997 annual capacity report that we looked at earlier.

THE COURT: Mr. Lo Re, in which binder is this exhibit?

MR. LO RE: Excuse me, one moment, Your Honor.

THE COURT: I found it.

MR. LO RE: Two.

THE COURT: Yes.

By MR. LO RE:

Q. Now, if you could turn to HQ2716? Under table 2.1, which we looked at earlier, the next page says – now, we're on page 2717. The second sentence in that first paragraph says, "The acceptance capacity available for allocation to the purchasers will equal the system operating capacity, unless part

Page 1514

of that operating capacity is used to accommodate contingencies, e.g., emergencies, the contract's 20 percent adjustment provision, and cask loading considerations." What is your understanding of that sentence?

A. Well, it's essentially saying our acceptance capacity is our operating capacity and – unless part of that capacity is set aside for contingencies or other issues. Then the second, the sentence right after that goes on to say that, "To the extent that that capacity would be needed, then the remaining acceptance capacity available for other purchasers in any given year would be reduced."

Q. And if you turn quickly to page 2713 of the same document, under the heading, "Expanded Scope of the Annual Capacity Report," do you see that, sir?

A. Yes.

Q. The second paragraph there, page 2713, 2713.

A. Yes.

Q. Okay. Thank you. That first full paragraph, it says, "In addition, DOE will identify issues and system considerations which could affect annual acceptance capacity. For example, capacity used to accommodate changes in SNF quantities

Page 1515

resulting from the contract's provision for a 20 percent adjustment to approved delivery commitment schedules would reduce the capacity available for allocation." And what is that sentence?

A. This is basically consistent with what I said earlier. Back in June 1987, this was an issue that was recognized, and basically, it was, more or less, informing the world that if someone comes in for a 20 percent adjustment, that it's going to have to come out of somebody else's hide, and we're going to have to work through that problem.

Q. And, Mr. Kouts, what is your understanding with respect to the DOE's position on this issue after the issuance of the 1987 ACR?

A. The Department's position is consistent. It has not changed since this point.

Q. Now, Mr. Kouts, during your testimony, you referred to litigation brought by Tennessee, the state of Tennessee, involving the MRS proposal. Do you recall that?

A. Yes.

Q. And were there any other instances of litigation between 1985 and 1998 involving the OCRWM waste management program, that you recall?

A. There were, yes, there were numerous other

Page 1516

lawsuits that had been filed by – against not only the Department, but also other entities that are directly related to the Department's fulfillment of its mission.

Q. And do you have an opinion as to the effect that those lawsuits had upon DOE's ability to perform the contract, perform the standard contract in a timely manner?

A. Well, I think the one that affected the Department most was probably the remand of the EPA standard in the 1987 time frame, which essentially required an act of Congress in 1992 to stimulate the Environmental Protection Agency to issue new standards for Yucca Mountain, which were not issued in final form until the 2001 time frame, just before the Department was ready to move forward with the site recommendations, so we had a delay in the standards to which we were going to be trying to license the repository by a period of about 14 years. And that initial litigation caused that delay and the EPA's subsequent inability to issue a standard before, before the 2001 time frame, so that certainly affected our ability to have a repository available in 1998. Without the standard in place, we could not submit a – we could submit a license

Page 1517

application to the Nuclear Regulatory Commission, but they could not act on it until that standard was finalized.

Q. Mr. Kouts, how is the OCRWM program, waste management program funded?

A. It's funded from essentially two funding sources, the Nuclear Waste Fund and the defense account allocation. Every year, the Department makes – the administration or the President makes the request for the program for funding from both those accounts, both the Nuclear Waste Fund and what we call the 050, or the defense account, and the sum of those two appropriations then make up the total budget of the program in any one year.

MR. LO RE: Now, Your Honor, I'm going to hand out a binder that we have provided to Plaintiffs last week and I would like to use with Mr. Kouts. I do not at this time plan to move it into evidence. However, I would like to use it with Mr. Kouts at this time.

THE COURT: Does it relate to the testimony Mr. Kouts has just given?

MR. LO RE: Yes, it does.

THE COURT: Thank you.

MR. LO RE: Thank you.

Page 1518

BY MR. LO RE:

Q. Mr. Kouts, I've just handed you a binder that is entitled, "Summary of Energy and Water Development Appropriations For the Nuclear Waste Fund and Defense Nuclear Waste Fund For FY 1983 through FY 2006." Do you see that, sir?

A. Yes.

Q. And are you familiar with this binder?

A. Yes.

Q. And what is it, sir?

A. It's a compilation of the request and also the actual disposition by Congress on those requests for both the Nuclear Waste Fund and the defense disposal account I mentioned earlier.

Q. And were you involved in the preparation in this binder?

A. I directed this binder be placed to provide a history of the funding of the program.

Q. Now, Mr. Kouts, in the beginning of this binder, there is an Excel spreadsheet. Do you see that, the very first page?

A. Yes, I do.

Q. And what is that?

A. That's essentially a rollup of the funding requested for the program in each of the years from

Page 1519

1983 to 2005 and, actually, the appropriations that Congress disposed of.

