IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NEBRASKA PUBLIC POWER DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.01-116C |
| v. | ) | (Judge Allegra) |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO THE COURT'S
ORDERS DATED OCTOBER 14 AND DECEMBER 16, 2005

Defendant, the United States, respectfully responds to this Court's orders dated October 14 and December 16, 2005, in which the Court directed the United States to "file a supplemental brief on whether the writ of mandamus should be deemed effective herein, covering any associated jurisdictional/authority issues."[1]

As we discuss beginning at page 56 of the brief that we filed on December 23, 2005, with the United States Court of Appeals for the Federal Circuit in PSEG Nuclear, LLC v. United States, No. 05-5162 (Fed. Cir.), the United States Court of Appeals for the District of Columbia Circuit exceeded its jurisdiction in issuing its writ of mandamus in Northern States Power Co. v. United States Department of Energy, 128 F.3d 754, 757 (D.C. Cir. 1997), cert. denied, 525 U.S. 1016 (1998). In response to the Court's October 14 and December 16, 2005 orders, we have attached a copy of that brief to this filing and respectfully refer the Court to the information contained in that PSEG Nuclear brief.

[1] Although this pleading had been due on December 23, 2005, the Court has deemed its electronic filing system inaccessible that day, thus we are filing this brief today, December 27, 2005.

Further, for the reasons that we explained in our response to the Court's show cause order dated October 14, 2004, to the extent that another court exceeds its jurisdiction in deciding a case that properly belongs before this Court, the alternate court's decision should not be binding through res judicata upon the parties before this Court. See Christopher Village v. United States, 360 F.3d 1319, 1329-30 (Fed. Cir. 2004). We have now presented to the Federal Circuit our arguments regarding the proper scope of the D.C. Circuit's jurisdiction in Northern States. To the extent that the Federal Circuit agrees with our jurisdictional analysis in PSEG Nuclear, we will be in a better position to address more fully the issues raised by our October 13, 2005 filing, which we submitted in response to the Court's October 5, 2005 order.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr
HAROLD D. LESTER, JR.
Assistant Director

s/ Heide L. Herrmann by Alan J. Lo Re
HEIDE L. HERRMANN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-6289
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel
Department of Justice

December 27, 2005

# ATTACHMENT

05-5162

---

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PSEG NUCLEAR, L.L.C. and
PUBLIC SERVICE ELECTRIC AND GAS COMPANY,

Plaintiffs-Appellants,

v.

THE UNITED STATES,

Defendant-Appellee.

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN 01-CV-551, SENIOR JUDGE BOHDAN A. FUTEY

---

BRIEF FOR DEFENDANT-APPELLEE, THE UNITED STATES

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7562
Facsimile: (202) 307-2503

OF COUNSEL:

ALAN J. LO RE
Senior Trial Counsel
HEIDE L. HERRMANN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

December 23, 2005

Attorneys for Defendant-Appellee

TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUE .......... 1

STATEMENT OF THE CASE .......... 2

I. NATURE OF THE CASE .......... 2

II. COURSE OF PROCEEDINGS BELOW .......... 2

STATEMENT OF FACTS .......... 5

SUMMARY OF ARGUMENT .......... 9

ARGUMENT .......... 14

I. STANDARD OF REVIEW .......... 14

II. THE COURT OF FEDERAL CLAIMS POSSESSES JURISDICTION TO ENTERTAIN PSEG'S CONTRACT CLAIMS UNLESS THE NWPA GRANTS JURISDICTION TO THE UNITED STATES COURTS OF APPEALS .......... 15

III. DIFFERENT COURTS HAVE INTERPRETED THE JUDICIAL REVIEW PROVISION OF THE NWPA IN DIFFERENT AND SOMETIMES DIRECTLY CONFLICTING WAYS .......... 16

A. The NWPA Judicial Review Provision States That The Various United States Courts Of Appeals Have Original Jurisdiction To Review Any Final Decisions Or Actions Of The Secretary Of Energy Arising Under Subtitle A Of Title I Of The NWPA .......... 16

TABLE OF CONTENTS (cont'd)

PAGE

B. Reviewing The Judicial Review Provision Of The NWPA, The D.C. Circuit In *General Electric* Found That Section 119 Encompasses Matters Arising Under Title III Of The NWPA .......... 22

C. The United States Courts Of Appeals Have Routinely Exercised Jurisdiction Under Section 119 Over Actions Arising Outside Of Subtitle A Of Title I Of The NWPA ....... 25

D. The D.C. Circuit Then Extended The Jurisdictional Reach Of Section 119 To Encompass Matters Relating To The Provisions Of, And Remedies Created By, The Standard Contract .......... 26

E. The D.C. Circuit Subsequently Declined To Review Requests For Additional Consideration Of The Available Remedies For DOE's Delay In Beginning SNF Acceptance .......... 31

F. The Court Of Federal Claims In This Case Found That, Because The NWPA Mandates The January 31, 1998 Date, Section 119 Provides The United States Courts Of Appeals With Original And Exclusive Jurisdiction To Review NWPA Contract Claims .......... 32

G. The Trial Court In *Boston Edison* And Several Other Cases Has Now Interpreted Section 119 In A Manner Directly Contrary To The D.C. Circuit's Past Interpretations .......... 35

TABLE OF CONTENTS (cont'd)

PAGE

IV. ALTHOUGH A CLOSE QUESTION, THE SUPREME COURT'S ANALYSIS IN *FAUSTO* DOES NOT AFFECT THE JURISDICTIONAL ANALYSIS HERE ................................ 38

V. THE TRIAL COURT IN THIS CASE, CONSISTENT WITH THE D.C. CIRCUIT'S LONGSTANDING INTERPRETATION, CORRECTLY HELD THAT THE JUDICIAL REVIEW PROVISION OF THE NWPA ENCOMPASSES SECTION 302 ........................................................................ 43

A. Supported by The D.C. Circuit's Longstanding Interpretation Of Section 119, The Trial Court Correctly Found That Section 119 Encompasses Matters Arising Under Section 302 ....................................... 43

B. Congress's Actions Since The D.C. Circuit Decided *General Electric* Further Support The Appropriateness Of The D.C. Circuit's Interpretation Of Section 119 ........................................................................ 47

VI. EVEN THOUGH SECTION 119 ENCOMPASSES SECTION 302, THE TRIAL COURT ERRED IN FINDING THAT THE UNITED STATES COURTS OF APPEALS HAVE JURISDICTION TO ENTERTAIN PSEG'S CONTRACT CLAIMS ................................................................. 49

CONCLUSION ........................................................................................ 60

# TABLE OF AUTHORITIES

CASES PAGE(S)

Alabama Power Co. v. United States Department of Energy,
307 F.3d 1300 (11th Cir. 2002) .......... 26

Amen v. City of Dearborn,
718 F.2d 789 (6th Cir. 1983), cert. denied, 465 U.S. 1101 (1984) .......... 55

Arkla, Inc. v. United States,
37 F.3d 621 (Fed. Cir. 1994) .......... 57, 58

Block v. Community Nutrition Inst.,
467 U.S. 340 (1984) .......... 40

Bosco v. United States,
976 F.2d 710 (Fed. Cir. 1992) .......... 42

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2005) .......... passim

Brown Shoe Co. v. United States,
370 U.S. 294 (1962) .......... 16

Cannon v. University of Chicago,
441 U.S. 677 (1979) .......... 48

Christianson v. Colt Indus. Operating Corp.,
486 U.S. 800 (1988) .......... 55

City of Burbank v. United States,
273 F.3d 1370 (Fed. Cir. 2001) .......... passim

Commonwealth Edison Co. v. United States Department of Energy,
877 F.2d 1042 (D.C. Cir. 1989) .......... 25

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Consolidated Edison Co. of N.Y., Inc. v. United States Dep't of Energy,
870 F.2d 694 (D.C. Cir. 1989) ........................................................ 25

Dehne v. United States,
970 F.2d 890 (Fed. Cir. 1992) ........................................................ 14

Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.,
272 F.3d 1365 (Fed. Cir. 2001) ........................................................ 16

Florida Power & Light Co. v. United States,
64 Fed. Cl. 37 (2005) ........................................................ passim

Florida Power & Light Co. v. United States,
66 Fed. Cl. 93 (2005) ........................................................ 36

General Electric Uranium Management Corp.
v. United States Department of Energy,
764 F.2d 896 (D.C. Cir. 1985) ........................................................ passim

Honeywell, Inc. v. United States,
228 Ct. Cl. 661 F.2d 182 (1981) ........................................................ 58

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) ........................................................ passim

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) ........................................................ 16

Land v. Dollar,
330 U.S. 731 (1947) ........................................................ 14

Lindahl v. OPM,
470 U.S. 768 (1985) ........................................................ 39

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Lorillard v. Pons,
434 U.S. 575 (1978) ........................................................................ 48

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) ........................................................................ 14

Merrill Lynch, Pierce, Fenner & Smith v. Curran,
456 U.S. 353 (1982) ........................................................................ 48

Midwest Independent Transmission Systems Operator, Inc. v. FERC,
388 F.3d 903 (D.C. Cir. 2005) ....................................................... 24

National Presto Indus. v. Dazey Corp.,
107 F.3d 1576 (Fed. Cir. 1997) ...................................................... 43

Northern States Power Co. v. United States Dep't of Energy,
128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1016 (1998) .... passim

Northern States Power Co. v. United States Dep't of Energy,
No. 97-1064, 1998 WL 276581 (D.C. Cir. May 5, 1998) .......................... 31

PIN/NIP, Inc. v. Platte Chem. Co.,
304 F.3d 1235 (Fed. Cir. 2002) ...................................................... 43

Reynolds v. Army & Air Force Exchange Serv.,
846 F.2d 746 (Fed. Cir. 1988) ........................................................ 14

Roedler v. Department of Energy,
255 F.3d 1347 (Fed. Cir. 2001) ...................................................... 15

Santa Fe Engineers, Inc. v. United States,
801 F.2d 379 (Fed. Cir. 1986) ........................................................ 58

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

State of Tennessee v. Herrington,
806 F.2d 642 (6th Cir. 1986) .......... 26

United States v. Cook County,
170 F.3d 1084 (Fed. Cir. 1999) .......... 55

United States v. Fausto,
484 U.S. 439 (1988) .......... 38, 39, 40

Wheeler v. United States,
11 F.3d 156 (Fed. Cir. 1993) .......... 14

Wisconsin Electric Power Co. v. Department of Energy,
778 F.2d 1 (D.C. Cir. 1985) .......... 25

