**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on July 12, 2006)

| | | |
|---|---|---|
| NEBRASKA PUBLIC POWER DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-116C |
| | ) | (Judge Allegra) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF NEBRASKA PUBLIC POWER DISTRICT'S BRIEF**
**<u>IN RESPONSE TO THE COURT'S ORDER OF JUNE 2, 2006</u>**

Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7940
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
*Nebraska Public Power District*

*Of Counsel:*

Jay E. Silberg
Walter F. Zenner
Daniel S. Herzfeld
Jack Y. Chu
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
Tel: (202) 663-8000

Dated: July 12, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

QUESTIONS PRESENTED .......... 1

SUMMARY OF ARGUMENT .......... 1

FACTUAL BACKGROUND .......... 3

A. Congress Enacts the NWPA to Require DOE to Dispose of Spent Nuclear Fuel and Other Nuclear Waste .......... 3

B. All Nuclear Electric Utilities Execute the Standard Contract that DOE Promulgated to Carry Out Its Statutory Duties Under the NWPA .......... 4

C. DOE Disclaims an Unconditional Statutory or Contractual Duty to Timely Commence Disposal .......... 4

D. The D.C. Circuit Holds DOE in Violation of Its Statutory Duty and Issues a Limited Mandamus Order, but Denies Contractual Relief .......... 5

1. *Indiana Michigan* .......... 5

2. *Northern States I* .......... 5

3. *Northern States II* .......... 7

ARGUMENT .......... 8

I. AS AN EXCEPTION TO THE RULES OF *RES JUDICATA, CHRISTOPHER VILLAGE* PERMITS A COLLATERAL ATTACK ON THE JUDGMENT OF ANOTHER COURT ONLY IN LIMITED CIRCUMSTANCES NOT PRESENT IN *INDIANA MICHIGAN* OR *NORTHERN STATES I* .......... 8

II. THE D.C. CIRCUIT'S JUDGMENT AND MANDAMUS ORDER IN *INDIANA MICHIGAN* AND *NORTHERN STATES I* WERE SUPPORTED BY AN APPROPRIATE GRANT OF JURISDICTION AND WAIVER OF SOVEREIGN IMMUNITY PROVIDED BY THE NWPA AND APA .......... 10

A. The D.C. Circuit Had Subject Matter Jurisdiction in *Indiana Michigan* and *Northern States I* Under NWPA § 119, Which Lodges Jurisdiction in the Courts of Appeals for All Challenges to Agency Action Arising Under NWPA § 302 ....................11

B. APA § 702 Broadly Waives the Sovereign Immunity of the United States for Review of Agency Actions in Suits, Such as *Indiana Michigan* and *Northern States I*, Seeking "Relief Other Than Money Damages" ....................12

C. APA § 702's Broad Waiver of Sovereign Immunity Is Subject to Only Three Limitations, None of Which Applied to the Writ of Mandamus Issued in *Northern States I* ....................13

1. APA § 702's Waiver of Sovereign Immunity Excludes Claims for "Money Damages," but the Petitioners in *Northern States I* Neither Sought Nor Received an Award of Money Damages ....................13

2. Under the "Impliedly Forbidden Relief" Clause of APA § 702(2), the Tucker Act Withdraws the APA's Waiver of Sovereign Immunity for Contract Claims, but the Writ of Mandamus in *Northern States I* Enforced Only Statutory Rights, Not Contract Rights ....................14

a. In the Tucker Act Context, APA § 702(2) Affects Contract Claims but Not Statutory Claims for Specific Relief ....................14

b. APA § 702(2) Did Not Apply to *Northern States I*, Because the Petitioners' Claims Were Based in Statute, Not Contract ....................16

(1) The *Megapulse* Test Is the Appropriate Standard for Determining Whether a Claim Is Statutory or Contractual ....................16

(2) Under the *Megapulse* Test, the Claim and Relief in *Northern States I* Were Statutory, Not Contractual ....................18

3. The "Adequate Remedy" Limitation of APA § 704 May Withdraw the APA's Waiver of Sovereign Immunity in Some "General Statutory Review" Cases, but It Does Not Apply to Cases, Such as *Northern States I*, Brought Under

"Specific Statutory Review" Provision, Such as NWPA § 119....................20

a. "Specific Statutory Review" Cases, Such as *Northern States I*, Are Not Subject to the "Adequate Remedy" Limitation of APA § 704....................21

b. *Christopher Village* and *Consolidated Edison* Were Subject to the "Adequate Remedy" Limitation of APA § 704 Only Because They Were "General Statutory Review" Cases....................23

(1) *Christopher Village* ....................23

(2) *Consolidated Edison* ....................25

4. Even If the "Adequate Remedy" Limitation of APA § 704 Had Applied to *Northern States I*, the D.C. Circuit Still Would Have Had Jurisdiction, Because an "Adequate Remedy" Would Not Have Been Available in the Court of Federal Claims....................26

III. INDEPENDENTLY OF THE D.C. CIRCUIT'S MANDAMUS ORDER, THE DECISIONS OF THE FEDERAL CIRCUIT IN *MAINE YANKEE* AND *NORTHERN STATES III* BIND THIS COURT AND PRECLUDE IT FROM ENTERTAINING ANY "UNAVOIDABLE DELAY" DEFENSE....................28

CONCLUSION....................29

# TABLE OF AUTHORITIES

Cases

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)........................................................................................ *passim*

*Brazos Elec. Power Co-op., Inc. v. United States*,
144 F.3d 784 (Fed. Cir. 1998)..........................................................................22

*Christopher Village, L.P. v. United States*,
360 F.3d 1319 (Fed. Cir. 2004).................................................................. *passim*

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)..........................................................................................10

*Consolidated Edison Co. of New York, Inc. v. United States*,
247 F.3d 1378 (Fed. Cir. 2001).............................................2, 9, 21, 23, 25, 26

*Doe v. United States*,
372 F.3d 1308 (Fed. Cir. 2004)...................................................................21, 26

*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) ............................................................................11

*General Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*,
764 F.2d 896 (D.C. Cir. 1985) ..........................................................................11

*Humane Soc. of the U.S. v. Clinton*,
236 F.3d 1320 (Fed. Cir. 2001)........................................................................12

*Indiana Michigan Power Co. v. Dep't of Energy*,
88 F.3d 1272 (D.C. Cir. 1996) ................................................................. *passim*

*Ins. Corp of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982)............................................................................................9

*Katz v. Cisneros*,
16 F.3d 1204 (Fed. Cir. 1994)...........................................................................28

*Maine Yankee Atomic Power Co. v. United States*,
225 F. 3d 1336 (Fed. Cir. 2000).................................................................3, 28, 29

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ..................................................... 10, 16-19, 27

*Nat'l Ctr. for Mfg. Sciences v. United States*,
114 F.3d 196 (Fed. Cir. 1997)....................22

*Nevada v. Watkins*,
939 F.2d 710 (9th Cir. 1991) ....................22

*Norby Lumber Co. v. United States*,
46 Fed. Cl. 47 (2000) ....................17

*Northern States Power v. U.S. Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997) ("*Northern States I*"),
*cert. denied*, 525 U.S. 1016 (1998).................... *passim*

*Northern States Power v. U.S. Dep't of Energy*,
1998 WL 276581 (D.C. Cir. May 5, 1998) ("*Northern States II*")....................7, 8, 20

*Northern States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000) ("*Northern States III*") ....................3, 28, 29

*Roberts v. United States*,
242 F.3d 1065 (Fed. Cir. 2001)....................17, 22, 27