Q. Now, Mr. Kouts, I'd like to direct your attention to Defendant's Demonstrative 19, and I don't think it's in that binder. It may be in the blue binders that we gave you. I think it's at the end of the blue binders that we gave you.

A. I'd have to –

MR. LO RE: That would be binder number four, Your Honor.

THE WITNESS: I don't think I have that.

BY MR. LO RE:

Q. Not in there.

THE COURT: Mr. Kouts, I have something that looks like that.

MR. LO RE: That's it, I believe, Your Honor. Is that marked as Defendant's Demonstrative 19?

THE WITNESS: Okay. It's on the screen here.

THE COURT: Counsel?

MR. SMALL: Your Honor, just for clarity of the record, I would like to state that the budget information that the government is apparently about to elicit testimony about, again, I want to make it

Page 1520

clear that this is subject to our continuing objection, that it comes in maybe as part of the story, but it does not come in as relevant to an affirmative defense which is not in play.

THE COURT: No, exactly, that's why I asked the question of Mr. Lo Re earlier, whether the materials he was about to provide related to the testimony that Mr. Kouts had just given, you know, for the record. And the objection is noted.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Mr. Kouts, what is this chart?

A. It's a graphical representation of the same information, budget information requests and so forth, that are provided in the binder in front of me.

Q. Now, what does this chart depict with respect to the request versus the amounts that were actually appropriated for the Waste Management System?

A. Well, I think what it depicts is that, except for the first few years of operation, of the existence of the office beginning in about 1986 and continuing almost throughout until 1998, that the Department received less than the requests that it

Page 1521

had asked of Congress in virtually any of those years, some of those years were substantial reductions in the amount of budget, which impact the program from the standpoint of not being able to accomplish the activities that it had intended in that specific year, due to a lack of budget.

Q. And just so the record is clear, we're looking at Defendant's Demonstrative 19, and the last year depicted there is 1998, is that right?

A. That's correct.

Q. Just so we know we're looking at the same chart, Mr. Kouts, do you have an opinion as to how, if any way, the budget shortfalls affected DOE's ability to perform the standard contract in a timely manner?

A. It certainly affected our ability to have the repository available and to have any kind of a facility available in the 1998 time frame.

Q. Are there any particular years that stand out to you with respect to shortfalls?

A. Oh, I think you can tell from the charts. Certainly, 1987 was a big reduction, same with 1990, and 1989, '88, '89, '90 were substantial reductions. We had another very substantial reduction in 1996. What's not indicated in the 1996 number is that,

Page 1522

although 400 million dollars was appropriated, 85 million of that was held by Congress, and the Department was not to expend it until we received interim storage legislation. We never did, so that, in that specific year, we had a major reduction in force of staff and contractor support, due to the substantial reduction in that year.

Q. Now, Mr. Kouts, could you turn to Defendant's -- excuse me. Yeah, Defendant's Demonstrative Exhibit 20, and this is a chart entitled, "Nuclear Waste Fund and Defense Nuclear Waste Fund, Requested Funds Versus Appropriated Funds 1983 to 2005." What does this chart depict, sir?

A. Well, this is essentially the same chart, only expanded to the entire history of the program. The other one stopped in the '98 time frame, and, you know, the same pattern has continued, especially, as I mentioned, in the 2005 time frame, where we had requested 880 million dollars and received 577 million. That was one of the big factors as to why we also suspended the DCS process because it was just very apparent at that point that the amount of funding that we were going to need in terms of

Page 1523

developing the repository was not going to be there, and 2010 was no longer a viable schedule date.

MR. LO RE: Your Honor, at this time, the government would move for the admission of Defendant's Demonstrative Exhibit 19 and Defendant's Demonstrative Exhibit 20 into evidence as summary charts, pursuant to Federal Rule of Evidence 1006.

THE COURT: Mr. Small?

MR. SMALL: Subject to our continuing objection, Your Honor, I suppose I have no objection, as they do summarize the witness' testimony regarding project shortfalls, so based on the Court's prior ruling, I would say I have no objection to the extent they're being offered to tell the story of what's happening in the program. On the other hand, we do object to the broader admission of these documents.

THE COURT: Now, Mr. Lo Re, let me just clarify for the record, you're saying Defendant's Demonstratives 19 and 20 provide a summary of the information that's in the volume, the fifth volume you've just provided, is that correct?

MR. LO RE: Yes, that's correct, Your Honor.

THE COURT: And if the Court, as Plaintiffs, were to parse through each of the

CERTIFICATE OF FILING

I hereby certify that on this 13th day of October 2005, a copy of foregoing "DEFENDANT'S RESPONSE TO THE COURT'S OCTOBER 5, 2005 ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.