Wisconsin Electric Power Co. v. United States Department of Energy,
211 F.3d 646 (D.C. Cir. 2000) .......... 31, 32

STATUTES

16 U.S.C. §§ 837a .......... 51

16 U.S.C. §§ 839-839h .......... 51

16 U.S.C. § 839e .......... 51, 52, 54

16 U.S.C. § 839f .......... 51, 52

28 U.S.C. § 1491 .......... 15, 38, 42, 44, 49

42 U.S.C. §§ 10101-10270 .......... 5, 16

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

42 U.S.C. § 10131 .................................................................... passim

42 U.S.C. § 10139 .................................................................... passim

42 U.S.C. § 10162-10169 .................................................................... 48

42 U.S.C. § 10172 .................................................................... 47

42 U.S.C. § 10201 .................................................................... 19

42 U.S.C. § 10222(a)(1) .................................................................... passim

96 Stat. 2201 .................................................................... 25

10 C.F.R. § 961.11 .................................................................... passim

MISCELLANEOUS

Cong. Rec. S10439 (Sept. 24, 1981) .................................................................... 41

126 Cong. Rec. H26306 (Sept. 30, 1982) .................................................................... 21

48 Fed. Reg. 5458 (Feb. 4, 1983) .................................................................... 7

48 Fed. Reg. 16,590 (Apr. 18, 1983) .................................................................... 7, 27, 50

59 Fed. Reg. 27007 (May 25, 1994) .................................................................... 8

60 Fed. Reg. 21793 (May 3, 1995) .................................................................... 8, 28

Statement of Sherwood Smith, Edison Electric Institute, to House Committee on Interior and Insular Affairs, Subcommittee on Energy and the Environment (July 9, 1981) .................................................................... 42

BRIEF FOR DEFENDANT-APPELLEE, THE UNITED STATES

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

05-5162

PSEG NUCLEAR, L.L.C. and
PUBLIC SERVICE ELECTRIC AND GAS COMPANY,

Plaintiffs-Appellants,

v.

THE UNITED STATES,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES COURT OF FEDERAL
CLAIMS IN 01-CV-551, SENIOR JUDGE BOHDAN A. FUTEY

## STATEMENT OF THE ISSUE

Whether the trial court correctly held that, pursuant to the judicial review provision of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10139, the various United States courts of appeals possess original and exclusive jurisdiction to entertain plaintiff's claims for partial breach of a contract into which plaintiff

and the Department of Energy ("DOE") entered in accordance with the requirements of the NWPA.

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

Plaintiffs-appellants, PSEG Nuclear, L.L.C. and Public Service Electric and Gas Company (collectively, "PSEG"), appeal from an interlocutory order of the United States Court of Federal Claims, in which the trial court dismissed PSEG's contract claims for lack of jurisdiction. Florida Power & Light Co., *et al.* v. United States, 64 Fed. Cl. 37 (2005) (A0001-27).[1]

### II. COURSE OF PROCEEDINGS BELOW

On September 26, 2001, PSEG filed a complaint in the Court of Federal Claims, which it amended on December 23, 2003, alleging (as amended) (1) that DOE "partially and materially breached the Standard Contracts" by failing to dispose of the nuclear utilities' SNF "beginning no later than January 31, 1998," (2) that DOE "breached the covenant of good faith and fair dealing" by failing to begin disposal by that date, and (3) that DOE's failure to accept their SNF in a

[1] "A____" refers to the joint appendix in this appeal. "PBr___" refers to the plaintiff-appellant's initial brief, dated October 14, 2005. "ABr___" refers to the amicus brief filed by 13 of the clients of Greenberg Traurig, LLP, that have related suits pending in the Court of Federal Claims, dated October 25, 2005.

timely manner constituted a taking of their property in violation of the Fifth Amendment to the United States Constitution. In addition to PSEG's complaint, 65 other complaints alleging damages arising from a partial breach of the Standard Contract, based upon the delay by the Department of Energy ("DOE") in beginning spent nuclear fuel ("SNF") acceptance from nuclear utility contract holders, were filed between February 1998 and January 2004, approximately 59 of which remain pending, through which, according to industry reports, the plaintiffs are seeking up to $50 billion in damages.[2]

On October 14, 2004, the trial court judge assigned to preside over PSEG's case, as well as three other SNF cases, issued a show cause order in each of those cases, indicating the trial court's preliminary belief that the judicial review provision of the NWPA, 42 U.S.C. § 10139(a), granted original and exclusive jurisdiction to entertain the SNF contract claims to the United States courts of appeals for the District of Columbia and the regional circuits. In response to that show cause order, all of the parties, including the United States, indicated their belief that the Court of Federal Claims, rather than the United States courts of appeals, possessed jurisdiction to entertain the SNF contract claims.

---

[2] Two of the 66 cases subsequently were withdrawn, four others have been resolved amicably, and one, Indiana Michigan Power Co. v. United States, No. 98-486C (Fed. Cl.), has been resolved on the merits.

By order dated January 31, 2005, the trial court concluded that it lacked jurisdiction to entertain PSEG's contract claims, as well as the contract claims of the three other SNF plaintiffs. It determined that the judicial review provision of the NWPA, 42 U.S.C. § 10139, created original and exclusive jurisdiction in the United States courts of appeals to entertain any challenges to activities arising under the NWPA, including those arising under the contracts mandated by Section 302 of the NWPA. The trial court ordered the transfer of the contract claims of two of the plaintiffs subject to the court's order to the United States Court of Appeals for the District of Columbia Circuit, but dismissed the contract claims of PSEG and another plaintiff as barred by the 180-day statute of limitations applicable to challenges under the NWPA's judicial review provision. The trial court certified its order for interlocutory review.

The trial court judge who issued the January 31, 2005, order then retired. The four cases in which the order was issued were transferred to four other judges at the Court of Federal Claims. On February 10, 2005, PSEG and the other three plaintiffs timely filed a joint petition with this Court for permission to seek interlocutory review of the trial court's January 31, 2005 interlocutory order. Simultaneously, the four plaintiffs filed motions for reconsideration of the January 31, 2005 order with the four trial court judges to whom the cases had been

transferred. Three of the trial court judges granted the motion for reconsideration, finding that the Court of Federal Claims possessed jurisdiction to entertain the plaintiffs' contract claims. However, the motion for reconsideration was denied in PSEG's case.

By order dated August 4, 2005, after resolution of the motions for reconsideration, this Court granted PSEG's petition for permission to appeal.

## STATEMENT OF FACTS

In January 1983, Congress enacted the NWPA, 42 U.S.C. §§ 10101-10270. Two of the Act's primary purposes were to "establish the Federal responsibility, and a definite Federal policy, for the disposal" of SNF and high-level radioactive waste ("HLW") owned by commercial nuclear utilities and, further, "to establish a schedule for the siting, construction, and operation of repositories" for permanent storage of such waste. 42 U.S.C. § 10131(b). In Section 302(a) of the NWPA, Congress authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). The statute provided that the contracts should contain the following terms:

> Contracts entered into under this section shall provide that —
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the [HLW] or [SNF] involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [HLW] or [SNF] involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). Other than establishing the manner in which the fees were to be calculated, id. § 10222(a)(2)-(3), the NWPA did not mandate the remaining terms of the contract. Thus, while the NWPA provided that DOE, "beginning not later than January 31, 1998, will dispose of [SNF]," id. § 10222(a)(5), as the D.C. Circuit held, it did not require DOE to have an operational repository by that date, but allowed temporary storage of SNF in alternative facilities pending the availability of a repository. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996) (language of subsection 302(a)(5)(A), dealing with the repository, may not be read into subsection 302(a)(5)(B), dealing with January 31, 1998 date).

In February 1983, DOE, in furtherance of its obligations pursuant to the NWPA, published for notice and comment in the Federal Register a proposed

"Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"). That rulemaking was to "have the effect of developing the contractual terms and conditions under which DOE [would] make available nuclear waste disposal services." 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) (Notice of Proposed Rulemaking). After receiving and evaluating comments from interested parties, and after adopting many of the contract provisions requested in those comments, DOE published the terms of the Standard Contract in a final rule. 48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983); see 10 C.F.R. § 961.11 (containing Standard Contract terms). The final Standard Contract contemplated that DOE would begin SNF acceptance by January 31, 1998, at a "DOE facility," which is defined as a repository contemplated by the NWPA, "a facility operated by or on behalf of DOE for the purpose of disposing of [SNF]," or "such other facility(ies) to which [SNF] may be shipped by DOE prior to its transportation facility." 10 C.F.R. § 961.11, Arts. I(10), II.

On June 16, 1983, PSEG executed its contracts with DOE for the disposal of PSEG's SNF. Amended Compl. ¶ 9. The Standard Contracts that PSEG executed did not obligate DOE to begin accepting SNF from each and every contract holder by January 31, 1998. Instead, it obligated DOE to allocate SNF acceptance rights based upon the comparative age of all SNF owned by all Standard Contract

holders, with those contract holders owning the oldest SNF earning the first acceptance allocations. 10 C.F.R. § 961.11, Art. IV.B.5(a).

In 1994, DOE issued a Notice of Inquiry, in which it identified its "preliminary view" that DOE had "no statutory obligation to accept [SNF] beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA] . . . ." 59 Fed. Reg. 27007, 27008 (May 25, 1994). After receiving comments from interested parties, DOE issued a Final Interpretation on May 3, 1995, which included DOE's belief that the January 31, 1998 date in the Standard Contract for beginning SNF acceptance was conditioned upon the existence of a repository and that, if it were unconditional, the "Delays" clause of the Standard Contract would provide an administrative remedy for DOE's failure to begin acceptance. 60 Fed. Reg. 21793 (May 3, 1995). Pursuant to the "Judicial Review" provision of the NWPA, 42 U.S.C. § 10139, several nuclear utilities, including PSEG, challenged DOE's interpretation in the D.C. Circuit. The court of appeals limited its analysis and holding in Indiana Michigan to a determination "that section 302(a)(5)(B) [of the NWPA] create[d] an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998," and remanded the matter to DOE for further action

consistent with that holding. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996).

In late 1996, subsequent to the issuance of the Indiana Michigan decision, DOE issued letters to utilities holding NWPA disposal contracts acknowledging a contractual obligation to begin accepting SNF for disposal by January 31, 1998, advising that it would be unable to do so, and soliciting views of recipients. See Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754, 757 (D.C. Cir. 1997), cert. denied, 525 U.S. 1016 (1998). On June 3, 1997, DOE informed the Standard Contract holders that it viewed its inability to accept SNF beginning January 31, 1998, to constitute an "unavoidable delay" under Article IX.A of the contracts, but that it nonetheless was willing to consider possible contract amendments to mitigate the delay's effect. Id. Upon challenge of those decisions, the court of appeals rejected DOE's positions. Id. at 760.