*Sharp v. Weinberger*,
798 F.2d 1521 (D.C. Cir. 1986) ....................15, 17

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985)....................15, 17, 18

*Transohio Sav. Bank v. OTS*,
967 F.2d 598 (D.C. Cir. 1992)....................15, 17

*United States v. Mitchell*,
463 U.S. 206 (1983)....................10, 26

*United States v. Testan*,
424 U.S. 392 (1976)....................10, 26

*Yankee Atomic Elec. Co. v. United States*,
42 Fed. Cl. 223 (1998) ....................29

Statutes and Regulations

5 U.S.C. § 701....................10, 23

5 U.S.C. § 702.................... *passim*

5 U.S.C. § 704 ........ *passim*

5 U.S.C. § 706 ........ 10, 24

18 U.S.C. § 1905 ........ 10

28 U.S.C. § 1331 ........ 10

28 U.S. C. § 1491 ........ 10

28 U.S.C. § 1651 ........ 2, 13

31 U.S.C. § 3701 et seq. ........ 17

42 U.S.C. § 2239 ........ 25

42 U.S.C. § 2297g-1 ........ 25

42 U.S.C. § 10101-10270 ........ 3

42 U.S.C. § 10131 ........ 3

42 U.S.C. § 10139 (NWPA § 119) ........ *passim*

42 U.S.C. § 10222 (NWPA § 302) ........ *passim*

59 Fed. Reg. 27,007 (May 25, 1994) ........ 4

60 Fed. Reg. 21,793 (May 3, 1995) ........ 4, 5

<u>Other Authorities</u>

H.R. Rep. No. 94-1656 (1976),
*as reprinted in* 1976 U.S.C.C.A.N. 6121 ........ 12, 15, 22

Standard Contract for Disposal of Spent Nuclear Fuel
and/or High-Level Radioactive Waste,
10 C.F.R. § 961.11 ........ 4, 6

<u>Miscellaneous</u>

Gregory C. Sisk, *The Tapestry Unravels: Statutory Waivers of Sovereign Immunity and Money Claims Against the United States*, 71 Geo. Wash. L. Rev. 602 (2003) ........ 15, 27, 28, 30

Walter Gellhorn, Clark Byse *et al.*, *Administrative Law* 985-86 (8th ed. 1987) ................21, 22, 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on July 12, 2006)

| | | |
|---|---|---|
| NEBRASKA PUBLIC POWER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) | No. 01-116C<br>(Judge Allegra) |

**PLAINTIFF NEBRASKA PUBLIC POWER DISTRICT'S BRIEF**
**IN RESPONSE TO THE COURT'S ORDER OF JUNE 2, 2006**

Pursuant to the hearing held on June 1, 2006 and the Court's order of June 2, 2006 (and subsequent extension), plaintiff Nebraska Public Power District ("NPPD") hereby submits its brief regarding the Court's (and the government's) authority *vel non* to disregard the *res judicata* effect of the judgment and mandamus order issued by the U.S. Court of Appeals for the District of Columbia Circuit in *Indiana Michigan* and *Northern States I*, respectively.

**QUESTIONS PRESENTED**

1. Whether and, if so, under what circumstances it would be appropriate in this case to collaterally attack the writ of mandamus issued by the D.C. Circuit in *Northern States I*?

2. Whether appropriate waivers of sovereign immunity underlay and supported the writ of mandamus that that court issued in *Northern States I*?

**SUMMARY OF ARGUMENT**

This Court (and the government) are bound to accord *res judicata* effect to the judgment and mandamus order of the D.C. Circuit in *Indiana Michigan* and *Northern States I*, because that court had ample jurisdiction – including the requisite waiver of sovereign immunity – both to



400422289v1

render its judgment and to issue the mandamus order. The D.C. Circuit had jurisdiction under § 119 of the Nuclear Waste Policy Act ("NWPA"), coupled with the broad waiver of sovereign immunity found in § 702 of the Administrative Procedure Act ("APA") for cases seeking review of administrative agency actions and "relief other than money damages." Under the All Writs Act, 28 U.S.C. § 1651, such relief includes writs of mandamus.

APA § 702(2) withdraws the APA's sovereign immunity waiver for relief that the Tucker Act "impliedly forbids." However, § 702(2) did not do so in *Indiana Michigan* or *Northern States I,* because the Tucker Act does not "impliedly forbid" equitable relief for statutory claims (as opposed to contract claims). Hence, in issuing a limited mandamus order, the D.C. Circuit did not "overstep" its jurisdiction under the APA. It evaluated only the U.S. Department of Energy's ("DOE's") compliance with the NWPA, not the Standard Contracts, and it prohibited DOE from taking any action that would violate its statutory duty, but refrained from enjoining DOE from breaching the Contracts.

Similarly, the "adequate remedy" limitation of APA § 704, which formed the basis for the decisions in *Christopher Village* and *Consolidated Edison*, did not withdraw or otherwise affect the D.C. Circuit's jurisdiction in *Indiana Michigan* or *Northern States I*. This is so for two independently sufficient reasons:

- NWPA § 119 is a "specific statutory review" provision under APA § 704 and, therefore, is not governed by the "adequate remedy" provision of § 704 (thus distinguishing both *Christopher Village* and *Consolidated Edison)*; and

- Even if the "adequate remedy" provision of APA § 704 did apply to specific statutory review proceedings (an inherently self-contradictory proposition), the petitioners in *Indiana Michigan* and *Northern States I* had no "adequate remedy" in the Court of Federal Claims ("CFC"), because they sought only prospective equitable relief not available there and had no claim for retrospective monetary relief.

Finally, even assuming *arguendo* that the D.C. Circuit somehow managed to get it all wrong, the questions presented here are rendered academic by the decisions of the Federal Circuit, in *Maine Yankee* and *Northern States III*, that DOE's failure to meet the 1998 deadline was not a "delay" within the meaning of the Delays clause of the Standard Contracts and that DOE therefore had breached those Contracts when it failed to meet the deadline.

## FACTUAL BACKGROUND

The factual background of the spent nuclear fuel ("SNF") cases is well-known by now, but certain aspects bear repeating for the light they shed on exactly what questions the D.C. Circuit decided and exactly what relief it granted in *Indiana Michigan* and *Northern States I*.[1]

### A. Congress Enacts the NWPA to Require DOE to Dispose of Spent Nuclear Fuel and Other Nuclear Waste

In January 1983, Congress enacted the NWPA, 42 U.S.C. §§ 10101 – 10270. Congress did so intending to "establish the Federal responsibility, and a definite Federal policy, for the disposal" of SNF and high-level radioactive waste. 42 U.S.C. § 10131(b)(2). The NWPA authorized DOE to enter into contracts with nuclear utilities to collect and dispose of their nuclear waste in return for the payment of fees by the utilities. 42 U.S.C. § 10222(a)(1). Significantly, Congress expressly mandated that those contracts require that DOE, "beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel as provided in this subchapter." 42 U.S.C. § 10222(a)(5) (NWPA § 302).

[1] In addition to the citations below, this recitation draws, where appropriate, upon the statement of facts in the government's brief to the Federal Circuit in *PSEG Nuclear, L.L.C. v. United States*, No. 05-5162 (Fed. Cir.) (dated Dec. 23, 2005) (attached to the government's brief, filed in the instant case in this Court, of Dec. 27, 2005) (hereinafter "Gov't PSEG Br.").