DOE was ultimately unable to begin SNF acceptance from the contract holders by January 31, 1998, and this suit followed.

## SUMMARY OF ARGUMENT

We agree with PSEG that the trial court erred in finding that the Court of Federal Claims lacks jurisdiction to entertain PSEG’s contract claims. Nevertheless, in its initial brief, PSEG has glossed over the severely conflicting

jurisdictional rationales that other courts have used to find that the Court of Federal Claims possesses jurisdiction to entertain such claims. Over 20 years ago, the D.C. Circuit issued the first of several decisions regarding the scope of Section 119, the judicial review provision in the NWPA, 42 U.S.C. § 10139(a), which places original and exclusive jurisdiction to consider challenges under the NWPA, including final actions, decisions, and failures to act or to decide under Subtitle I of Title A of the NWPA in the United States Courts of Appeals for the D.C. Circuit and regional circuits. The D.C. Circuit, subsequently joined by the Eleventh Circuit, interpreted that provision as including review under Section 119 matters arising under Title III of the NWPA, the location of the NWPA's fee and contracting provisions. The D.C. Circuit also announced a limit upon the scope of the Section 119 judicial review provision, finding that challenges to purely contract administration matters belong in the Court of Federal Claims.[3] The D.C. Circuit has issued numerous decisions regarding Nuclear Waste Fund ("NWF") fee issues and SNF acceptance issues that arise only pursuant to Title III of the NWPA, some of which PSEG and other SNF plaintiffs have argued are binding precedent that

---

[3] Notwithstanding this jurisdictional analysis, as will be discussed below, the D.C. Circuit, in the Northern States and Indiana Michigan cases, considered contract administration issues.

limit the Government's ability to advance certain arguments before the Court of Federal Claims.

Conversely, the Court of Federal Claims has issued three different lines of decisions regarding jurisdiction. In the first, the trial court has agreed that it possesses jurisdiction to entertain matters relating to contract administration under the Standard Contract, a contract authorized by Title III of the NWPA, while further tacitly agreeing that, under Section 119 of the NWPA, certain Title III disputes must be brought before the United States courts of appeals. In the second, which is the case on appeal here, the trial court found that, because Section 119 encompasses review of actions under Section 302, the limitation that the D.C. Circuit imposed upon Section 119's application to contract administration matters was in error and that the United States courts of appeals possess original and exclusive jurisdiction to consider challenges to those issues regarding contract administration. In the third line of cases, the trial court, disagreeing with the second line, has called into question the entirety of the D.C. Circuit's decisions regarding fees and SNF acceptance obligations. It held that Section 119 does not grant jurisdiction to the courts of appeals to consider Section 302 matters at all. See, e.g., Boston Edison Co. v. United States, 64 Fed. Cl. 167, 178-79 (2005). In this third line of decisions, the trial court, if correct, would eradicate the

jurisdictional foundation for all of the D.C. and Eleventh Circuit decisions regarding matters addressed in Title III of the NWPA, including fees and DOE's obligations to accept SNF. Although the trial court which adopted this third line of reasoning has suggested that it is not questioning the D.C. Circuit's past decisions, it is clear that either the D.C. Circuit and regional circuits have "original and exclusive jurisdiction" to entertain Section 302 matters, or they do not. It is impossible for both the courts of appeals and the Court of Federal Claims simultaneously to have such original and exclusive jurisdiction. Further, the Court of Federal Claims' third line of jurisdictional analysis – suggesting that the D.C. and Eleventh Circuits have erred in entertaining fee and SNF acceptance issues – renders unclear the binding effect of the decisions of the courts of appeals since, according to this third line of reasoning, they purportedly were issued by courts without jurisdiction.

We identify these conflicting jurisdictional positions to highlight the importance of this Court's final resolution of the jurisdictional question here. To ensure that the trial court in this and other SNF cases properly acts within the scope of its jurisdiction, and does not infringe upon that of the courts of appeals, there is a need to identify clearly the basis for the trial court's jurisdiction.

To determine the trial court's jurisdiction, it is necessary, first, to determine whether Section 119 encompasses actions, decisions, and failures to act arising from Section 302, the section that establishes the NWPA's fee and contracting requirements. Assuming that the long-standing analysis of the D.C. and Eleventh Circuits is correct, it then becomes necessary to determine whether Section 119 grants jurisdiction to the courts of appeals to consider all issues involving the contracts referenced in Section 302 or whether, instead, Section 119 encompasses only certain issues. When the trial court analyzed Section 119, it erred in finding that all contract disputes arising under the Standard Contract belong in the United States courts of appeals. Where Section 302 To the contrary, because Section 302 of the NWPA requires DOE to include a provision in its contracts that DOE will begin SNF acceptance by January 31, 1998, but does not identify that deadline outside the context of a direction to include it as a contract term, the courts of appeals' jurisdiction under Section 119 is limited to the question whether the contracts promulgated comply with the statutory direction to include an obligation to begin acceptance SNF not later than January 31, 1998. Because PSEG challenges DOE's failure to <u>comply</u> with its previously promulgated contract terms, jurisdiction to entertain that challenge in the Court of Federal Claims

pursuant to the Tucker Act, rather than in the courts of appeals under Section 119, is proper.

ARGUMENT

I. STANDARD OF REVIEW

"This Court reviews de novo whether the Court of Federal Claims possessed jurisdiction" to entertain the plaintiff's contract claims because jurisdiction is a "question[] of law." Wheeler v. United States, 11 F.3d 156, 158 (Fed. Cir. 1993) (citing Dehne v. United States, 970 F.2d 890, 892 (Fed. Cir. 1992)). In considering a motion to dismiss for lack of subject matter jurisdiction, "the court must accept as true any undisputed allegations of fact made by the non-moving party." Reynolds v. Army & Air Force Exchange Serv., 846 F.2d 746, 747 (Fed. Cir. 1988).[4] Nevertheless, "[t]he party invoking federal jurisdiction bears the burden of establishing" the court's subject matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); see Reynolds, 846 F.2d at 748 (plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence").

[4] "If a motion to dismiss for lack of subject matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see Land v. Dollar, 330 U.S. 731, 735 n.4 (1947).

## II. THE COURT OF FEDERAL CLAIMS POSSESSES JURISDICTION TO ENTERTAIN PSEG'S CONTRACT CLAIMS UNLESS THE NWPA GRANTS JURISDICTION TO THE UNITED STATES COURTS OF APPEALS

"The Tucker Act vests the Court of Federal Claims with jurisdiction over . . . government contract dispute[s] unless a specific jurisdictional statute grants jurisdiction to another court." City of Burbank v. United States, 273 F.3d 1370, 1377 (Fed. Cir. 2001) (citing 28 U.S.C. § 1491(a)(1)). In this case, the trial court found that PSEG's breach of contract claims, which arise from a contract authorized by the NWPA, are subject to the judicial review provision of the NWPA and that this judicial review provision, Section 119, grants jurisdiction to entertain such contract claims to the United States courts of appeals. As will be discussed below, the trial court's analysis of the applicability of Section 119 of the NWPA to PSEG's contract claims is incorrect, and jurisdiction to entertain those contract claims in the Court of Federal Claims is proper, although not upon the basis that PSEG appears to suggest.[5]

---

[5] In its brief, PSEG suggests that this Court has already resolved the issue of whether the Court of Federal Claims possesses jurisdiction to entertain the nuclear utilities' breach of contract claims, citing this Court's decision in Roedler v. Department of Energy, 255 F.3d 1347 (Fed. Cir. 2001). PBr36. In Roedler, the Court considered whether the plaintiffs, who were ratepayers of a nuclear utility, could seek monetary damages from the United States in the United States district court under the Little Tucker Act. Roedler, 255 F.3d at 1351. However, in Roedler, this Court was not presented with and did not consider the issue now

## III. DIFFERENT COURTS HAVE INTERPRETED THE JUDICIAL REVIEW PROVISION OF THE NWPA IN DIFFERENT AND SOMETIMES DIRECTLY CONFLICTING WAYS

### A. The NWPA Judicial Review Provision States That The Various United States Courts Of Appeals Have Original Jurisdiction To Review Any Final Decisions Or Actions Of The Secretary Of Energy Arising Under Subtitle A Of Title I Of The NWPA

To appreciate fully the meaning of the judicial review provision in the NWPA and the scope of its reach, it is important to review the long-standing interpretations of that provision under which the nuclear utility industry and the Government have operated for the past 20 years.

1. In 1983, Congress enacted the Nuclear Waste Policy Act of 1982 "NWPA"), 42 U.S.C. §§ 10101-10270. The NWPA is divided into five titles: Title I, entitled "Disposal and Storage of High-Level Radioactive Waste, Spent

---

presented – that the judicial review provision of the NWPA creates original and exclusive jurisdiction in the United States courts of appeals – because neither party raised that issue. The doctrine of res judicata does not establish the Court of Federal Claims' jurisdiction with regard to an issue that was never considered.

Recently, this Court resolved one of the SNF plaintiff's appeals of a SNF damages decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), but, in that case, the Court did not address the jurisdictional issue raised here. The mere exercise or assumption of jurisdiction in Indiana Michigan does not constitute binding precedent on the jurisdictional point. See Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1378 (Fed. Cir. 2001) ("[w]e are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed *sub silentio* . . .") (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 307 (1962)).

Nuclear Fuel, and Low-Level Radioactive Waste;" Title II, entitled "Research, Development, And Demonstration Regarding Disposal Of High-Level Radioactive Waste And Spent Nuclear Fuel;" Title III, entitled "Other Provisions Relating To Radioactive Waste;" Title IV, entitled "Nuclear Waste Negotiator;" and Title V, entitled "Nuclear Waste Technical Review Board." See 96 Stat. 2201 (enacted Jan. 7, 1983). There are eight subtitles within Title I – Subtitles A through H – while Titles II through V do not contain any subtitles.

In Section 111 of the NWPA, which is contained in Subtitle A of Title I, Congress set forth the primary purposes of "this subtitle"[6] of the NWPA: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF; establishing Federal responsibility and policy for the disposal of SNF; defining the relationship between the Federal Government and state governments regarding SNF disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent

---

[6] When codified, the NWPA became "Chapter 108" of Title 42 of the United States Code. When codified, the term "Title," as it had been used in the statute as published in the Statutes At Large, was changed to "Subchapter," and the term "Subtitle" was changed to "Part." Accordingly, in various court decisions, the words "Title" and "Subchapter," and the words "Subtitle" and "Part," are used interchangeably.

> fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

The NWPA also contains a judicial review provision, which is contained in Section 119 of Subtitle A of Title I of the statute. 42 U.S.C. § 10139. It provides for judicial review of certain actions, or inaction, by the Secretary of Energy and grants original and exclusive jurisdiction to the D.C. Circuit and the various regional circuits over the following:

> Except for review in the Supreme Court of the United States, the United States courts of appeals[7] shall have original and exclusive jurisdiction over any civil action –
>
> (A) for review of any final decision or action of the Secretary, the President, or the Commission under this subtitle;
>
> (B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this subtitle;
>
> (C) challenging the constitutionality of any decision made, or action taken, under any provision of this subtitle;

---

[7] Section 119(a)(2) of the NWPA defines the venue for challenges under section 119 as "the judicial circuit in which the petitioner resides or has its principal office, or in the [D.C. Circuit]." 42 U.S.C. § 10139(a)(2).

> (D) for review of any environmental impact statement . . . with respect to any action under this subtitle . . .;
>
> (E) for review of any environmental assessment prepared under section 112(b)(1) [in Subtitle A of Title I] or 135(c)(2) [in Subtitle B of Title I]; or
>
> (F) for review of any research and development activity under title II.

42 U.S.C. § 10139(a)(1) (emphasis added).[8] Under that judicial review provision, any petition seeking review of any "decision or action or failure to act" identified in Section 119(a)(1) must be filed "not later than the 180th day after the date of the decision or action or failure to act involved." Id. § 10139(c).

Title III of the NWPA contains Section 302(a), in which Congress authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). That same section of the statute provides that the "[c]ontracts entered into under this section shall provide" that, "in return for the payment of fees established by this section, the Secretary,

[8] In addition, Section 221 of the Act, 42 U.S.C. § 10201, expressly provides for judicial review of research and development activities under Title II in accordance with Section 119.

beginning not later than January 31, 1998, will dispose of the [HLW and SNF] involved as provided in this subtitle."[9] 42 U.S.C. § 10222(a)(5). Other than establishing the manner in which the fees that contract holders were required to pay were to be calculated, id. § 10222(a)(2)-(3), the NWPA did not mandate the remaining terms of the contract.

Section 302(a) also establishes the fees that contract holders will have to pay into the Nuclear Waste Fund ("NWF") for the disposal of their SNF, expanding upon Section 111 of Subtitle A of Title I, which specifically identifies the creation of the NWF and the payment of fees as a purpose of Subtitle A of Title I. See 42 U.S.C. § 10131(b)(4).

2. The version of the NWPA that was enacted resulted from three bills that were introduced in the House of Representatives during the 97th Congress: H.R. 3809, H.R. 6598, and H.R. 5016. The language of Section 119 contained in H.R. 3809 and H.R. 6598 was substantially similar to the language of Section 119 that was enacted. Each of those bills also included, with Subtitle A of Title I, an analog to current Section 302, denominated Section 124 in H.R. 3809 and Section 123 in H.R. 6598. See Report on H.R. 3809, pt. 1 at 15-18 ("Section 124(a)

---

[9] Although Section 302(a)(5)(B) references "this subtitle," there actually is no subtitle in Title III.

authorizes the Secretary to contract with utilities . . . to provide repository services in return for payments by repository users to cover program costs"); Report on H.R. 6598, pt. 1, at 77 ("Section 123(a)(1) authorizes [DOE] to enter into contracts . . . for the disposal of [SNF]. Contracts are required to establish fees and charges to offset all expenditures.").[10]

When the three bills were reconciled and introduced as H.R. 7187 (a substitute for H.R. 3809), see 126 Cong. Rec. H26306 (Sept. 30, 1982), provisions from the Science and Technology Committee were placed in Title II, displacing former Title II provisions that were then relocated to Sections 303 and 304 of a new Title III. Section 124 of H.R. 3809 and Section 123 of H.R. 6598, which related to fees and the creation of a contract, were also moved to the newly-created Title III, for reasons that do not appear to be specified in the legislative history, and were placed in Section 302. However, the judicial review language in Section 119 was not expressly revised to incorporate this relocation. Nevertheless, Subtitle A of Title I retained references to the fees that the statute would require contract holders to pay. See 42 U.S.C. § 10131(a)(4)-(5), (b)(4) (Section 111, Subtitle A, Title I).

---

[10] The Senate version of the bill did not contain a judicial review provision.

B. Reviewing The Judicial Review Provision Of The NWPA, The D.C. Circuit In *General Electric* Found That Section 119 Encompasses Matters Arising Under Title III Of The NWPA

Although the language of Section 119 only expressly refers to review of decisions, actions, or inaction of the Secretary of Energy arising under the "Subtitle" in which Section 119 is located – Subtitle A of Title I – and to matters specifically referenced in Subtitle B of Title I and in Title II, the D.C. Circuit has held unequivocally that various actions or decisions arising under Title III of the NWPA fall within the original and exclusive jurisdiction of the United States courts of appeals pursuant to section 119. In General Electric Uranium Management Corp. v. United States Department of Energy, 764 F.2d 896 (D.C. Cir. 1985), the D.C. Circuit reviewed the history, development, and purposes of the NWPA and concluded, in reviewing a challenge to the Secretary's establishment of NWF fees under Section 302 of Title III, that Congress intended to include review of actions under Section 302 in the courts of appeals' original and exclusive jurisdiction. Recognizing that Section 302 in Title III "has no specific review provision" in the NWPA, the Court found "it inconceivable that Congress intended to have review of all actions concerning waste disposal in the court of appeals – including the choice, characterization, approval of, and authorization for construction of candidate sites; federal agency actions such as coordination and

environmental review; research and development questions relating to the disposal of high-level wastes and SNF, including funding and payments to the states and Indian tribes under the Act – except for questions concerning the composition of the [NWF] and a few other matters located in Subchapter III." Id. at 901-02.

The D.C. Circuit also found that "[t]he structure of the Waste Act supports [its] view that it would be singularly incongruous for fee questions [in Title III] to be subject to judicial review in both the district courts and the courts of appeals, while all other matters would go directly to the courts of appeals." Id. at 902. As the D.C. Circuit explained, the NWPA focuses only on the disposal of particular nuclear wastes, making it likely that Congress intended for a uniform judicial review of all of the matters identified in the statute relating to disposal:

> The Waste Act has a limited and integral purpose and structure. It focuses *only* on the disposal of nuclear wastes. Subchapter I addresses permanent repositories for the disposal of high-level wastes and SNF in Part A, an interim storage program in Part B, monitored retrievable storage in Part C, and low-level waste disposal in Part D. Subchapter II provides for research, development and demonstration, and Subchapter III is a catch-all for other necessary provisions. In Part A of Subchapter I, Congress expressed its goal to set up a Nuclear Waste Fund, and its intention that generators and owners of nuclear wastes and SNF should bear the costs of disposal. The mere fact that Congress granted the Secretary the authority to enter into contracts to provide for the payment of those disposal costs in a different

> subchapter does not compel the conclusion that Congress thereby intended that there would be entirely different judicial review procedures for those contracts.

Id. (emphasis added).

The D.C. Circuit also noted that, "as we look at the statute as a whole," section 302(a)(1) "gives the Secretary the authority to enter into contracts to provide the fees for disposal '[i]n the performance of his functions *under this chapter* . . . . .'"[11] Id. (italics in original). "In this context," the court held, "the word 'chapter' refers to Chapter 108 of Title 42 which, of course, encompasses the entire Waste Act." Id. "Therefore, [the court found] that section 302 incorporates by reference the functional responsibilities of the Secretary under Part A of Subchapter I." Id. The court also found that, "[b]y the same token, the purpose to establish the Waste Fund . . . is found in Part A of Subchapter I" and that "[t]his purpose incorporates by reference the contractual provisions of section 302." Id. "It thus appears," the court held, "that, from whatever vantage point we approach the statutory construction problem that we address here, we inevitably conclude that Congress intended to vest original and exclusive jurisdiction with the courts of appeals." Id.; see Midwest Indep. Transmission Sys. Operator, Inc. v. FERC, 388

---

[11] In the original statute as enacted, prior to its codification in the United States Code, the language of the Act read "[i]n the performance of his duties *under this Act* . . . ." 96 Stat. 2201, 2257 (italics added).

F.3d 903, 909-10 (D.C. Cir. 2005) (discussing basis of General Electric's jurisdictional ruling).[12]

C. The United States Courts Of Appeals Have Routinely Exercised Jurisdiction Under Section 119 Over Actions Arising Outside Of Subtitle A Of Title I Of The NWPA

In the 20 years since the General Electric decision was issued, both the D.C. Circuit and the United States Court of Appeals for the Eleventh Circuit have consistently asserted jurisdiction over challenges to the Secretary's actions or alleged inactions arising out of the fee provisions of Section 302 of Title III of the NWPA. See, e.g., Wisconsin Electric Power Co. v. Department of Energy, 778 F.2d 1, 2-3 (D.C. Cir. 1985); Consolidated Edison Co. of N.Y., Inc. v. United States Dep't of Energy, 870 F.2d 694 (D.C. Cir. 1989); Commonwealth Edison Co. v. United States Department of Energy, 877 F.2d 1042, 1045 (D.C. Cir. 1989);

[12] This rationale also applies to section 302(a)(5), the portion of the NWPA that authorizes the Secretary of Energy to enter into SNF disposal contracts. Section 302(a)(5), as enacted, required contracts to provide that "the Secretary, beginning not later than January 31, 1998, will dispose of the [waste] involved as provided in this subtitle." 96 Stat. at 2258 (emphasis added). Yet, there is no "subtitle" in Title III, in which Section 302 is contained. Waste disposal activities are discussed in Subtitle A of Title I. (Although the word "subtitle" in Section 302(a)(5)(B) was changed to "subchapter" (rather than "part") when codified in the United States Code, the notes to that section indicate that the publishers "translated" the words "this subtitle" to "this subchapter to reflect the probable intent," in their view, "of Congress because Title III of Pub. L. 97-425, which enacted this subchapter, does not contain subtitles," 42 U.S.C. § 10222 Historical and Statutory Notes.)