### B. All Nuclear Electric Utilities Execute the Standard Contract that DOE Promulgated to Carry Out Its Statutory Duties Under the NWPA

Following DOE's promulgation of the Standard Contract (set forth at 10 C.F.R. § 961.11), each and every nuclear utility in the country executed it, rather than risk losing their nuclear plant operating licenses (*see* 42 U.S.C. § 10222(b)(1)). The utilities have duly complied with their part of the statutory and contractual *quid pro quo*; to date they have paid DOE more than $25 billion (including accumulated interest) and they continue to pay DOE at the rate of about $750 million per year.

### C. DOE Disclaims an Unconditional Statutory or Contractual Duty to Timely Commence Disposal

For its part, in the decade following the enactment of the NWPA, DOE made little progress toward meeting the 1998 deadline to begin accepting and disposing of spent fuel. In 1994, DOE addressed this problem by announcing its "preliminary view" that it had no *statutory* obligation to accept SNF beginning in 1998, unless certain conditions were met. 59 Fed. Reg. 27,007, 27,008 (May 25, 1994) (the so-called "Notice of Inquiry").

One year later DOE issued a further, "final" pronouncement in which it again took the position that the statutory and contractual deadline of 1998 was conditional. *See* 60 Fed. Reg. 21,793 (May 3, 1995) (the "Final Interpretation"). As a precautionary move, DOE took the further position that if the deadline actually turned out to be an unconditional obligation, then the Delays clause of the Standard Contract, as administered by a DOE contracting officer, would provide the utilities with an adequate administrative remedy for DOE's failure to meet it. *Id.*

**D. The D.C. Circuit Holds DOE in Violation of Its Statutory Duty and Issues a Limited Mandamus Order, but Denies Contractual Relief**

**1. *Indiana Michigan***

In 1995, a large group of utilities, states, and state agencies sought to challenge DOE's "Final Interpretation" by petitioning the D.C. Circuit for review pursuant to NWPA § 119 (42 U.S.C. § 10139), alleging that DOE's interpretation violated the statutory requirements of NWPA § 302. *See generally Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1273-74 (D.C. Cir. 1996) ("*Indiana Michigan*"). The D.C. Circuit accepted jurisdiction under § 119, reviewed DOE's Final Interpretation of its obligations under NWPA § 302(a)(5)(B), and rejected that interpretation, holding that:

(i) DOE's interpretation of the Standard Contract was contrary to the plain language of the statute; and

(ii) the statute "creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998."

*Indiana Mich.*, 88 F.3d at 1277. Consequently, the court vacated DOE's Final Interpretation and remanded the matter to DOE for further action not inconsistent with its decision. *Id.*

**2. *Northern States I***

In late 1996, in the wake of *Indiana Michigan*, DOE sent letters to nuclear utilities in which it acknowledged its contractual obligation to begin accepting spent fuel by the 1998 deadline, but advised the utilities that it would be unable to do so. *See Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997) ("*Northern States I"), cert. denied*, 525 U.S. 1016 (1998). In mid-1997, DOE notified all of the utilities that it considered its inability to meet the deadline to be an "unavoidable delay" cognizable under the Delays clause of the Standard Contracts (*Northern States I*, 128 F.3d at 757), whose terms excuse certain types of



400422289v1

delay arising out of "causes beyond the control and without the fault or negligence" of the party failing to perform (*see* 10 C.F.R. 961.11, Art. IX).

Nuclear utilities, states, and state agencies again petitioned the D.C. Circuit for review of DOE's actions, again alleging that DOE's interpretation violated the statutory requirements of NWPA § 302. *See Northern States I*, 128 F.3d at 756-58. Having previously obtained a judgment declaring this type of action to be in violation of DOE's statutory duties, the petitioners sought a writ of mandamus to compel compliance. Applying the traditional discretionary standards for mandamus relief, the court denied a broad writ of mandamus on the ground that the contract provided "a potentially adequate remedy if DOE fails to fulfill its obligations by the deadline . . . ." *Id.* at 755. But to prevent DOE from circumventing the court's prior interpretation of the NWPA, the D.C. Circuit issued a limited writ of mandamus prohibiting DOE from adopting an interpretation of the Standard Contract that would violate its statutory duty to undertake an absolute and unconditional contractual obligation to begin disposing of spent fuel by the 1998 deadline. As the court stated:

> *[W]e preclude DOE from concluding that its delay is unavoidable* on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim.
>
> . . . .
>
> *This cannot be a valid interpretation*, as it would allow the Executive Branch to void an unequivocal obligation imposed by Congress. *DOE has no authority to adopt a contract that violates the directives of Congress* . . . . We hold that this [unavoidable delays] provision in the Standard Contract, insofar as it is applied to DOE's failure to perform by 1998, *is inconsistent with DOE's statutory obligation to assume an unconditional duty*.

*Northern States I*, 128 F.2d at 760 (emphasis added).

### 3. *Northern States II*

Subsequently, some of the utilities, states and state agencies, and DOE, petitioned for rehearing and moved for additional relief. In an unpublished decision, the D.C. Circuit declined to grant the requested relief, carefully drawing a distinction between the limits of its jurisdiction under the NWPA and APA, and that of the CFC under the Tucker Act. *See Northern States Power Co. v. U.S. Dep't of Energy*, 1998 WL 276581 (D.C. Cir. May 5, 1998) (unpublished) (*"Northern States II"*). In language deserving of liberal quotation, the court explained the statutory, rather than contractual, source of the petitioners' claims and the statutory, rather than contractual, basis for the court's decision and limited mandamus order in *Northern States I*, as follows:

> Our decision in *Northern States [I]* barred the DOE from interpreting the [Standard] Contract as imposing only a *contingent* disposal obligation; *such an interpretation*, we ruled, would place the DOE *in violation of its statutory duties under the [NWPA]*, which required it to undertake an *unconditional* obligation. Beyond that *clarification of the statute's requirements*, we remitted the utilities to their remedies under the Standard Contract. Suits based on the [Standard] Contract may present issues of the permissible forms of equitable adjustment, and possibly the award of some forms of equitable adjustment would place the DOE *in violation of the NWPA and again properly trigger our jurisdiction* (as opposed to that of the Court of Federal Claims) *under either the NWPA or the APA.*
>
> . . . .
>
> The [move-fuel] order [sought by one utility] cannot issue because enforcement of our mandate does not extend to requiring the DOE to perform under the Standard Contract. While *the statute requires the DOE to include an unconditional obligation in the Standard Contract*, it does not itself require performance. *Breach* by the DOE does not violate a *statutory* duty; thus, our jurisdiction to hear allegations of failure to take an action required under the NWPA, *see* 42 U.S.C. § 10139(a)(1)(B), does not provide a basis for a move-fuel order.

> . . . .
>
> The DOE petitions for rehearing, suggesting that this Court has erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract. As the above should make clear, we did not; *we merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation* to begin disposal by January 31, 1998. The *statutory* duty to include an unconditional obligation is *independent* of any rights under the contract. *The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA.*

*Northern States II*, 1998 WL 276581, at *1-2 (D.C. Cir. May 5, 1998) (emphasis added).

In short, the D.C. Circuit issued the limited mandamus order to enforce DOE's statutory duty to undertake an absolute contractual obligation to begin performing by the deadline. It did so by prohibiting DOE from adopting an interpretation of the contract at odds with that duty.