Alabama Power Co. v. United States Dep't of Energy, 307 F.3d 1300, 1302 (11th Cir. 2002). Similarly, the United States Court of Appeals for the Sixth Circuit has found that Congress intended that the judicial review provisions of Section 119 encompass more than the specific subtitles and sections expressly identified in Section 119: specifically, matters arising under Section 141 of Subtitle C of Title I. State of Tennessee v. Herrington, 806 F.2d 642, 647-51 (6th Cir. 1986).

### D. The D.C. Circuit Then Extended The Jurisdictional Reach Of Section 119 To Encompass Matters Relating To The Provisions Of, And Remedies Created By, The Standard Contract

As previously discussed, Section 302(a)(5) provides that any contract into which DOE enters "shall provide" that (A) "following commencement of a repository, the Secretary shall take title to the [HLW and SNF] involved as expeditiously as practicable . . .," and (B) "in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [HLW and SNF] involved as provided in this subtitle." 42 U.S.C. § 10222(a)(5) (emphasis added). The January 31, 1998 deadline identified in Section 302(a)(5)(B) appears nowhere else in the NWPA. To the contrary, the only direction in the NWPA relating to that date is that DOE is to include that date in its contracts.

When DOE promulgated the Standard Contract through notice-and-comment rulemaking in 1983, it complied with the requirement contained in Section 302(a)(5) and identified the January 31, 1998 deadline in the contract. 48 Fed. Reg. 16,590 (Apr. 18, 1983); see 10 C.F.R. § 961.11, Art. II (containing Standard Contract terms). However, DOE also included a clause that defined the parties' rights and obligations in the event that there was any unavoidable delay, as that term was defined in the Standard Contract, that occurred in SNF acceptance. 48 Fed. Reg. 16,590 (Apr. 18, 1983) (Art. IX.A). No entity, within 180 days after the promulgation of these contract terms, filed any challenge to the terms of the Standard Contract, other than those relating to the manner in which the fee was calculated (as previously identified), or to those provisions within the Standard Contract that would excuse DOE from delayed performance if it experienced unavoidable delays. Accordingly, because Section 302(a)(5)(B) only requires that DOE include the January 31, 1998 date in the contract, and because no entity challenged the manner in which DOE included that provision in the contract within 180 days after the contract's promulgation, any challenge to DOE's contract language was time-barred. See 42 U.S.C. § 10139(c) (requiring all challenges to final actions, decisions, or failures to act to which Section 119 is applicable to be filed within 180 days after action, decision, or failure to act).

In a Federal Register notice issued in 1995, DOE issued a "final interpretation" indicating that its belief that the NWPA conditioned its obligation to provide SNF storage, as identified in Section 302 of Title III of the NWPA, upon the availability of a repository or other permanent or interim storage facility constructed pursuant to the NWPA. 60 Fed. Reg. 21793 (May 3, 1995). Assuming, without discussion or analysis, jurisdiction under Section 119 to entertain challenges to activities arising under Title III of the NWPA, the D.C. Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), found jurisdiction to entertain a challenge to that "final interpretation" and rejected DOE's interpretation of its obligations under Title III of the NWPA. Although the language of Section 302(a)(5)(B) provides that DOE's contracts "shall provide" that DOE will begin SNF acceptance not later than January 31, 1998, and although no entity had challenged DOE's implementation of this statutory direction within 180 days after the Standard Contract was promulgated, the D.C. Circuit determined "that section 302(a)(5)(B) [contained in Title III] create[d] an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998," id. at 1277, without reference to the fact that any such obligation was contractual. The D.C.

Circuit remanded the matter to DOE for further proceedings consistent with its holding. Id.

Subsequently, in January 1997, a number of utilities and state agencies filed separate petitions for writs of mandamus in the D.C. Circuit that, among other things, sought to compel DOE to begin accepting SNF by January 31, 1998, which they alleged was required pursuant to section 302(a)(5)(B) of Title III of the NWPA. See Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1016 (1998). In comments responding to the utilities' demands dated June 3, 1997, DOE indicated its belief that "the Standard Contract adopted by the Department pursuant to Section 302 and entered into by the contract holders specifies the available remedies in the event the Department is unable to meet the January 31, 1998 date," specifically identifying the "Unavoidable Delays" clause of the Standard Contract. Id. at 757 (quoting comments). In Northern States, the D.C. Circuit, again assuming jurisdiction without discussion or analysis, granted the petitions for mandamus in part by ordering DOE to "proceed with contractual remedies in a manner consistent with the NWPA's command that it undertake an unconditional obligation to begin disposal of SNF by January 31, 1998." Id. at 760. It found that, as directed by the NWPA, "DOE's duty to take the materials by the 1998 deadline is also an integral

part of the Standard Contract, which provides that the Department 'shall begin' disposing of the SNF by January 31, 1998." Id. at 758 (citing 10 C.F.R. § 961.11, Art. II). It evaluated the contract provisions and the potential delay remedies available pursuant to the language of the Standard Contract, including Article IX of the Standard Contract, the "Unavoidable Delays" clause – a contractual provision that was not contained in the NWPA. After conducting this evaluation, it ordered that DOE was precluded from "concluding that its delay is unavoidable" under the "Unavoidable Delays" clause "on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." Id. The D.C. Circuit further ordered that "DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity,'" as identified in that contract clause. Id. However, it concluded that Article IX.B of the Standard Contract – the "Avoidable Delays" clause – afforded utilities a "potentially adequate remedy," id. at 758-59, 761, and "that petitioners must pursue the remedies provided in the Standard Contract." Id. at 758.

In a subsequent unpublished order issued in response to petitions for rehearing, the D.C. Circuit indicated that it had "remitted the utilities to their remedies under the Standard Contract," that "[s]uits based on the Contract may

present issues of the permissible forms of equitable adjustment, and [that] possibly the award of some forms of equitable adjustment would place the DOE in violation of the NWPA and again properly trigger [the D.C. Circuit's] jurisdiction (as opposed to that of the Court of Federal Claims) under either the NWPA or the APA." Northern States Power Co. v. United States Dep't of Energy, No. 97-1064, 1998 WL 276581, at *1 (D.C. Cir. May 5, 1998) (unpublished). It further denied, in response to the Government's petition for rehearing, that it had "erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract" and that it had "merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998." Id. at *2.

### E. The D.C. Circuit Subsequently Declined To Review Requests For Additional Consideration Of The Available Remedies For DOE's Delay In Beginning SNF Acceptance

Subsequently, in Wisconsin Electric Power Co. v. United States Department of Energy, 211 F.3d 646 (D.C. Cir. 2000), the D.C. Circuit considered a contract holder's request for "a declaration that [DOE] must provide both monetary and non-monetary relief for having failed to begin disposing of [the petitioner's] spent nuclear fuel (SNF) on January 31, 1998, as required by the parties' Contract"

pursuant to Section 302(a)(5) of the NWPA. Id. at 647. The D.C. Circuit, in effect, found that the NWPA required the Secretary to include a provision in his contracts that required DOE to begin acceptance of SNF beginning no later than January 31, 1998. The court further found that "a contract '[b]reach by the DOE does not violate a statutory duty,'" id. at 648 (quoting from prior unpublished Northern States decision), and, presumably, any remedy for breach would be a matter of contract. The D.C. Circuit indicated that it had previously reviewed the Standard Contract in Northern States to determine whether DOE’s actions could constitute an “unavoidable delay” under the terms of the Standard Contract, only for purposes of determining whether DOE was undermining its statutory duty to include in its contracts an unqualified obligation to begin accepting SNF no later than January 31, 1998. The D.C. Circuit noted in Wisconsin Electric that "[t]he Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes." Id.

### F. The Court Of Federal Claims In This Case Found That, Because The NWPA Mandates The January 31, 1998 Date, Section 119 Provides The United States Courts Of Appeals With Original And Exclusive Jurisdiction To Review NWPA Contract Claims

At various times between February 1998 and January 2004, a total of 66 cases have been filed in the Court of Federal Claims, seeking damages for DOE's

partial breach of the Standard Contract and/or for takings under the Fifth Amendment of the United States Constitution.

By unpublished order dated October 14, 2004, issued in four of the SNF cases, including the case on appeal here, the Court of Federal Claims requested that those plaintiffs show cause as to "why their claims based on defendant's alleged breach of a contract to begin to dispose of SNF before the date set out at Section 302(a)(5)(B) of the NWPA should not be dismissed for lack of jurisdiction or transferred to a federal circuit court of appeals with original and exclusive jurisdiction to hear challenges to the Department of Energy's ('DOE') purported actions or failures to act in conformity with the statute." Order, at 36 (Fed. Cl. Oct. 14, 2004). The basis of the court's order for the plaintiffs to show cause was its preliminary analysis that, "although the Act clearly contemplates a 'contract,' it just as clearly did not provide for review of that contract in the usual forum, the Court of Federal Claims." Order, at 10 (Fed. Cl. Oct. 14, 2004), reprinted in Florida Power & Light Co. v. United States, 62 Fed. Cl. 37, 49 (2005) (A25) (incorporating language from show cause order). The court indicated its preliminary view that the judicial review provisions of the NWPA, which are set forth at Section 119, provide for original and exclusive jurisdiction in the Federal circuit courts of appeals of any challenge to the Secretary of Energy's action or

failure to take an action required by the NWPA and that this exclusive jurisdiction includes actions under the contract mandated by Section 302(a)(5). Id.

By order dated January 31, 2005, the trial court found that, under the judicial review provisions of the NWPA, the Court of Federal Claims lacks jurisdiction to entertain these contract claims. Florida Power & Light Co. v. United States, 64 Fed. Cl. 37 (2005) (A1-27). Agreeing with the D.C. Circuit's analysis in General Electric and subsequent decisions, it held that Section 119, the judicial review provision of the NWPA, provides the United States courts of appeals with original and exclusive jurisdiction over activities arising under Title III of the NWPA, which includes Section 302. A2-3, 21-27. However, disagreeing with the D.C. Circuit, it further found that, because the plaintiffs' contracts were mandated by Section 302(a)(5) of Title III of the NWPA, the United States courts of appeals, and not the Court of Federal Claims, were the appropriate fora for review of the plaintiffs-petitioners' claims:

> In sum, over the twenty-two year period since enactment of the NWPA, the U.S. Circuit Courts of Appeal appear consistently (with the exception [of the D.C. Circuit's decision in Wisconsin Electric]) to have exercised jurisdiction over petitions challenging DOE actions or failures to act under Title III of the Act, including Section 302, the provision at issue here, based on Section 119's grant of original and exclusive jurisdiction for those

> courts to review "any final decision or action of the Secretary, the President or the Commission."
>
> Thus, the legislative history and structure of the Act, and longstanding judicial practice, appear to support the conclusion that a challenge to DOE's failure to accept waste by the date set out in Section 302(a)(5)(B) is a challenge to "the failure of the Secretary [of DOE] . . . to take any action[] required under [Title III of the Act]" under Section 119(a)(1)(B), and thus is an action falling within the original and exclusive jurisdiction of the appropriate Federal court of appeals.