## ARGUMENT

*"The Trouble with the Sovereign Immunity Doctrine*
*Is that It Interferes with Consideration of Practical Matters,*
*and Transforms Everything into a Play on Words"*
(Walter Gellhorn, as quoted in *Bowen*, 487 U.S. 879)

### I. AS AN EXCEPTION TO THE RULES OF *RES JUDICATA*, *CHRISTOPHER VILLAGE* PERMITS A COLLATERAL ATTACK ON THE JUDGMENT OF ANOTHER COURT ONLY IN LIMITED CIRCUMSTANCES NOT PRESENT IN *INDIANA MICHIGAN* OR *NORTHERN STATES I*

The doctrine of *res judicata* serves the essential goal of finality in litigation by precluding an unsuccessful litigant in one action from collaterally attacking one court's judgment in a second action in another court. In general, this rule governs even if the first court lacked subject matter jurisdiction. *See Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1329-30 (Fed. Cir. 2004) ("[i]n most circumstances a judgment may not be collaterally attacked on the ground that the original tribunal lacked subject matter jurisdiction, even if the issue of subject matter

jurisdiction has not been litigated in the first action") (citing *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982) (other citations omitted).

As a narrow exception to that general rule, the decision of the Federal Circuit in *Christopher Village* recognizes a special rule uniquely permitting the government, as sovereign, to collaterally attack an adverse judgment in an earlier action where the jurisdiction of the court in that earlier action was not supported by a waiver of sovereign immunity. The Federal Circuit held that the earlier court lacked a waiver of sovereign immunity under the APA because the "adequate remedy" provision of APA § 704 withdrew the waiver, given that the plaintiffs had an adequate remedy in an action for money damages in the CFC. *Christopher Village*, 360 F.3d at 1333 n.6 ("section 704 [of the APA] precludes district court jurisdiction in this case").

For present purposes, NPPD takes no exception to *Christopher Village* itself. As more fully developed below, however, that decision simply does not apply here, for two reasons:

*First*, the "adequate remedy" limitation of APA § 704 does not apply to *all* cases that rely on the APA for a waiver of sovereign immunity. Significantly, it does not apply to cases, such as *Indiana Michigan* or *Northern States I*, brought under a "specific statutory review" provision such as NWPA § 119, as opposed to cases brought under the "general statutory review" provisions of the APA alone, as was true both in *Christopher Village* and in *Consolidated Edison Co. of New York, Inc. v. United States*, 247 F.3d 1378 (Fed. Cir. 2001).

*Second*, even if the "adequate remedy" limitation of APA § 704 *had* applied in *Indiana Michigan* or *Northern States I*, the petitioners there raised a statutory claim for which the CFC could offer no remedy at all, because the petitioners sought only prospective equitable relief and could not have sought retrospective monetary relief.

## II. THE D.C. CIRCUIT'S JUDGMENT AND MANDAMUS ORDER IN *INDIANA MICHIGAN* AND *NORTHERN STATES I* WERE SUPPORTED BY AN APPROPRIATE GRANT OF JURISDICTION AND WAIVER OF SOVEREIGN IMMUNITY PROVIDED BY THE NWPA AND APA

As the Court here stated at the hearing held on June 1, three key questions typically present themselves in any case involving judicial review of agency action in federal court:

(1) Whether the court has *subject matter jurisdiction*;

(2) Whether there is a *waiver of sovereign immunity* for the type of claim and relief requested; and

(3) whether the government has violated a *substantive right*.

Many times, but not always, the reviewing court has subject matter jurisdiction under the general federal question statute, 28 U.S.C. § 1331; sovereign immunity is waived by the judicial review provisions of the APA (5 U.S.C. §§ 701 – 706); and a separate substantive statute or regulation provides the source of the rights claimed to have been invaded. An example of such a substantive statute is the Trade Secrets Act, 18 U.S.C. § 1905. *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) (review of agency decision to disclose EEO reports submitted by government contractor was available under the APA and Trade Secrets Act); *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) (review of agency's decision to disclose government contractor's proprietary data was available under the APA and Trade Secrets Act).

Cases brought under the Tucker Act depart from this typical pattern in that the Tucker Act provides both subject matter jurisdiction and a waiver of sovereign immunity for claimants seeking money damages. *See* 28 U.S.C. § 1491; *United States v. Mitchell*, 463 U.S. 206, 212, 215-16 (1983). The substantive rights sued on, however, must come from elsewhere, either a contract with the United States or a money-mandating provision of the Constitution, a statute, or a regulation. *See United States v. Testan*, 424 U.S. 392, 398-99, 400-01, 401-02 (1976) (citing

*Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-09 (Ct. Cl. 1967) (neither the Constitution, a statute or a regulation creates a cause of action for money damages unless, in itself, it can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained")).

The *Indiana Michigan* and *Northern States* cases in the D.C. Circuit also departed from the typical pattern, although all three elements were nonetheless present. As detailed below, subject matter jurisdiction existed under NWPA § 119 (rather than the general federal question statute); sovereign immunity was waived at least arguably by NWPA § 119 but clearly by APA § 702 (and not withdrawn by any exception to the APA); and the petitioners sought to enforce substantive rights created by NWPA § 302 (as distinguished from the Standard Contracts entered into pursuant to that statute).

### A. The D.C. Circuit Had Subject Matter Jurisdiction in *Indiana Michigan* and *Northern States I* Under NWPA § 119, Which Lodges Jurisdiction in the Courts of Appeals for All Challenges to Agency Action Based on NWPA § 302

NWPA § 119 is a jurisdictional statute in that it expressly provides for direct judicial review of a variety of actions under the NWPA in the courts of appeals. 42 U.S.C. § 10139(a)(1) ("[e]xcept for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action . . .").

Although NWPA § 119 expressly refers only to review of actions under one subtitle of the NWPA, the D.C. Circuit has long since decided that Congress intended the courts of appeals to have original and exclusive jurisdiction over cases brought under the NWPA more generally, including NWPA § 302, the section that authorizes DOE to enter into contracts with nuclear utilities for the disposal of their spent fuel. *See General Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy,* 764 F.2d 896 (D.C. Cir. 1985). ***Not even the government disagrees with that***

***decision.*** *See* Gov't PSEG Br. at 45 ("the [*PSEG*] trial court correctly determined in this case that Section 119, the judicial review provision of the NWPA, encompasses actions, decision, and failures to act arising under Title III of the NWPA, including activities under Section 302").

Arguably, NWPA § 119 also waives sovereign immunity. It is true that § 119 does not describe the relief available in such actions, but that is not the test. The test is simply whether Congress intended to waive sovereign immunity. *See, e.g., Humane Soc. of the U.S. v. Clinton*, 236 F.3d 1320, 1326 (Fed. Cir. 2001) (whether a statute waives sovereign immunity depends on "what can be ascertained about Congress's purpose and intent"). Under that test, it is reasonable to conclude that Congress intended to make any and all relief available under NWPA § 119 save for that prohibited by the exclusive "money damages" jurisdiction of the CFC under the Tucker Act. But one need not reach this issue, for the APA clearly provides a waiver of adequate scope.

### B. APA § 702 Broadly Waives the Sovereign Immunity of the United States for Review of Agency Actions in Suits, Such as *Indiana Michigan* and *Northern States I*, Seeking Relief "Other Than Money Damages"

APA § 702 establishes a general right of judicial review of agency action, broadly waiving the sovereign immunity of the United States for actions seeking "relief other than money damages." *See* APA § 702; *see also Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988) ("the 1976 amendment to § 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity" to the extent provided for therein).