A27. As support for its jurisdictional finding, the trial court relied, in part, upon its analysis of the statutory language, A27, and upon this Court's decision in City of Burbank v. United States, 273 F.3d 1370 (Fed. Cir. 2001), which it found involved a statutory scheme and judicial review provision similar to Section 119 of the NWPA. A3-4.

### G. The Trial Court In *Boston Edison* And Several Other Cases Has Now Interpreted Section 119 In A Manner Directly In Conflict With The D.C. Circuit's Past Interpretations

Soon after issuing her decision in Florida Power, the judge who authored that opinion retired, and the four cases subject to the Florida Power decision were reassigned to other judges. Upon motions for reconsideration filed by the plaintiffs in those cases, three of the four judges assigned to them vacated the January 31, 2005 Florida Power jurisdictional decision, each adopting a jurisdictional basis in

direct conflict with the decisions of the D.C., Sixth, and Eleventh Circuits. Specifically, each of the three judges of the Court of Federal Claims vacating the Florida Power order adopted the opinion of another Court of Federal Claims' judge in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), in which the trial court determined that "[j]urisdiction over actions taken under Title III," including Section 302, "is not affected at all by Section 119," allowing the Court of Federal Claims to assert jurisdiction over contract matters without reference to Section 119. Id. at 178-79; see Florida Power & Light Co. v. United States, 66 Fed. Cl. 93, 97-98 (2005).

Specifically, the Boston Edison court reviewed Section 119 of the NWPA, identified the use of the language "under this subtitle" that appears in that section, and, in direct conflict with the D.C. Circuit's decision in General Electric and subsequent decisions invoking similar interpretations, determined that Section 119, by its terms, applies only to final actions, decisions, or failures to act arising under Subtitle A of Title I and the other sections of the NWPA specifically referenced in Section 119. Id. at 178-79. The Boston Edison court found that the Florida Power court's interpretation that Section 119 extends to matters encompassed within Title III "overrides and renders surplusage the detailed legislative text that delineates those actions which Congress provided shall be reviewable exclusively in the

courts of appeals." Id. at 178. The Boston Edison court briefly addressed the D.C. Circuit's decision in General Electric, holding that it "did not involve a breach of contract" and "is limited to its holding that the D.C. Circuit has exclusive jurisdiction to review DOE's rules regarding fee rates under the NWPA," id. at 178 n.13, but did not address the other D.C., Sixth, or Eleventh Circuit decisions that have interpreted Section 119 in a manner similar to General Electric and did not explain how the General Electric decision could be justified under the Boston Edison court's analysis. Further, to the extent that the Boston Edison court's analysis is correct, it would necessarily eliminate the jurisdictional basis for two cases upon which the SNF plaintiffs in the Court of Federal Claims repeatedly rely in the lower court and which bar the Government in the Court of Federal Claims from relying upon the Standard Contract's "Unavoidable Delays" clause, Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), and Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998), given that both decisions arise out of Section 302 of Title III.

## IV. ALTHOUGH A CLOSE QUESTION, THE SUPREME COURT'S ANALYSIS IN *FAUSTO* DOES NOT AFFECT THE JURISDICTIONAL ANALYSIS HERE

As an initial matter, no court that has considered the jurisdiction of the Court of Federal Claims to entertain claims for breach of the Standard Contract has considered the line of decisions which includes United States v. Fausto, 484 U.S. 439 (1988). This line of decisions could be viewed as foreclosing review of the Secretary's contractual-based actions.

Generally, the Court of Federal Claims possesses jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to consider claims for the breach of a contract by the Government. However, in Fausto, the United States Supreme Court held that, where Congress has devised a comprehensive framework of administrative and judicial review, that framework will deprive the Court of Federal Claims of jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491. Fausto, 484 U.S. at 454-55.

In Fausto, the Supreme Court considered whether a Federal employee in the excepted service could seek back pay in the United States Claims Court pursuant to the Tucker Act, 28 U.S.C. § 1491, as a result of his improper termination from Federal service, even though the Civil Service Reform Act of 1978 ("CSRA"), P.L. 95-454, did not expressly afford nonpreference excepted service employees a right

of appeal to the Merit Systems Protection Board ("MSPB") or any other express remedy. The Supreme Court recognized that, when Congress passed the CSRA in 1978, it "'comprehensively overhauled the civil service system,' creating an elaborate 'new framework for evaluating adverse personnel actions against [Federal employees].'" Fausto, 484 U.S. at 443 (quoting Lindahl v. OPM, 470 U.S. 768, 773-74 (1985)). As the Court recognized, the CSRA "prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review," id., but that "[n]o provision of the CSRA gives nonpreference members of the excepted service the right to administrative or judicial review of suspicion for misconduct." Id.

To determine "whether that withholding of remedy was meant to preclude judicial review for those employees, or rather merely to leave them free to pursue the remedies that had been available before enactment of the CSRA," the Supreme Court "examin[ed] the purpose of the CSRA, the entirety of its text, and the structure of review that it establishes." Id. at 443-44. In reviewing the entirety of the CSRA, the Supreme Court found an intent by Congress not to provide judicial review over those matters that were not expressly linked to the judicial review provisions:

> The Court of Appeals viewed the exclusion of nonpreference members of the excepted service from the definitional sections of Chapter 75 as congressional silence on the issue of what review these employees should receive . . . . The court therefore found respondent free to pursue whatever judicial remedies he would have had before enactment of the CSRA. We view the exclusion quite differently. In the context of the entire statutory scheme, we think it displays a clear congressional intent to deny the excluded employees the protections of Chapter 75 – including judicial review – for personnel action covered by that chapter.

Id. at 447 (emphasis added). The Court found it "evident that the absence of provision for these employees to obtain judicial review is not an uninformative consequence of the limited scope of the statute, but rather a manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action of the type governed by Chapter 75." Id. at 448-49. The Supreme Court found that "the presumption of judicial review is not to be applied in the 'strict evidentiary sense,' but may be 'overcom[e] whenever the congressional intent to preclude review is 'fairly discernible in the statutory scheme.'" Id. at 452 (quoting Block v. Community Nutrition Inst., 467 U.S.340, 351 (1984)).

Here, the NWPA created a comprehensive scheme for addressing the disposition of SNF and HLW generated by commercial nuclear utilities, as

evidenced by the express statutory findings and purposes of the Act. 42 U.S.C. § 10131; see Cong. Rec. S10439 (Sept. 24, 1981) (statement of Senator McClure, introducing S. 1662: NWPA would be "comprehensive nuclear waste legislation for this Nation"). The NWPA also contained a judicial review provision which vested exclusive jurisdiction in the courts of appeals to entertain challenges to the Secretary's decisions, actions, or failure to act under Title I, Subtitle A, of the NWPA.

Under the reasoning of Fausto, it is possible to interpret the comprehensive scheme that Congress enacted in the NWPA to mean that, (1) to the extent that judicial review of decisions, actions, or failures to act under the NWPA exists, exclusive jurisdiction is vested in the United States courts of appeals and (2) to the extent that the NWPA did not expressly identify a means of judicial review for certain actions required by the NWPA, Congress did not intend to permit review of those matters. This conclusion is further supported by the fact that the NWPA created a NWF, composed of fee payments by the owners of SNF, to "ensure that the costs of carrying out activities relating to the disposal of such [waste] will be borne by the persons responsible for generating such [waste]," and not by the taxpayers. 42 U.S.C. § 10131(b)(4); see id. § 10222(a)(4) (Secretary to propose fee adjustments "to insure full cost recovery"); Statement of Sherwood Smith,

Edison Electric Institute, to House Committee on Interior and Insular Affairs, Subcommittee on Energy and the Environment (July 9, 1981) (representing upon behalf of nuclear industry that "[w]e must emphasize . . . that the full cost of storage and disposal of commercial [SNF and HLW] will be paid by the utilities and will be included as part of the cost of nuclear fuel" and that "the handling of spent fuel would not involve any cost to the Government"). In the 23 years since the NWPA was enacted, Congress has not appropriated money for use in the programs authorized by the NWPA outside the context of the NWF.

Nevertheless, in addition to the judicial review provision of the NWPA, Congress also authorized the Secretary of Energy to "enter into contracts" with the owners and generators of commercially-generated SNF and HLW for its acceptance, transportation, and ultimate disposal. 42 U.S.C. § 10222(a)(1). Traditionally, entities that have entered into contracts with the Government may invoke the jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, to resolve disputes arising under those contracts, and the NWPA does not expressly repeal that jurisdiction. Without any legislative history that provides any further guidance on this issue, it does not appear that the necessary "clear and convincing evidence" exists of a legislative intent to repeal Tucker Act jurisdiction over these contract claims. See Bosco v. United States, 976 F.2d 710,

715 (Fed. Cir. 1992) (invoking "clear and convincing evidence" test to establish revocation by implication).

## V. THE TRIAL COURT IN THIS CASE, CONSISTENT WITH THE D.C. CIRCUIT'S LONGSTANDING INTERPRETATION, CORRECTLY HELD THAT THE JUDICIAL REVIEW PROVISION OF THE NWPA ENCOMPASSES SECTION 302

### A. Supported By The D.C. Circuit's Longstanding Interpretation Of Section 119, The Trial Court Correctly Found That Section 119 Encompasses Matters Arising Under Section 302

Even if the Fasuto line of cases does not prevent the Court of Federal Claims from entertaining PSEG's contract claims, it remains necessary to consider whether Section 119 of the NWPA precludes the Court of Federal Claims from exercising jurisdiction under the Tucker Act. Although PSEG seems to suggest that this Court can simply assume that jurisdiction exists here under some unidentified rationale, "[j]urisdictional requirements lie at the heart of the court's power to hear and decide cases," and "Federal courts simply may not presume to create jurisdiction where Congress declines to do so." National Presto Indus. v. Dazey Corp., 107 F.3d 1576, 1583 (Fed. Cir. 1997). Any court "must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1241 (Fed. Cir. 2002).

Accordingly, contrary to PSEG's suggestion, this Court must actually analyze the statutes at issue to identify the actual basis from which jurisdiction arises.