"Relief other than money damages" includes declaratory, injunctive, and mandamus relief. *See* H.R. Rep. No. 94-1656, at 3-8 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6123-29 (legislative history of the 1976 amendment to the APA) (what became the amendment to APA § 702 "would strengthen this accountability [of the Government for wrongs committed against its citizens] by withdrawing the defense of sovereign immunity in actions seeking relief

other than money damages, *such as an injunction, declaratory judgment, or writ of mandamus"*) (emphasis added); *see also* All Writs Act, 28 U.S.C. § 1651 (authorizing federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

### C. APA § 702's Broad Waiver of Sovereign Immunity Is Subject to Only Three Limitations, None of Which Applied to the Writ of Mandamus Issued in *Northern States I*

Under the waiver of sovereign immunity provided by APA § 702, the D.C. Circuit had jurisdiction over *Northern States I* unless: (i) the petitioners sought and received "money damages," a form of relief that is outside the scope of the APA's waiver of sovereign immunity; (ii) under APA § 702(2), the Tucker Act "impliedly forbade" the D.C. Circuit from awarding equitable relief; or (iii) the "adequate remedy" limitation of APA § 704 applied to *Northern States I* and the CFC could have offered an adequate remedy to the petitioners. In fact, none of these three limitations applied to *Northern States I*. Thus, the D.C. Circuit had full jurisdiction, including a waiver of sovereign immunity, to issue its writ of mandamus.

#### 1. APA § 702's Waiver of Sovereign Immunity Excludes Claims for "Money Damages," but the Petitioners in *Northern States I* Neither Sought Nor Received an Award of Money Damages

By its terms, APA § 702 waives sovereign immunity for claims seeking "relief other than money damages." This limitation does not apply to *Indiana Michigan* or *Northern States I*, because the petitioners sought and received only equitable relief. Specifically, they sought only declaratory, injunctive, and mandamus relief. In *Indiana Michigan*, they received only declaratory relief, and in *Northern States I*, they received only limited mandamus relief.

Moreover, the declaratory and mandamus relief that the D.C. Circuit awarded there did not amount in substance to "money damages" even under a broad interpretation of this term,

because the relief did not declare DOE liable to pay any money to the petitioners, nor did it have the practical effect of requiring DOE to pay any money. *Cf. Bowen*, 487 U.S. at 915-16 (dissenting opinion of Scalia, J.) (emphasizing the need to draw the jurisdictional divide based on the substance of a claim rather than its form).

### 2. Under the "Impliedly Forbidden Relief" Clause of APA § 702(2), the Tucker Act Withdraws the APA's Waiver of Sovereign Immunity for Contract Claims, But the Writ of Mandamus in *Northern States I* Enforced Only Statutory Rights, Not Contract Rights

#### a. In the Tucker Act Context, APA § 702(2) Affects Contract Claims but Not Statutory Claims for Specific Relief

After setting forth the general right of judicial review (and, thus, the waiver of sovereign immunity), APA § 702 adds a proviso limiting the right of review (and, thus, the waiver of sovereign immunity) by stating that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or *impliedly forbids the relief* which is sought." APA § 702(2) (emphasis added). The legislative history of the 1976 APA amendments identifies the Tucker Act as the statute that Congress principally had in mind, and it expresses the understanding of Congress that the Tucker Act "impliedly" forbids declaratory or injunctive relief – especially specific performance – in *contract* cases:

> [T]he amendment to 5 U.S.C. [§] 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought. Clause (2) of the third new sentence added to [§] 702 contains a second proviso concerned with situations in which Congress has consented to suit and the remedy provided is intended to be the *exclusive* remedy. For example, in the Court of Claims Act, Congress created a damage remedy for *contract claims* with jurisdiction limited to the Court of Claims except in suits for less than $10,000. *The measure is intended to foreclose specific performance of government contracts.* In the terms of the proviso, a statute granting consent to suit, *i.e.*, the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act.

H.R. Rep. No. 94-1656, at 12-13 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6133 (emphasis added).

A number of cases illustrate the application of this "impliedly-forbidden-relief" clause. *See, e.g.*, *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985) (Tucker Act impliedly forbids the remedy of specific performance of government contracts and thereby deprived district court of jurisdiction over contract-based claim); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in *contract* cases, because the waiver is by its terms inapplicable if 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,' and 5 U.S.C. § 702, and the Tucker Act and Little Tucker Act impliedly forbid such relief") (emphasis added); *Transohio Sav. Bank v. OTS*, 967 F.2d 598, 609 (D.C. Cir. 1992) ("this Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA") (emphasis in original) (citing *Sharp*, 798 F.2d at 1523 (in turn citing other cases)). *See also generally* Gregory C. Sisk, *The Tapestry Unravels: Statutory Waivers of Sovereign Immunity and Money Claims Against the United States*, 71 Geo. Wash. L. Rev. 602, 627-32 (2003) [hereinafter "Sisk"] (Section III.A, "Contract Claims and the Bar on Specific Performance").

Although the Tucker Act impliedly forbids APA jurisdiction in contract cases (even for equitable relief not available in the CFC), it does not withdraw the APA's sovereign immunity waiver in cases brought under constitutional, statutory, or regulatory provisions. *See, e.g.*, *Transohio Sav. Bank*, 967 F.2d at 610 ("under [APA] § 702 and the Tucker Act, litigants may

bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court").

**b. APA § 702(2) Did Not Apply to *Northern States I*, Because the Petitioners' Claims Were Based in Statute, Not Contract**

In its brief to the Federal Circuit in *PSEG* and in its presentations to this Court, the government takes the position that the D.C. Circuit lacked jurisdiction to issue its writ of mandamus in *Northern States I*. Although the government agrees that NWPA § 119 confers jurisdiction on the D.C. Circuit of matters arising under NWPA § 302, it argues that the D.C. Circuit "overstepped" that jurisdiction by "evaluating . . . DOE's compliance with the terms of its contracts" when it issued the limited writ of mandamus. *See* Gov't PSEG Br. at 56. The government misreads the D.C. Circuit's decision.

In fact, the D.C. Circuit interpreted only NWPA § 302 and evaluated only DOE's compliance with that statute; it had no need to interpret the Standard Contract or evaluate DOE's compliance with the contract to determine that DOE's decision to treat the contract as conditional and its delay as "unavoidable" violated its duty under the NWPA. As detailed below, the mere fact that the D.C. Circuit's mandamus order *might* have future litigation or financial consequences for DOE under the contract (though, in fact, it does not, for the reasons described in Section III below) does not transform the petitioners' statutory claim or the relief granted into contractual ones.

**(1) The *Megapulse* Test Is the Appropriate Standard for Determining Whether a Claim Is Statutory or Contractual**

Federal courts have generally been vigilant in setting and policing boundaries between suits under the APA and suits under the Tucker Act, lest the broader APA waiver crowd out the narrower Tucker Act waiver. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982);



400422289v1

*but see Bowen*, 487 U.S. 879 (1988) (narrowly construing "money damages" within the meaning of APA § 702 so as to give broader interpretation to APA's judicial review provisions). But there is also a risk that the Tucker Act may crowd out APA jurisdiction. As the D.C. Circuit put it in *Megapulse*,

> [a]lthough it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in *contract* actions, we must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds *other than a contractual relationship* with the government.

672 F.2d at 968 (emphasis added). Accordingly, it has long since been accepted that classifying a particular action as one arising under the Tucker Act or not depends on:

> (1) the "*source of the rights* upon which the plaintiff bases its claims," and
>
> (2) the "*type of relief sought (or appropriate).*"

*Id.* (emphasis added); *see also Roberts v. United States*, 242 F.3d 1065, 1068-69 (Fed. Cir. 2001) ("[t]he answer to the sovereign immunity and jurisdiction questions depends not simply on whether a case involves contract issues, but on whether, *despite the presence of a contract*, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution") (emphasis in original) (citations and quotation omitted); *Transohio Sav. Bank*, 967 F.2d at 609-11 (discussing *Sharp* and *Megapulse* in connection with OTS's argument that Transohio's case was purely a "contract" case); *Norby Lumber Co., Inc. v. United States*, 46 Fed. Cl. 47, 51 (2000) (Miller, J.) ("[w]hether an action is founded upon a contract is determined by looking to the source of the rights upon which a plaintiff bases its claims and the nature of the relief sought") (citing *Megapulse*, 672 F.2d at 968).