Any analysis of whether the trial court properly possesses jurisdiction to entertain PSEG's contract claims requires a two-step analysis. In the first inquiry, the Court must determine whether the NWPA judicial review provision in Section 119 encompasses matters arising out of Section 302. If, contrary to the findings of the D.C. and Eleventh Circuits and the trial court in this case, Section 119 does not encompass Section 302 matters, the jurisdictional inquiry ends, as it would be clear that the NWPA's judicial review provision could not encompass any matters relating to the contract mandated by Section 302 and, assuming that the rationale of Fausto does not apply, the Tucker Act, 28 U.S.C. § 1491, would establish the Court of Federal Claims' jurisdiction to entertain PSEG's contract claims. However, assuming the D.C. and Eleventh Circuits and the trial court in this case are correct in holding that Section 119 encompasses Section 302 matters, a second inquiry is then necessary: determining the scope of that jurisdiction over Section 302 matters. Specifically, it would be become necessary to determine whether contract disputes arising during contract performance constitute actions or decisions arising under Section 302.

With regard to the first inquiry, the trial court correctly determined in this case that Section 119, the judicial review provision of the NWPA, encompasses actions, decisions, and failures to act arising under Title III of the NWPA, including activities under Section 302. As the D.C. Circuit recognized over 20 years ago in General Electric, Congress certainly intended, in enacting the NWPA, to provide for a uniform judicial review of all matters identified in the statute relating to disposal. General Elec., 764 F.2d at 902. Further, as the D.C. Circuit recognized, "as we look at the statute as a whole," Section 302(a)(1) in Title III "gives the Secretary the authority to enter into contracts to provide the fees for disposal '[i]n the performance of his functions *under this chapter* . . .,'" or, as stated in the original statute prior to its codification, "*under this Act* . . . ." 96 Stat. 2201, 2257 (italics added). "In this context," the D.C. Circuit held, "the word 'chapter' refers to Chapter 108 of Title 42 which, of course, encompasses the entire Waste Act." General Elec., 764 F.2d at 902. "Therefore, [the court found] that section 302 incorporates by reference the functional responsibilities of the Secretary under Part A of Subchapter I." Id. The D.C. Circuit also found that, "[b]y the same token, the purpose to establish the Waste Fund . . . is found in Part A of Subchapter I" and that "[t]his purpose incorporates by reference the contractual provisions of section 302." Id.; see 42 U.S.C. § 10131(b)(4). "It thus

appears," the D.C. Circuit held, "that, from whatever vantage point we approach the statutory construction problem that we address here, we inevitably conclude that Congress intended to vest original and exclusive jurisdiction with the courts of appeals." General Elec., 764 F.2d at 902.[13]

The rationale of the trial court in Boston Edison in holding that Section 119 does not encompass any issue involving Section 302 is erroneous. The Boston Edison court attempted to distinguish the D.C. Circuit's decision in General Electric by stating that it "did not involve a breach of contract" and "is limited to its holding that the D.C. Circuit has exclusive jurisdiction to review DOE's rules regarding fee rates under the NWPA." Boston Edison, 64 Fed. Cl. at 178 n.13. However, the D.C. Circuit in General Electric based its jurisdiction to entertain fee

---

[13] In its brief, PSEG attempts to argue that the D.C. Circuit in General Electric was only considering which of two courts – the United States district court or the D.C. Circuit – should take possession to entertain a Nuclear Waste Fund fee challenge, but suggests that General Electric did not resolve jurisdictional issues between the D.C. Circuit and the Court of Federal Claims. PBr15. We do not understand PSEG's argument. The General Electric court decided that it had "original and exclusive jurisdiction" to entertain the fee issues in that case. General Elec., 764 F.2d at 904. It did not leave open the possibility that its "original and exclusive jurisdiction" might be shared with some other court, as that concept would render the D.C. Circuit's jurisdiction other than "original and exclusive." Further, PSEG does not explain how the D.C. Circuit's rationale in General Electric – that the judicial review provision in Section 119 encompasses Title III and Section 302 – would somehow provide the Court of Federal Claims with jurisdiction to entertain Title III matters.

issues under Section 302 upon its analysis that Section 119 encompassed Title III, including Section 302, of the NWPA. The Boston Edison court did not, and could not, explain how, under the Boston Edison court's analysis, the D.C. Circuit could ever have assumed original and exclusive jurisdiction over the fee issues arising under Section 302(a)(1) that it considered in General Electric or other cases or over the SNF acceptance issues that it considered in Indiana Michigan and Northern States. To the contrary, the Boston Edison court analysis is in direct conflict with the D.C. Circuit's analysis in General Electric: the two courts' analyses cannot be reconciled. As previously explained, the General Electric analysis, which all courts have followed from 1984 until Boston Edison was issued earlier this year, is cogent and reasonable. This Court should not alter the status quo 20 years later.

### B. Congress's Actions Since The D.C. Circuit Decided *General Electric* Further Support The Appropriateness Of The D.C. Circuit's Interpretation Of Section 119

Congress's actions since the General Electric decision was issued in 1984, as well as since the issuance of the D.C. Circuit's similar 1985 decision in Wisconsin Electric, indicate Congress's implicit approval of the D.C. Circuit's interpretation. Congress enacted significant amendments to the NWPA in 1987, including a redirection of DOE's program to permit DOE to evaluate only Yucca Mountain as a potential repository site, 42 U.S.C. § 10172, and the addition of several

provisions regarding a potential Monitored Retreivable Storage facility. Id. §§ 10162-10169. Yet, even though the D.C. Circuit's interpretations of Section 119's judicial review provisions had been previously issued on more than one occasion, Congress did not amend Section 119.

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." Lorillard v. Pons, 434 U.S. 575, 580-81 (1978); see Cannon v. University of Chicago, 441 U.S. 677, 696-97 (1979) (Congress is presumed to know existing law when enacting statutes). Although Congress amended portions of, rather than "re-enacted," the NWPA in 1987, its actions are similar, particularly where the statute was the subject of significant attention and revision. In another context, the Supreme Court has recognized that "[t]he fact that a comprehensive reexamination and significant amendment of the [statute at issue there] left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy." Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 381-82 (1982). Here, in light of the longstanding interpretation of the D.C. Circuit, which has been followed by the Sixth and Eleventh Circuits and which forms the jurisdictional basis for numerous dispositive decisions regarding Nuclear Waste

Fund fee issues arising under Title III, and in light of Congress's significant amendments to the NWPA since the D.C. Circuit announced its interpretation of Section 119, this Court should not create a new interpretation of the scope of Section 119 or of Section 119's applicability to matters arising under Section 302.

## VI. EVEN THOUGH SECTION 119 ENCOMPASSES SECTION 302, THE TRIAL COURT ERRED IN FINDING THAT THE UNITED STATES COURTS OF APPEALS HAVE JURISDICTION TO ENTERTAIN PSEG'S CONTRACT CLAIMS

Assuming that this Court agrees that Section 119's judicial review provisions apply to actions, decisions, and failures to act under Section 302, this Court must then determine whether PSEG's contract claims arise under Section 302 or, instead, are contract performance disputes that fall within the jurisdictional grant of the Tucker Act, 28 U.S.C. § 1491. Contrary to the trial court's holding in this case, although Section 302 mandated that the contract at issue "shall provide" for SNF acceptance beginning no later than January 31, 1998, any contract performance disputes arising after that contract term was established and after the time for challenging the promulgation of that term had expired arise under the contract, not the statute, and the Court of Federal Claims properly possesses jurisdiction to entertain such disputes. Specifically, Section 302(a)(5)(B) of the NWPA provides that "[c]ontracts entered into under this section shall provide that," in the exchange

for the payment of fees, DOE, "beginning not later than January 31, 1998, will dispose" of the SNF involved. 42 U.S.C. § 10222(a)(5)(B) (emphasis added). In 1983, DOE complied with this statutory requirement, placing the January 31, 1998 date in Article II of the Standard Contract. See 48 Fed. Reg. 16,590 (Apr. 18, 1983). To the extent that interested parties were dissatisfied with the manner in which DOE complied with the statutory direction to include the January 31, 1998 deadline in the Standard Contract, they had 180 days to challenge the contract provisions in the United States courts of appeals. 42 U.S.C. § 10139(c). No entities filed such a challenge. Given that DOE complied with the specific statutory requirement regarding the language to include in its contract, and given that no entity filed a challenge to the manner in which DOE complied with the statutory direction regarding contract language within the 180-day time limit, any subsequent challenges to any contract terms, any contract language, or any contract performance issues are contract disputes that belong in the Court of Federal Claims, not issues that arise under the NWPA.

The trial court in this case relied upon the Federal Circuit's decision in City of Burbank v. United States, 273 F.3d 1370 (Fed. Cir. 2001), to find that the United States courts of appeals possess jurisdiction to entertain all matters relating to Section 302, including these contract cases. However, the City of Burbank

decision not only fails to support original and exclusive jurisdiction in the courts of appeals, but supports the Court of Federal Claims' jurisdiction. In City of Burbank, this Court considered the scope of the judicial review provision contained in the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. §§ 839-839h ("Northwest Power Act" or "NPA"). Under the NPA, the Bonneville Power Administration ("BPA") may sell surplus electric energy that it generates outside of the Pacific Northwest, but "must do so . . . pursuant to the authorization and restrictions codified at 16 U.S.C. §§ 837a, and 839c(f)." City of Burbank, 273 F.3d at 1373; see 16 U.S.C. § 839f(a) (authorizing BPA Administrator "to contract in accordance with section 2(f) of the Bonneville Project Act"); id. § 839f(c) (identifying limitations and conditions on contracts for sale of electric power for use outside Pacific Northwest). "[W]hen the BPA agrees to sell electric energy to an entity outside the Pacific Northwest, . . . some of the contractual provisions are mandated by statute," while "[t]he BPA freely negotiates other provisions, which are not mandated by statute." Id. The NPA specifies that the BPA Administrator "shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power," 16 U.S.C. § 839e(a)(1), identifies some of the factors that the Administrator had to consider in setting rates, id. § 839e, and requires that the

Administrator set certain rates in a notice-and-comment administrative rulemaking. Id. § 839e(i); see City of Burbank, 273 F.3d at 1373-74. The NPA also requires that the BPA include a price adjustment provision in its contracts for electric energy sales, but "the particular content of the price adjustment, including the manner in which the price is to be adjusted, is not statutorily mandated." City of Burbank, 273 F.3d at 1381.