Thus, in *Spectrum Leasing*, where the government invoked the Debt Collection Act, 31 U.S.C. §§ 3701 *et seq.*, to withhold payments otherwise due to a government contractor and the

contractor sued in district court under the APA to obtain an injunction to compel payment, the application of this test led the court to conclude that the plaintiff's claim was based on the contract and sought what was in essence a contractual remedy, which brought it within the exclusive jurisdiction of the Tucker Act. *See Spectrum Leasing,* 764 F.2d at 894-95 ("[h]aving determined that the contract [rather than the Debt Collection Act] provides the ultimate source of Spectrum's rights and that the relief sought is a typical contract remedy, we must conclude that Spectrum's claim is one founded on a contract for purposes of the Tucker Act").

Conversely, in *Megapulse* itself, the use of the test led to the conclusion that APA review was appropriate because the ultimate source of the plaintiff's rights was the Trade Secrets Act and not the plaintiff's government contracts. As the court recognized there, an action does not arise under a contract simply because the court may need to refer to a contract, or even resolve contract issues, to decide the case. *See Megapulse,* 672 F.2d at 968 ("[i]t is not at all unusual for a court to find it necessary in the course of deciding a dispute over which it does have jurisdiction to decide an issue which would be outside its jurisdiction if raised directly"). If, as was the case there, the ultimate source of the plaintiff's rights depends not on a contract but on a statute, then the action arises under the statute. *Id.*, 672 F.2d at 969-70 ("we do not accept the Government's argument that the mere existence of such contract-related issues must convert this action to one based on the contract").

#### (b) Under *Megapulse,* the Claim and Relief in *Northern States I* Were Statutory, Not Contractual

Applying the foregoing test to *Northern States I* leads inexorably to the conclusion that, notwithstanding the Tucker Act, the D.C. Circuit properly had jurisdiction under the APA's waiver of sovereign immunity. This is so because the source of the petitioners' claim there was

statutory (not contractual) and the statute in question is not a "money-mandating" one, such that the petitioners necessarily sought only relief "other than money damages."

In *Indiana Michigan,* the D.C. Circuit had decided that NWPA § 302 required DOE to undertake an unconditional contractual duty to begin performing by the designated deadline in 1998. *See Indiana Mich.,* 88 F.3d at 1277. Notwithstanding this declaratory judgment, DOE announced that it would not be able to meet the deadline. It further advised the utilities that it viewed its prospective inability to perform to be an "unavoidable delay" under the Standard Contract and therefore excusable pursuant to the Unavoidable Delays clause of the contract. *Northern States I,* 128 F.3d at 757. In *Northern States I,* the utilities, states, and state agencies petitioned the D.C. Circuit for a writ of mandamus seeking, among other forms of relief, an order that DOE begin disposing of the utilities' spent fuel by the 1998 deadline. *Id.* at 756.

As in *Indiana Michigan,* the source of the petitioners' substantive rights in *Northern States I* was NWPA § 302, not the Standard Contract. The right they sought to vindicate was the statutory right – as previously declared by the D.C. Circuit – that DOE had an unconditional obligation to begin performing by January 31, 1998.

The fact that any relief granted might have spillover consequences for DOE under the Standard Contract did not transmute the claim or the case into one based on the contract. *See Megapulse,* 672 F.2d at 968. As the *Megapulse* court observed in a similar context:

> [i]t is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a [government] contract. It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, *even if in clear violation of a specific statute*, simply because that same action might *also* amount to a breach of *contract.*

*Megapulse,* 672 F.2d at 971 (emphasis added).

In *Northern States II*, the D.C. Circuit itself explained its jurisdictional rationale in similar terms, declaring that "[t]he *statutory* duty to include an unconditional obligation is *independent* of any rights under the *contract*." *Northern States II*, 1998 WL 276581, at *2 (emphasis added). Hence, "[t]he Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA." *Id.* Accordingly, the court issued a mandamus order limited to "prohibit[ing] the DOE from implementing an interpretation [of the Standard Contract] that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998." *Id.* Recognizing that its jurisdiction extended only to the statutory cause of action, however, the court denied a broader mandamus that would have amounted to an order of specific performance of the contract. *See Northern States I*, 128 F.3d at 759; *see also Northern States II*, 1998 WL 276581, at *2 ("[b]reach by DOE does not violate a statutory duty").

Because the D.C. Circuit issued the limited mandamus order to enforce only a statutory duty and carefully refrained from enforcing any contractual rights or duties (such as by ordering specific performance of the contract), the mandamus order conformed to the limits of the APA's waiver of sovereign immunity.

### 3. The "Adequate Remedy" Limitation of APA § 704 May Withdraw the APA's Waiver of Sovereign Immunity in Some "General Statutory Review" Cases, but It Does Not Apply to Cases, Such as *Northern States I*, Brought Under a "Specific Statutory Review" Provision, Such as NWPA § 119

A third limitation on the APA's broad waiver of sovereign immunity is set forth in APA § 704, which states that judicial review is available for "[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* . . . ."



400422289v1

APA § 704 (emphasis added). As this language makes clear, APA § 704 recognizes two different types of reviewable agency action:

(1) those agency actions "made reviewable by statute"; and

(2) "final agency action for which there is no other adequate remedy in a court."

APA § 704. This distinction is worth exploring in greater detail, as judicial review in *Indiana Michigan* and *Northern States I* was of the first type, which is not subject to the "adequate remedy" limitation. In contrast, judicial review in *Christopher Village* and *Consolidated Edison* was of the second type, which alone is subject to the "adequate remedy" limitation.

**a. "Specific Statutory Review" Cases, Such as *Northern States I*, Are Not Subject to the "Adequate Remedy" Limitation of APA § 704**

Review of agency action "made reviewable by statute" is known as "specific statutory review" (in contrast to "general" statutory review or "nonstatutory" review) and is available in accordance with the terms of the statute providing for such review. *See* Walter Gellhorn, Clark Byse *et al.*, *Administrative Law* 985-86 (8th ed. 1987) ("Gellhorn"). By the terms of § 704 itself, as quoted above, "specific" statutory review is not subject to the "adequate remedy" limitation of that section. *See* APA § 704; *Bowen*, 487 U.S. at 903-04 (explaining that the intent of the "adequate remedy" limitation of APA § 704 was to prevent the APA's "general" authorization for review of agency action from duplicating or defeating "specific" or "special" statutory review procedures); *id.* at 926 & n.4 (dissenting opinion of Scalia, J.) (making the undisputed point that despite the "adequate remedy" limitation of APA § 704, "many suits, both for specific relief and for damages, reach district court under the APA because they come within the more specific rubric of § 704, '[a]gency action made reviewable by statute'"); *cf. Doe v. United States*, 372 F.3d 1308, 1312 (Fed. Cir. 2004) (recognizing that "adequate remedy" provision of APA § 704

is limited to "nonstatutory" review cases); *Nat'l Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (same); *Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 786 (Fed. Cir. 1998) (same). Stated differently, "specific" statutory review *is* the alternative adequate remedy in such cases, and makes it unnecessary to resort to "general" statutory review. *Cf. Roberts*, 242 F.3d at 1068 ("a specific grant of jurisdiction to the district courts via another statute is not trumped by the Tucker Act").