The NPA's judicial review statute grants the United States Courts of Appeals for the regional circuits with original and exclusive jurisdiction to review challenges to certain "final actions and decisions taken pursuant to this chapter by the Administrator or the Council" of the BPA relating to certain sales of electric energy. See 16 U.S.C. § 839f(e)(5). It also defines the reviewable "final actions" as including "sales, exchanges, and purchases of electric power under section 839c of this title" and "final rate determinations under section 839e of this title." Id. § 839f(e)(1)(B) & (G). After the City of Burbank entered into and sued upon a contract with BPA, alleging a breach of contract arising from the BPA's application to the City of Burbank of the administratively-determined rate, this Court found that, in interpreting the NPA, "where disputed contract provisions are statutorily mandated or are arrived at via an administrative hearing under the [Administrative Procedures Act] in which the pertinent facts are reflected in an

administrative record, the Ninth Circuit possesses exclusive jurisdiction" under the provision at issue and that "[t]his is so even where a complainant styles her challenge as a breach of contract claim because the challenge is a collateral attack on the Act or regulation." Id. at 1380. However, it found that the price adjustment provision in the contract at issue was not statutorily mandated, but was freely negotiated by the parties. It found that, "[i]n contrast, where, as here, the alleged breaches of contract pertain to terms that were freely negotiated in an arms-length transaction and where the facts pertinent to those negotiations fall outside an administrative record," jurisdiction is proper in this Court and does not fall within the judicial review provision that was being considered. Id.

The Court of Federal Claims in this case relied upon the City of Burbank decision to support its finding that the United States courts of appeals, rather than the Court of Federal Claims, possesses jurisdiction to entertain PSEG's NWPA-based contract claims for three reasons:

> There can be no doubt that in this case: (1) the contract term – the disposal deadline – was statutorily required to be included in the Standard Contract; (2) an administrative hearing regarding the Standard Contract, including the disposal deadline, was held, and it included notice, comment, and opportunity to present facts as part of the administrative record on the specific points at issue here; and (3) there is no specific evidence that facts

> regarding the rule-making fell outside the administrative record.

Florida Power, 64 Fed. Cl. at 40 (A4).

The second and third bases that the trial court identified in support of its jurisdiction finding are easily distinguished. Although this Court found in City of Burbank that matters determined in an administrative rulemaking were subject to the NPA's judicial review provision, that was because the NPA actually mandates that rates be set in an administrative rulemaking and sets forth the administrative procedures that are to be utilized. See 16 U.S.C. § 839e(i). Conversely, although the trial court in this case correctly recognized that DOE developed the Standard Contract terms through an administrative rulemaking and that DOE was not barred from using such a procedure to develop standardized contract terms, no statutory provision required that they be developed in that manner. Accordingly, unlike rates promulgated pursuant to the NPA, the fact that the Standard Contract terms were developed through a notice-and-comment administrative rulemaking procedure provides no basis for applying the NWPA's judicial review provision to PSEG's breach of contract claims.

With regard to the first basis upon which the court below relied in finding that it lacked jurisdiction – the statutory nature of the January 31, 1998 deadline for

DOE to begin SNF acceptance – the specific manner in which the NWPA sets forth the January 31, 1998 deadline not only establishes that the Court of Federal Claims, rather than the United States courts of appeals, possesses jurisdiction over PSEG's contract claims, but that the D.C. Circuit, with all due respect, far exceeded its jurisdiction under the NWPA when it issued its writ of mandamus regarding DOE's contract obligations in Northern States.[14] As previously discussed, Section 302(a)(5)(B) of the NWPA provides that "[c]ontracts entered into under this section shall provide that," in the exchange for the payment of fees, DOE, "beginning not later than January 31, 1998, will dispose" of the SNF involved. 42 U.S.C. § 10222(a)(5)(B) (emphasis added). Because no entities challenged DOE's April 18, 1983 implementation of that requirement in the

---

[14] In their briefs, PSEG and the amici assert that the D.C. Circuit's decisions in Indiana Michigan and Northern States should have *res judicata* effect. PBr22; ABr9-12. Yet, PSEG also appears to argue that the Court should follow the jurisdictional rationale of Boston Edison and the cases at the Court of Federal Claims that have followed it. PBr21. It is inconceivable that PSEG would obtain a judgment from one court based upon one jurisdictional argument, but then subsequently proceed before a different court, arguing a jurisdictional position that would eliminate the jurisdictional basis of the prior judgment but, at the same time, arguing that the prior judgment issued without jurisdiction should be viewed as *res judicata*. In any event, another court cannot decide for the Court of Federal Claims whether the Court of Federal Claims possesses jurisdiction. See United States v. Cook County, 170 F.3d 1084, 1091-92 (Fed. Cir. 1999); see also Christianson v. Colt Industries, 486 U.S. 800, 815-818 (1988); Amen v. City of Dearborn, 718 F.2d 789, 793-94 (6th Cir. 1983), cert. denied, 465 U.S. 1101 (1984).

Standard Contract, including the remedies established in the Standard Contract for failure to meet that deadline, within the 180-day time limit established by Section 119, 42 U.S.C. § 10139(c), the United States courts of appeals' jurisdiction to entertain challenges to the contract provisions concluded. Any subsequent challenges to any contract terms or performance issues are contract disputes that belong in the Court of Federal Claims.

Although the trial court here relied upon the D.C. Circuit's decisions in Indiana Michigan and Northern States, and the extent to which the D.C. Circuit there considered contract-related issues, as support for the argument that the United States courts of appeals possesses jurisdiction under Section 119 to entertain disputes relating to the January 31, 1998 deadline, those decisions actually indicate that the D.C. Circuit overstepped its jurisdiction in evaluating, 13 and 14 years after the contract language was drafted and contracts were executed, DOE's compliance with the terms of its contracts. Because Section 302(a)(5)(B) only mandates that DOE include a specific term in its contract, DOE's compliance with that requirement ended the United States courts of appeals' oversight of that aspect of the Standard Contract. The D.C. Circuit's decision in Northern States to evaluate, in 1997, whether it approved of the "Unavoidable Delays" clause and to eliminate remedial provisions of which it did not approve, despite the parties'

agreement 14 years earlier to those provisions, was beyond its jurisdiction.[15] The D.C. Circuit's decision in Northern States through which it overstepped its jurisdiction does not somehow support the trial court's belief in this case that Section 119 divests the Court of Federal Claims of its jurisdiction to consider contract disputes.

It is true that certain matters that arise under Section 302 remain under the courts of appeals' jurisdiction, even though those issues may have an effect upon the contract litigation in the Court of Federal Claims. For example, some SNF plaintiffs in the Court of Federal Claims have challenged DOE's collection of the fee mandated by Section 302(a)(2) and (a)(3). However, the D.C. Circuit's decisions have made clear that the United States courts of appeals possess "original and exclusive jurisdiction" with regard to those issues. See, e.g., General Elec., 764 F.2d at 902; see also Arkla, Inc. v. United States, 37 F.3d 621, 623 (Fed. Cir. 1994) ("[a]ffording a litigant more than one full and fair opportunity for judicial resolution of the same issue results in an untenable misallocation of resources") . Even though certain portions of the statutory fee provisions may have been

---

[15] In Nebraska Public Power District v. United States, No. 01-116C (Fed. Cl.), the trial court has requested briefing upon the arguments that the Government would make regarding the "Unavoidable Delays" clause if it were not barred from doing so by the D.C. Circuit's writ of mandamus.

reprinted in the Standard Contract itself, that fact does not somehow modify the United States courts of appeals' exclusive jurisdiction to entertain such statutory matters.[16] See Arkla, 37 F.3d at 623. However, the D.C. Circuit's decision in Northern States to extend its jurisdiction to enforcement of the January 31, 1998 date, rather than merely to determine in response to a timely protest whether DOE in 1983 properly promulgated that provision, exceeded the jurisdictional grant of Section 119.

In any event, even if the D.C. Circuit correctly held that jurisdiction to enforce the January 31, 1998 date is properly with the United States courts of appeals, this Court's decision in City of Burbank still supports the Court of Federal Claims' jurisdiction to entertain PSEG's contract claims. Although the NWPA mandates that DOE include a contract provision that provides for DOE to begin SNF acceptance by January 31, 1998, it does not contain any provision regarding SNF acceptance after that date, regarding DOE's obligations for SNF acceptance

[16] That situation is analogous to one where the terms of a regulation are incorporated into a contract provision: although the terms become a part of the contract, they are still treated, for purposes of interpretation, in accordance with the rules applicable to interpreting regulations. See Santa Fe Engineers, Inc. v. United States, 801 F.2d 379, 381 (Fed. Cir. 1986); Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981). Similarly, if contract terms come from a statute, they still retain their statutory basis and remain subject to the jurisdictional review provisions that apply to the statute.

after January 31, 1998, or regarding any "rate" by which DOE must accept SNF after January 31, 1998. The Standard Contract that was promulgated through notice-and-comment rulemaking contains numerous provisions that were not mandated by the NWPA, including the procedure through which different nuclear utilities would receive their SNF acceptance allocations (Article V), the order in which SNF would be accepted from nuclear utilities (Article VI.B), the nuclear utility contract holders' obligations accurately to describe the SNF in their possession (Articles IV.A & VI.B.3), the utilities' obligation to prepare their SNF for transport (Article IV.A.2), the technical requirements that SNF being accepted must satisfy to be accepted as part of the initial acceptance queue (Article VI.A & Appendix E). See 10 C.F.R. § 961.11. In City of Burbank, this Court determined that, at least under the NPA, the fact that various contract provisions at issue were not statutorily mandated precluded the courts of appeals' exercise of jurisdiction under the NPA's judicial review provision. City of Burbank, 273 F.3d at 1379-81. Similarly, here, the Court of Federal Claims, rather than the D.C. Circuit or the other regional courts of appeals, possesses jurisdiction to entertain PSEG's contract claims arising out of DOE's failure to perform its contract in compliance with all of the terms of the Standard Contract.

## CONCLUSION

For the foregoing reasons, this Court should reverse the CFC's decision, finding that, although Section 119 of the NWPA encompasses actions, decisions, and failures to act arising under Section 302, the Court of Federal Claims nevertheless possesses jurisdiction to entertain PSEG's contract-based claims.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

David M. Cohen / by HD [signature]

DAVID M. COHEN
Director

OF COUNSEL:

ALAN J. LO RE
Senior Trial Counsel
HEIDE L. HERRMANN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

December 23, 2005

Attorneys for Defendant-Appellee

CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of December 2005, a copy of the foregoing "DEFENDANT'S RESPONSE TO THE COURT'S ORDERS DATED OCTOBER 14 AND DECEMBER 16, 2005" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Alan J. Lo Re