Beginning with the passage of the Federal Trade Commission Act of 1914, Congressional regulatory legislation has frequently incorporated "specific statutory review" provisions. *See* Gellhorn at 985-86; *see also* H.R. Rep. No. 94-1656, at 5 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6125 ("acceptance of judicial review is reflected not only in court decisions but in the many statutes in which Congress has provided a special procedure for reviewing particular administrative activity").

One such specific statutory review provision is NWPA § 119, which expressly provides for judicial review of any "final decision or action" of certain officials, of their failure to act, of the constitutionality of any decision made or action taken, of any environmental impact statement, of any environmental assessment prepared under certain provisions, and of any research and development activity. 42 U.S.C. § 10139(a)(1)(A)-(F). Each of these actions are "made reviewable by statute" within the meaning of APA § 704. "Specific statutory review" of these actions is available in accordance with the terms of NWPA § 119, which determines what action is reviewable and when. *See, e.g., Nevada v. Watkins*, 939 F.2d 710, 712 (9th Cir. 1991) ("the NWPA expressly provided that each 'environmental assessment' [by DOE] would be a 'final agency action subject to judicial review' in accordance with the APA and the NWPA review provisions"). Accordingly, these actions constitute "actions made reviewable by statute"

within the meaning of APA § 704. Thus, judicial review under NWPA § 119 is not subject to the "adequate remedy" limitation of APA § 704, and neither *Christopher Village* nor *Consolidated Edison* has any bearing on *Northern States I*.

**b. *Christopher Village* and *Consolidated Edison* Were Subject to the "Adequate Remedy" Limitation of APA § 704 Only Because They Were "General Statutory Review" Cases**

Separately from agency action "made reviewable by statute," APA § 704 also makes judicial review available for "final agency action *for which there is no other adequate remedy in a court*." 5 U.S.C. § 704 (emphasis added). This type of review falls under the rubric of "general" statutory review (sometimes also known as "non-statutory" review). *See* Gellhorn at 986-87; *see also Bowen*, 487 U.S. at 891 n.16 (majority opinion) ("Thus, the State does not argue that a disallowance decision . . . is *specifically* reviewable . . . . It acknowledges that there is no special statutory procedure covering disallowance decisions and relies entirely on the *general* provision for judicial review of agency action contained in the APA, 5 U.S.C. § 701 *et seq.*") (emphasis added).

It was this second type of judicial review – general statutory review – that occurred in the underlying district court case in *Christopher Village*, which was then appealed to the Fifth Circuit, and in the district court case in *Consolidated Edison*.

**(1) *Christopher Village***

In *Christopher Village*, the plaintiffs were the owners of a low-income housing project subsidized by the U.S. Department of Housing and Urban Development ("HUD") pursuant to contracts with HUD. When the owners allowed the property to deteriorate, HUD threatened to foreclose on the mortgage unless the owners spent $2 million on maintenance of the property. To prevent the foreclosure, the plaintiffs brought suit in federal district court seeking mandamus



400422289v1

and injunctive relief under sections 702 and 706 of the APA, not under any specific statutory review provision, none apparently being available. *See Christopher Village*, 360 F.3d at 1323. They also sought a declaratory judgment concerning their right to rent increases under the contracts, also relying on the APA as a waiver of sovereign immunity. *Id.* The plaintiffs lost in the district court, which granted summary judgment in favor of HUD, holding that HUD's actions in determining rent increases were unreviewable and that the plaintiffs' contractual obligation to maintain the property was not conditioned on receiving rent increases. *Id.*

The owners appealed the district court's judgment to the Fifth Circuit, which reversed, but not before HUD foreclosed on the property and sold it, and not before the new owners tore it down. In light of these developments, the Fifth Circuit held that the request for injunctive relief had become moot. But it also held that the rest of the case could proceed because a declaratory judgment could form the predicate for a damages action in the CFC. On the merits, it held that HUD had violated its "contractual and regulatory duty" to consider the owners' request for rent increases. *Id.* at 1323-24.

The owners then brought an action in the CFC, in which they argued that *res judicata* barred HUD from relitigating its liability for breach of contract. In the Federal Circuit's view, the validity of this argument turned on whether the APA waived sovereign immunity for the district court case. The answer to that question, in turn, "depended on whether suit in the Court of Federal Claims for money damages constituted an 'adequate remedy' under section 704 of the APA." *Christopher Village*, 360 F.3d at 1327. Although reluctant to conclude that one of its sister courts had erred, the court rejected the plaintiffs' *res judicata* argument on the grounds that they had an adequate remedy in the CFC and, thus, "section 704 precludes district court jurisdiction in this case, and the Court of Claims' jurisdiction is exclusive." *Id.* at 1327-29,

1333 & n.6. The judgment of the Fifth Circuit, according to the Federal Circuit, was therefore void and not entitled to preclusive effect in the CFC. *Id.* at 1333.

**(2) *Consolidated Edison***

General statutory review, as well as the "adequate remedy" provision of APA § 704, also figured prominently in the *Consolidated Edison* case. There, the plaintiff first brought suit in the CFC to challenge the constitutionality of a provision in the Energy Policy Act of 1992 ("EPACT"), 42 U.S.C. § 2297g-1, which imposed assessments on utilities to fund the government's efforts to decontaminate and decommission facilities that the government had used to provide uranium enrichment services to the utilities (but did not contain any special provision for judicial review or come within the Atomic Energy Act's judicial review provision, 42 U.S.C. § 2239). After other utilities with similar claims suffered adverse judgments, the plaintiff brought suit in federal district court, where it sought declaratory and injunctive relief rather than a refund of the assessments it had already paid. After the district court denied the government's motion to transfer the case to the CFC, the government appealed. On appeal, the Federal Circuit held that although the plaintiff might satisfy APA § 702 by requesting relief "other than money damages," APA § 704 withdrew the waiver of sovereign immunity because the plaintiff had an "adequate remedy" available in the CFC. *Consolidated Edison*, 247 F.3d 1378, 1386 ("§ 704's exception for alternative adequate remedies forecloses a waiver of immunity under § 702").[2]

[2] Not all cases involving general statutory review will come within the "adequate remedy" provision of APA § 704. As Justice Scalia has observed, "even when no special review statute exists, the vast majority of specific-relief suits challenging agency action will reach district court because they are unaffected by the 'other adequate remedy' provision of § 704, since they challenge the application of statutes or regulations that cannot be regarded as providing for damages." *Bowen*, 487 U.S. at 926 n.4 (dissenting opinion).

### 4. Even If the "Adequate Remedy" Limitation of APA § 704 Had Applied to *Northern States I*, the D.C. Circuit Still Would Have Had Jurisdiction, Because an "Adequate Remedy" Would Not Have Been Available in the Court of Federal Claims

Even assuming for the sake of argument that the "adequate remedy" limitation of APA § 704 had applied to *Northern States I* (which would have been true only if NWPA § 119 did not exist), it still would not have divested the D.C. Circuit of jurisdiction, because the CFC could not have entertained, nor grant any remedy for, the petitioners' claim. This is so for two reasons:

*First*, the petitioners sought prospective equitable relief under the NWPA. Thus, the CFC could not have awarded the petitioners any remedy, particularly since the NWPA is not a money-mandating statute. *See Mitchell*, 463 U.S. at 216 ("[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act"); *Testan*, 424 U.S. at 400 (source of substantive law for a claim under the Tucker Act must be a "money-mandating" provision); *cf. Bowen*, 487 U.S. at 921-22 (dissenting opinion of Scalia, J.) (agreeing with the majority that "sovereign immunity does not bar respondent's actions insofar as they seek injunctive or declaratory relief with prospective effect") (citing *Testan*, 424 U.S. at 403 (distinguishing between "prospective reclassification" of a federal employee and "retroactive reclassification resulting in money damages")).

*Second*, unlike the claimants in *Christopher Village* and *Consolidated Edison* (and even *Bowen*), the petitioners in *Northern States I* could not possibly have pled any plausible claim for retrospective monetary relief since they were challenging and seeking to overturn DOE's interpretation of the NWPA, and not seeking any sort of damages for DOE's breach of the Standard Contract (necessarily so, because it was only 1996, two years before the deadline for DOE to commence performing). *Cf. Doe*, 372 F.3d at 1313 ("[t]his is not a case in which the plaintiff's claim for relief is simply a request for money damages disguised as a request for an

order granting injunctive relief, or in which the grant of equitable relief would give the plaintiff nothing more than an award of damages"); *Bowen*, 487 U.S. at 926 (dissenting opinion of Scalia, J.) (noting that the State of Massachusetts could have obtained complete relief from the Claims Court because it could "assert *immediately* a claim for money damages in the Claims Court") (emphasis added). To paraphrase Professor Sisk, *Northern States I* was not a case "where a claim for retroactive monetary relief could be made and would resolve all the legal issues raised, [such that] there is no need to obtain prospective equitable relief as well." Sisk at 698.

The government may argue that the utilities should have waited for however long was necessary and filed their law suits only after they had incurred monetary harm that would have conferred jurisdiction on the CFC. But that runs counter not only to *Roberts*, 242 F.3d at 1068, which recognizes that the Tucker Act does not trump a specific grant of jurisdiction to the district courts, but also to *Megapulse*, 672 F.2d at 971, which recognizes that a claimant need not forfeit a statutory right to specific relief simply because it may later accrue a contract right to damages.[3]

Moreover, *Megapulse* accepts the possibility that relief based on a statutory right might have spillover effects on a contract. *See Megapulse*, 672 F.2d at 971 ("[i]t is quite another [thing] to claim, as the Government does in this case, that an agency action may not be enjoined, *even if in clear violation of a specific statute*, simply because that same action might also amount to a breach of *contract*") (emphasis added). Even under the bright-line jurisdictional rule advocated by Professor Sisk, "[n]onmonetary relief would include all forms of prospective remedies, *including those that may have financial consequences for the government in the future*

[3] Indeed, even as staunch an advocate of the CFC's Tucker Act jurisdiction as Professor Sisk would not go so far as to require a claimant to forgo specific relief and wait until it has incurred monetary harm. Rather, he expressly acknowledges the argument that "a litigant need not delay until actual harm has occurred giving rise to a monetary claim, but may, where otherwise appropriate under law, seek to preempt any allegedly unlawful governmental activity through a declaratory judgment action." Sisk at 699.

. . . ." Sisk at 691 (describing the simple bright-line distinction that would result from his proposal to legislatively overrule *Bowen* and thereby "restore the integrity of the Tucker Act and the institutional viability of the Court of Federal Claims") (emphasis added); *see also Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (upholding district court jurisdiction in HUD Section 8 case, even though "[a]n adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing [contractual] relationship").[4]

In short, even if the "adequate remedy" limitation of APA § 704 applied to *Indiana Michigan* and *Northern States I* (which it did not), the CFC could not have offered the petitioners an adequate remedy or, indeed, any remedy at all to redress their statutory claims.

## III. INDEPENDENTLY OF THE D.C. CIRCUIT'S MANDAMUS ORDER, THE DECISIONS OF THE FEDERAL CIRCUIT IN *MAINE YANKEE* AND *NORTHERN STATES III* BIND THIS COURT AND PRECLUDE IT FROM ENTERTAINING ANY "UNAVOIDABLE DELAY" DEFENSE

Any attempt to collaterally attack the mandamus order of the D.C. Circuit in *Northern States I* may raise interesting questions of great academic and scholarly interest, but it would have no practical effect in advancing the ultimate resolution of this litigation.

The real issue hovering just below the surface here, of course, is whether the Court will ultimately entertain an argument by the government that its failure to timely commence performing the Standard Contracts is an "unavoidable delay" and, as such, did not constitute a breach of contract. The questions of delay and breach, however, have already been resolved by the Federal Circuit, which flatly held in *Maine Yankee* that "'DOE has breached the contract.'" *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000), *aff'g and*

[4] To be clear about this, however, the D.C. Circuit's limited mandamus order does not actually create any spillover effects for DOE under the Standard Contract, given that the Federal Circuit has already ruled that DOE breached all the utilities' contracts by failing to meet the 1998 deadline – a point we take up next.

*quoting Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 235 (1998) (Merow, J.). Indeed, the Federal Circuit concluded that DOE breached *every* utility's contract:

> Yankee contends that the government breached a critical and central obligation of the contract – that it begin disposal of nuclear waste by January 1, 1998. Congress found this objective so important that it took the unusual action of specifying that *all the contracts* must contain this explicit requirement. The breach involved *all the utilities* that had signed the contract – *the entire nuclear electric industry*.

*Maine Yankee*, 225 F.3d at 1341-42 (emphasis added).

In the companion case of *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ("*Northern States III*"), the Federal Circuit incorporated this reasoning by reference, adding only that "the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." *Id.* at 1367.

In short, the Federal Circuit has already held that DOE's failure to meet the 1998 deadline is not a "delay" of any sort within the meaning of the Delays clause of the Standard Contract. This forecloses any "unavoidable delay" argument. Accordingly, unless the government now wants to take on both the D.C. Circuit and the Federal Circuit, any collateral attack on *Northern States I* is pointless.

## CONCLUSION

Under the specific statutory review procedure in NWPA § 119 and the waiver of sovereign immunity provided by APA § 702, the D.C. Circuit possessed all requisite jurisdiction to hear and grant equitable relief on the statutory claim of the petitioners there, and it took great care to ensure that the statutory claim was the only one it addressed. Neither the "impliedly-forbidden-relief" provision of APA § 702(2) nor the "adequate remedy" provision of APA § 704

divested the court of its jurisdiction. Thus, *Christopher Village* provides no basis for a collateral attack on the D.C. Circuit's mandamus order in *Northern States I.*

Moreover, nothing in the D.C. Circuit's mandamus order poses a threat to "the integrity of the Tucker Act [or] the institutional viability of the Court of Federal Claims." Sisk at 691. In contrast, any unwarranted attempt to expand Tucker Act jurisdiction at the expense of APA jurisdiction would threaten the right of claimants to seek and obtain relief that is properly available and due under other provisions of law.

Finally, a word about finality. That, of course, is the very purpose of the doctrine of *res judicata*. When a matter has been fully and fairly litigated to a final conclusion, with all appeals exhausted, litigants should be entitled to proceed on the assumption that the conclusion is just that – a conclusion – and not merely one more step in a never-ending series of proceedings relitigating old issues over and over again. Accordingly, litigants should be entitled to have later courts proceed with the utmost care and caution when they invite and entertain an argument, years after a seemingly final conclusion, that the conclusion really wasn't final after all. It is not just the settled expectations of the litigants that are at stake, but also the institutional legitimacy of the courts themselves.

Dated: July 12, 2006

Respectfully submitted,

s/Alex D. Tomaszczuk by s/Daniel S. Herzfeld
Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7940
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
Nebraska Public Power District

*Of Counsel:*
Jay E. Silberg
Walter F. Zenner
Daniel S. Herzfeld
Jack Y. Chu
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
Tel: (202) 663-8000