# In the United States Court of Federal Claims

No. 01-116C

(Filed:  October 31, 2006)

_____

| | |
|---|---|
| NEBRASKA PUBLIC POWER DISTRICT, | * Government contract – spent nuclear fuel case; |
| | * Mandamus issued by D.C. Circuit in *Northern* |
| | * *States*; Whether mandamus may be collaterally |
| Plaintiff, | * attacked; *Christopher Village*; Judgment void if |
| | * unsupported by waiver of sovereign immunity; |
| v. | * Void order doctrine – applicability to mandamus |
| | * writs; Section 119 of the Nuclear Waste Policy |
| THE UNITED STATES, | * Act; Jurisdictional premises in *Northern States* |
| | * inconsistent with Federal Circuit holding in |
| Defendant. | * *PSEG*; Judgment and mandamus in *Northern* |
| | * *States* exceeded scope of section 119; Section |
| | * 119 does not provide waiver of sovereign |
| | * immunity; Waiver under APA section 702 |
| | * unavailable; Statutory versus nonstatutory |
| | * review cases under APA section 704; |
| | * *Consolidated Edison*; Mandamus is void; |
| | * Briefing on unavoidable delay clause ordered. |

_____

**OPINION and ORDER**

_____

*Alexander D. Tomaszczuk,* Pillsbury, Winthrop, Shaw, Pittman*,* Washington, D.C., for plaintiff.

*Harold D. Lester* and *Heide L. Herrmann*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Assistant Attorney General Peter D. Keisler.*

**ALLEGRA, Judge:**

At issue is whether a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit in *Northern States Power Co. v. Department of Energy*, 128 F.3d 754 (D.C. Cir. 1997), precludes defendant from presenting a particular defense to plaintiff's claims in this case, which involves a contract for the retrieval and storage of spent nuclear fuel.

Resolution of this issue poses vexing choices – between the finality of court orders and their validity, between judicial economy and deciding cases on the merits, and between comity

and judicial restraint and maintaining the integrity of this court's jurisdiction.  That resolution necessarily occurs against the backdrop of the Federal Circuit's decision in *Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005).  There, that court held that if, owing to the absence of a waiver of sovereign immunity, another court lacked jurisdiction over a suit in which it issued a judgment, that decision would not have preclusive effect in this court under the doctrine of *res judicata.*  In many ways, this case presents a variation on *Christopher Village, to wit*, whether the preclusive effect denied there may be effectively obtained if a court, assertedly operating without a waiver of sovereign immunity, issues a mandamus writ barring the parties from raising particular arguments before this court.  For the reasons that follow, this court concludes that the writ issued by the D.C. Circuit does not have this preclusive effect inasmuch as it is void.

## I.    BACKGROUND

Nebraska Public Power District (plaintiff or NPPD) is a public electric utility company operating as a political subdivision of the Nebraska state government.  It uses a variety of conventional fuels, such as coal and steam, to produce electricity for its customers, and also owns and operates the Cooper Nuclear Station, which produces electricity through nuclear fission.  As a byproduct of its operations, the Cooper Nuclear Station produces spent nuclear fuel which is currently stored at the plant site.

On June 24, 1983, the United States Department of Energy (DOE) and NPPD entered into a contract, pursuant to the Nuclear Waste Policy Act of 1982 (NWPA), Pub. L. No. 97-425, 96 Stat. 2201 (1982), providing that DOE would remove and dispose of NPPD's spent nuclear fuel no later than January 31, 1998.  In return, NPPD agreed to fund the disposal by paying statutory fees into the Nuclear Waste Fund (the Fund).  Defendant acknowledges that it has not yet removed or disposed of any nuclear waste, other than from foreign sources; plaintiff alleges that, by 2001, it had paid approximately $110 million into the Fund and that it continues to pay approximately $5.5 million annually into the Fund.

On March 2, 2001, NPPD filed a complaint in this court seeking damages for DOE's alleged partial breach of contract, breach of the implied covenant of good faith and fair dealing, and an uncompensated taking.  Prior to this case being transferred to the undersigned, the parties filed a number of dispositive motions, presenting issues involving liability and damages.  As will be seen, the liability determination in this case is impacted by the mandamus issued by the D.C. Circuit in *Northern States*.  To place the mandamus in its proper factual and legal context requires a brief overview of the relevant statutes and regulations, as well as the decisions leading up to its issuance.

### A.

The NWPA establishes a comprehensive framework for disposing of high-level radioactive waste and spent nuclear fuel (collectively referred to hereinafter as "SNF"), generated

by commercial nuclear power reactors.  *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000).  Pursuant to the NWPA, DOE's Office of Civilian Radioactive Waste Management is responsible for "the siting, construction, and operation of repositories" designed to store permanently and safely SNF.  42 U.S.C. § 10131(b)(1).  The owners and generators of SNF bear the costs of this monumental task by paying a variety of fees into the Fund, which is used exclusively to fund DOE's waste disposal activities.  42 U.S.C. §§ 10222(c), (d); *see also* 59 Fed. Reg. 27,007, 27,008 (May 25, 1994).

In order to manage the SNF disposal process, the NWPA authorizes DOE to enter into contracts with the owners and generators of SNF under which DOE will take title and possession of the SNF and ensure its safe disposal.  42 U.S.C. § 10222(a).  The statute states that all such contracts "shall provide that" the DOE will dispose of the SNF involved "beginning not later than January 31, 1998."  *Id*. at §10222(a)(5)(B).  Pursuant to its rulemaking authority under the NWPA, *see* 48 Fed. Reg. 5458 (Feb. 4, 1983), the DOE promulgated a "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" (the Standard Contract), 10 C.F.R. § 961.11 (1983), as well as associated fee schedules, 10 C.F.R. § 961.11, Art. VIII; *see also* 10 C.F.R. §§ 170.1 *et seq*, 171.1 *et seq*.[1]  In accordance with 42 U.S.C. § 10222(a)(5), Article II of the Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998, and shall continue until such time as all spent nuclear fuel has been disposed of."[2]  10 C.F.R. § 961.11, Art. II.  The Standard Contract also specifies in Articles IV.B., V, and VI, criteria and procedures for scheduling DOE's receipt of SNF, based on the anticipated annual capacity of a disposal facility and giving priority to the oldest discharged spent fuel.  *See also* 10 C.F.R. § 961.11.

Two other clauses in the Standard Contract are relevant herein.  *Id*. at Art. IX.  The first clause, dealing with "Unavoidable Delays by Purchaser or DOE," states that "[n]either the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform."  *Id*. at Art. IX.A.  The second clause, entitled "Avoidable Delays by Purchaser or DOE," provides that –

---

[1]  Under the statute, DOE was not required to employ a standard contract; it elected to do so.  *See* 42 U.S.C. § 10222(a)(1).

[2]  Though seemingly voluntary, a contract with DOE for SNF disposal is a necessary cost of doing business as a nuclear power generator.  Federal law requires such generators to obtain a license from the Nuclear Regulatory Commission in order to operate.  42 U.S.C. § 2077(a); *see also* 42 U.S.C. §§ 2133(a), 2282(a).  That license is contingent on the execution of a contract with DOE: by statute, the Nuclear Regulatory Commission will neither issue nor renew a commercial license for any nuclear power generator which does not enter into a contract with DOE for these disposal services.  42 U.S.C. § 10222(b)(1)(A).

> [i]n the event of any delay in the delivery, acceptance or transport of [SNF] to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

*Id.* at Art. IX.B.

Soon after this Standard Contract was issued, it became clear that DOE would be unable to meet the January 31, 1998, deadline. In 1987, Congress amended the NWPA to require DOE to focus its entire repository development effort on Yucca Mountain, Nevada, one of the earlier-identified candidate sites, in order to determine its suitability as the nation's first geologic repository. 42 U.S.C. § 10133 (as adopted by the Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001-5065, 101 Stat. 1330, 1330-227 to -255). Congress also authorized DOE to construct a Monitored Retrievable Storage (MRS) facility, intended to store temporarily the SNF until a permanent repository became operational. 42 U.S.C. §§ 10162 - 10168; *see also Pacific Gas & Elec. Co. v. United States*, 2006 WL 2925649 at * 23-24 (Fed. Cl. Oct. 13, 2006). Plaintiff alleges that by 1987, DOE was already more than ten years behind schedule, and had not developed any contingency plans for meeting the January 31, 1998, deadline. As a result of increasing concerns about the DOE's ability to perform, in 1993, several states and utilities asked DOE to address its responsibilities under the NWPA and the January 31, 1998, deadline. *See Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1274 (D.C. Cir. 1996). The agency responded informally, stating that it had no clear obligations to accept SNF absent an operational repository.

In 1994, DOE issued an official "Notice of Inquiry" in the Federal Register projecting that the "earliest possible date for acceptance of waste for disposal at a repository is 2010." 59 Fed. Reg. 27,007, 27,008 (May 25, 1994). The Notice sought to elicit, *inter alia*, comments on the DOE's "preliminary view . . . that it has no statutory obligation to accept [SNF] beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA]. . . ." *Id.* The following year, in May 1995, DOE responded to the public comments it had received and issued a "Final Interpretation of Nuclear Waste Acceptance Issues" (hereinafter "Final Interpretation"). 60 Fed. Reg. 21,793 (May 3, 1995). In the Final Interpretation, DOE concluded that it "[did] not have a legal obligation under either the [NWPA] or the Standard Contract to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the [NWPA]." 60 Fed. Reg. at 21,794.

Several utilities and state commissions, all of whom had paid fees into the Fund pursuant to the NWPA, petitioned the United States Court of Appeals for the District of Columbia Circuit for review of the DOE's Final Interpretation. The D.C. Circuit asserted jurisdiction over the Final Interpretation pursuant to the judicial review provision of the NWPA, 42 U.S.C. § 10139. It ruled in favor of petitioners, holding that the NWPA "creates an obligation in DOE, reciprocal

to the utilities' obligation to pay, to start disposing of the SNF no later than January 21, 1998," and vacating the DOE's decision. *Indiana Michigan*, 88 F.3d at 1277. The court concluded that it was "premature to determine the appropriate remedy . . . as DOE has not yet defaulted upon either its statutory or contractual obligation." *Id.* On remand, DOE issued the notice of delay required under Article IX of the Standard Contract and again advised the utilities, including plaintiff, that it would not be able to meet the deadline. This time, however, DOE preliminarily adopted the position that its failure to meet the deadline was excused because its delay was "unavoidable" under the "Unavoidable Delays by DOE or Purchaser" clause of the Standard Contract. *See Northern States Power Co. v. Dept. of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997) (hereinafter "*Northern States I*").

Plaintiff and other utilities subsequently filed a petition with the D.C. Circuit, seeking a writ of mandamus from the court to compel DOE to comply with the holding in *Indiana Michigan* and to begin contract performance by the January 31, 1998, deadline. The court did not issue a broad writ of mandamus compelling DOE to perform under the Standard Contract, because it found that plaintiff and the other petitioners had another "potentially adequate remedy" under the remedies provisions of the Standard Contract. *Northern States I*, 128 F.3d at 759. Rather, it issued a limited writ of mandamus ordering "DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." *Id.* at 760. The court continued, "[m]ore specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Id.* It concluded:

> DOE has no authority to adopt a contract that violates the directives of Congress, just as it cannot implement interpretations of the contract that contravene this court's prior ruling. We hold that this provision in the Standard Contract, insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty.

*Id.* The government petitioned the D.C. Circuit for rehearing, arguing that the court had "erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract" in derogation of the Tucker Act. *Northern States Power Co. v. United States*, 1998 WL 276581, at *2 (D.C. Cir. Order, May 5, 1998) (hereinafter "*Northern States II*"). *Per curiam*, the D.C. Circuit denied this petition, explaining that the mandamus "merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998." *Id.* It continued: "The statutory duty to include an unconditional obligation in the contract is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA." *Id.*

B.

As noted, on March 2, 2001, NPPD filed its complaint in this court seeking damages for DOE's alleged partial breach of the contract, breach of the implied covenant of good faith and fair dealing, and an uncompensated taking.  Between November 27, 2001, and November 7, 2002, defendant filed three dispositive motions and plaintiff filed one dispositive motion, including cross-motions for summary judgment on the intended rate of SNF acceptance.  In considering the motions, Judge Sypolt raised the issue of subject matter jurisdiction *sua sponte* and found that the judicial review provision of the NWPA, 42 U.S.C. § 10139, gives original and exclusive jurisdiction over appeals of DOE Final Interpretations to the D.C. Circuit, precluding this court from deciding the merits of NPPD's claims.  On January 31, 2005, Judge Sypolt dismissed the complaint.

The case was reassigned to the undersigned on February 2, 2005, and plaintiff subsequently filed a motion for reconsideration of Judge Sypolt's opinion on February 10, 2005.  On March 30, 2005, this court granted plaintiff's motion for reconsideration, stating that Judge Sypolt's determination that this court lacked jurisdiction was a manifest error of law, and citing the analysis set forth in *Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005), which held that the NWPA did not preclude the Court of Federal Claims from exercising jurisdiction over an alleged breach of the Standard Contract.  Accordingly, this court vacated Judge Sypolt's opinion and ordered the parties to rebrief the issues raised in the four dispositive motions.

On September 8, 2005, at the oral argument on the parties' pending motions, defendant indicated that it wished to mount a defense based on the "Unavoidable Delays by Purchaser or DOE" clause of the Standard Contract, but that the writ of mandamus issued by the D.C. Circuit in *Northern States I* prevented it from briefing and arguing this point.  This court subsequently ordered the parties to submit supplemental briefs discussing the authority of the D.C. Circuit to issue such a writ.  After briefing from the parties, this court held additional oral arguments on June 1, 2006.  Thereafter, the parties filed additional supplemental briefs.

## II.   DISCUSSION

The court is confronted with the issue whether the mandamus issued by the D.C Circuit actually precludes defendant from raising certain defenses before this court.  As simply as it is stated, this single query actually combines a number of separate, multifaceted inquiries, among them: (i) whether the mandamus writ issued by the D.C. Circuit can be attacked collaterally in this action; and (ii) whether the writ is void because it exceeds the jurisdiction of the D.C. Circuit and correspondingly infringes upon the jurisdiction of this court.  The court will address these issues *seriatim*.

A.

The common-law writ of mandamus is codified at 28 U.S.C. § 1651(a): "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." "This is a 'drastic and extraordinary remedy,'" the Supreme Court has stated, "'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258, 259-60 (1947)); *see also Mallard v. U.S. Dist. Court for Southern Dist. of Iowa*, 490 U.S. 296, 309 (1989). As is evident from the statutory language, "the Act is not itself a grant of jurisdiction." *In re Tennant*, 359 F.3d 523, 527 (D.C. Cir. 2004) (Roberts, J.). Importantly, "[w]hile the All Writs Act authorizes the employment of extraordinary writs, it confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction . . . . [T]he Act does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999); *see also, e.g., Pa. Bureau of Corrections v. United States Marshals Service*, 474 U.S. 34, 40-41 (1985); *Telecomm. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("The All Writs Act is not an independent grant of jurisdiction to a court; it merely permits a court to issue writs in aid of jurisdiction acquired to grant some other form of relief."); 19 J. Moore & G. Pratt, Moore's Federal Practice § 204.02[4] (3d ed. 1998) ("The All Writs act cannot enlarge a court's jurisdiction.").

Defendant believes (and plaintiff does not disagree) that the writ issued by the D.C. Circuit in *Northern States I* prohibits it from arguing that no breach of the Standard Contract occurred because the development of the storage facility was unavoidably delayed. At first blush, the notion that a court might use a mandamus to prevent a litigant from raising an argument before another court might seem startling. Particularly this might seem so if the succeeding court has proper jurisdiction over the issue presented, with the presumption being that any issues of preclusion instead would be resolved under the doctrines of collateral estoppel and *res judicata*. Yet, various cases hold that, generally, under the common law, and, specifically, under the All Writs Act, a Federal court, itself vested with proper jurisdiction, may issue a writ that prevents a litigant from raising an issue in another tribunal. *See United States v. New York Telephone*, 434 U.S. 159, 172 (1977); *Lab. Corp. of America Holdings v. Chiron Corp.*, 384 F.3d 1326, 1332 (Fed. Cir. 2004); *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985); *United States v. Int'l Bhd. of Teamsters Chauffers, Warehouseman and Helpers of America, AFL-CIO*, 911 F. Supp. 743, 748-51 (S.D.N.Y. 1996).[3] Such orders have been issued

---

[3] It is far less certain whether a Federal court can directly order another Federal court (not in its appellate review chain) to conduct or refrain from action. *See Mullis v. U.S. Bankr. Court for Dist. of Nevada*, 828 F.2d 1385, 1393 (9th Cir. 1987), *cert. denied*, 486 U.S. 1040 (1988); *Dhalluin v. McKibben*, 682 F. Supp. 1096, 1097 (D. Nev. 1988) ("The structure of the federal courts does not allow one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her lawful jurisdiction."); *see also* 16 Charles Alan Wright, et al., Federal Practice and Procedure § 3932, 477 (1996) ("[a] court of appeals could not issue a writ to a district court sitting in another circuit, nor to any other tribunal properly reviewable only in another circuit").

and upheld where courts, again with proper jurisdiction, sought to ensure that their decisions were afforded preclusive effect.[4]  In the case *sub judice*, however, these cases only serve to beg the question whether the D.C. Circuit was vested with the sort of jurisdiction that would provide a proper foundation for its issuance of the subject writ.

As a threshold matter, the court must address whether the validity of the D.C. Circuit's writ may be challenged collaterally in this litigation.  Certainly, it is neither within the purview nor the inclination of this court to assume a reviewing role and determine, on the merits, whether the writ was improperly issued and thus ***voidable***.[5]  The Supreme Court, of course, was presented with that very question, but denied the government's petition for certiorari.  *Dept. of Energy v. Northern States Power Co.*, 525 U.S. 1016 (1998).  The controversy here, rather, is more fundamental and limited to whether a collateral objection may be raised to the writ on the ground that it was ***void***, *ab initio*.  Before undertaking that inquiry, it is useful to review how courts have treated collateral attacks on judgments and orders.

---

[4]  *See In re Baldwin-United Corp. Ins. Litig.*, 770 F.2d 328, 335 (2d Cir. 1985) ("This provision permits a district court to enjoin actions in state court where necessary to prevent relitigation of an existing federal judgment."); *Int'l Ass'n of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 132 (5th Cir. 1975); *Redac Project 6426, Inc. v. Allstate Ins. Co.*, 412 F.2d 1043, 1047-48 (2d Cir. 1969); *In re Rezulin Products Liability Litigation*, 223 F.R.D. 109, 119-20 (S.D.N.Y. 2004); *Blue Cross of Cal. v. SmithKline Beecham Clinical Labs., Inc.*, 108 F. Supp. 2d 130, 136 (D. Conn. 2000).

[5]  Noting that the writ is one of "the most potent weapons in the judicial arsenal," *Will v. United States*, 389 U.S. 90, 107 (1967), the Supreme Court has held that three conditions must be satisfied before it may issue –

> First, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires," [*Kerr v. United States Dist. Court for Northern Dist. of Cal.*, 426 U.S. 394, 403 (1976)] – a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process, *Fahey*, *supra*, at 260, . . . .  Second, the petitioner must satisfy "'the burden of showing that [his] right to issuance of the writ is "clear and indisputable."'"  *Kerr*, *supra*, at 403 . . . (quoting *Bankers Life & Casualty Co.* [*v. Holland*, 346 U.S. 379, 383 (1953)].  Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.  *Kerr*, *supra*, at 403 (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 112, n.8 (1964)).

*Cheney*, 542 U.S. at 380-81 (parallel citations omitted); *see also Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26-28 (1943); *Northern States I*, 128 F.3d at 759.

As the Federal Circuit noted in *Christopher Village*, a party generally cannot avoid *res judicata* on the grounds that a prior judgment was rendered by a court that lacked subject matter jurisdiction, even if the jurisdictional issue was not litigated in the first action. 360 F.3d at 1329-30.[6]  This approach promotes finality in the law, which would be "disserved if courts had to reexamine the jurisdictional basis of every prior judgment before giving it preclusive effect." *Sterling v. United States*, 85 F.3d 1225, 1231 (7th Cir. 1996) (Flaum, J., concurring).  However, there is a well-recognized exception to this rule, applicable where giving preclusive effect to the prior judgment would "'substantially infringe[] the authority of another tribunal or agency of government,' Restatement (Second) of Judgments § 12(2) (1982), or. . . improperly trench[] on sovereign immunity." *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1104 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 869 (1988); *see also Christopher Village*, 360 F.3d at 330; *see generally*, *Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 172 (D.C. Cir. 1981).[7]  Reflecting this prior learning, the Federal Circuit has indicated that collateral review may occur where permitting a prior decision to stand would "directly implicat[e] issues of sovereign immunity." *Int'l Air Response v. United States*, 324 F.3d 1376, 1380 (Fed. Cir. 2003), *petition for reh'g denied*, 324 F.3d 1376 (Fed. Cir. 2003).

A cadre of Supreme Court cases has particularly emphasized the importance of preserving sovereign immunity in allowing judgments issued against the United States to be attacked collaterally.  At the anterior of that phalanx is *United States v. United States Fid. & Guar. Co.*, 309 U.S. 506, 513 (1940), where the Supreme Court held that the government's failure, in a prior receivership action, to raise sovereign immunity or appeal the final judgment did not waive sovereign immunity.  The Court emphasized that a judgment "is subject to collateral attack only if void," a condition that it held was met if there was no waiver of sovereign immunity.  "Consent alone gives jurisdiction to adjudge against the sovereign," it declared, and "[a]bsent that consent, the attempted exercise of judicial power is void." *Id.* at 514.  Considerable decisional support can be mustered for this view.  *See Durfee v. Duke*, 375 U.S. 106, 114 (1963) (holding that prior judgment could be collaterally attacked as void because claims against the United States "are justiciable only in those courts where Congress has consented to their consideration;" "sovereign immunity may in some contexts be controlling"); *Hooper v. United*

---

[6]  *See also, e.g., Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982); *Kalb v. Feuerstein*, 308 U.S. 433, 438 (1940) ("It is generally true that a judgment by a court of competent jurisdiction bears a presumption of regularity and is not thereafter subject to collateral attack."); *Chicot Cty. Drainage Dist. v. Baxter St. Bank*, 308 U.S. 371, 376-77 (1940); *Stoll v. Gottlieb*, 305 U.S. 165, 172 (1938).

[7]  Specifically, the Restatement provides that a party is not precluded from contesting a prior judgment, on subject matter jurisdiction grounds, if: (i) "[t]he subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority;" or (ii) "[a]llowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government." Restatement (Second) Judgments, § 12.  *See also In re Bulldog Trucking, Inc.*, 147 F.3d 347, 353 (4th Cir. 1998); *Sterling*, 85 F.3d at 1231.

*States*, 326 F.2d 982, 985 (Ct. Cl. 1964) ("It appears that where the public policy requiring the application of *res judicata* and collateral estoppel is outweighed by overriding considerations like . . . sovereign immunity, the court has not adhered to the finality that would otherwise be given to the prior decree.").[8]  Accordingly, judgments unsupported by a waiver of sovereign immunity may be collaterally attacked.

Orders too are vulnerable collaterally on the ground that they are void *ab initio*.  Thus, for example, in *Kalb*, 308 U.S. at 438-39, the Supreme Court held that a state court order that involved subject matter exclusively within a bankruptcy court's jurisdiction was a "nullit[y]," that is, it "was not merely erroneous, but was beyond [the court's] power, void, and subject to collateral attack."  *See also Ex parte Fisk*, 113 U.S. 713, 718 (1885) ("an order . . . , being without jurisdiction is void"); *Jackson v. Vance*, 179 F.2d 154, 158 (10th Cir. 1949), *cert. denied*, 339 U.S. 937 (1950); *In re Stern*, 235 F. Supp. 680, 682 (S.D.N.Y. 1964).  Analogous cases proceed, at least in part, on the common-sense principle that if the judgment underlying an order is void, the order predicated thereupon must be void, as well.  *See Heasley v. United States*, 312 F.2d 641, 648 (8th Cir. 1963); *TransAmerica Assur. Corp v. United States*, 423 F. Supp. 2d 691, 696 (W.D. Ky. 2006) ("the absence of subject matter jurisdiction" based on sovereign immunity grounds "void the entire proceeding and all orders arising from it"); *see also In re Marc Rich*, 707 F.2d 663, 669 (2d Cir. 1983) ("A federal court's jurisdiction is not determined by its power to issue a subpoena; its power to issue a subpoena is determined by its jurisdiction.").

Several cases, indeed, have allowed collateral attacks on writs of mandamus.  In one of the earliest of these, *Ex parte Rowland*, 104 U.S. 604 (1881), a state court issued a writ of mandamus ordering several officials to effectuate a judgment.  The state court held the officials in contempt for disobeying the writ and the Supreme Court eventually considered the case on a

---

[8]  *See also Sterling*, 85 F.3d at 1231 ("the Supreme Court has held that a judgment is afforded no *res judicata* effect if the claim should have been dismissed on the ground of sovereign immunity"); *Dept. of Army v. Fed. Labor Relations Auth.*, 56 F.3d 273, 275 (D.C. Cir. 1995) (emphasizing that the United States does not waive sovereign immunity by failing to raise it in a prior action); *see also Davis*, 667 F.3d at 172 ("On the other hand, it is axiomatic that, before a judgment can have issue preclusive effect under the doctrines of either *res judicata* or collateral estoppel, that judgment must be valid."); *cf. United States v. Cty. of Cook, Ill.*, 167 F.3d 381, 386-87 (7th Cir. 1999), *cert. denied*, 528 U.S. 1019 (1999).  A similar rule has led Federal courts not to accord full faith and credit to state judgments issued without an appropriate waiver of sovereign immunity.  *See Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 299 (6th Cir. 2005) (citing cases); *see also Jordan v. Gilligan*, 500 F.2d 701, 710 (6th Cir. 1974), *cert. denied*, 421 U.S. 991 (1974) (applying a similar rule where an earlier ruling was challenged on Eleventh Amendment grounds).  In *Int'l Air Response*, 302 F.3d at 1380, the Federal Circuit held that a district court order staying the running of the statute of limitations on claims under the Contracts Dispute Act was not subject to collateral attack because "the decision of the district court" did not "directly implicat[e] issues of sovereign immunity."  As will be seen, that case bears little resemblance to the case *sub judice*.

petition for a writ of habeas corpus.  Setting aside the contempt order, the Court reasoned that the validity of the contempt citation –

> depends entirely on the power of that court to require the court of county commissioners to do what its members have been held to be in contempt for not doing.  If the command of the peremptory writ of mandamus was in all respect such as the Circuit Court had jurisdiction to make, the proceedings for the contempt are not reviewable here.  But if the command was in whole or in part beyond the power of the court, the writ, or so much as was in excess of jurisdiction, was void, and the court had no right in law to punish for any contempt of its unauthorized requirements.

*Id*. at 612.  Further explaining its *ratio dicendi*, the Court stated that "[t]he object of the writ is to enforce the performance of an existing duty, not to create a new one."  *Id*; *see also Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 436 (1911); *In re Sawyer*, 124 U.S. 200, 221 (1888) ("The Circuit Court being without jurisdiction to entertain the bill in equity for an injunction, all its proceedings in the exercise of the jurisdiction which it assumed are null and void.  The restraining order, in the nature of an injunction, it had no power to make.").[9]  Summarizing the "void order" doctrine, the D.C. Circuit has held that "[w]hen a federal court reaches beyond its statutory grant of subject-matter jurisdiction, its judgment is void.  Similarly, when an enforcement order . . . is beyond the jurisdictional grant of the issuing court, the order is void."  *Commodity Futures Trading Comm'n*, 738 F.2d at 492.  Accordingly, it is beyond peradventure that a mandamus writ may be collaterally attacked if it was void *ab initio.*

---

[9]  To be sure the *Rowland* line of cases was followed by a shift in the law in which the Supreme Court emphasized that an order by a court, even if ultimately deemed void, must be obeyed until declared so by a court.  *See, e.g., Walker v. City of Birmingham*, 388 U.S. 307, 314 n.5 (1967); *Howat v. Kansas*, 258 U.S. 181, 189-90 (1922); *see also United States v. Shipp*, 203 U.S. 563, 573 (1906) (Holmes, J.).  However, the concept that an order predicated upon a void judgment is itself void remains viable, as evidenced by subsequent decisions.  Thus, for example, in *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353-54 (1920), the Supreme Court stated –

> Courts are constituted by authority and they can not go beyond the power delegated to them.  If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities.  They are not voidable, but simply void, and this even prior to reversal.

*See also Ins. Corp. of Ireland*, 456 U.S. at 702; *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 n.10 (D.C. Cir. 1984); *Heasley*, 312 F.2d at 649 (applying *Rowland*); *United States ex rel. Tungsten Reef Mines Co. v. Ickes*, 84 F.2d 257, 260 (D.C. Cir. 1936); Note, Nora Pomerantz, Civil Procedure – Nonparty Witness Challenge to Federal Court's Subject Matter Jurisdiction, 61 Temp. L. Rev. 213, 230 (1988).

Relying on many of the cases cited above, *Christopher Village* established that the United States may mount a collateral attack in this court on either a judgment or an order, if another court exercises jurisdiction over an action, or part thereof, that belongs here.  *See Christopher Village*, 360 F.3d at 1331 ("This holding would appear to apply equally to Congress' decision to grant exclusive jurisdiction to other courts, such as the Court of Federal Claims, and thereby render void a judgment that treads upon that exclusive jurisdiction."); *In re Penn Central Transp. Co.*, 384 F. Supp. 895, 953-54 (Sp. Ct. R.R.R.A. 1974).  In this regard, the Federal Circuit observed –

> Respect for the exclusive jurisdiction of the Court of Federal Claims is no less important than respect for the exclusive jurisdiction of the . . . courts in *Kalb* or . . . *Fidelity & Guaranty*.  The history of the Court of Federal Claims' jurisdiction over suits under the Tucker Act emphasizes the importance that Congress ascribed to the exclusive nature of that jurisdiction.

360 F.3d at 1332.[10]  In *Christopher Village*, the Federal Circuit ultimately permitted a collateral attack on the Fifth Circuit's judgment on various contract issues and declared that judgment void, reasoning that "[t]he Fifth Circuit's ruling, like the ones at issue in *Kalb* and *Fidelity & Guaranty*, did not merely exceed the court's jurisdiction, it 'directly implicat[ed] issues of sovereign immunity' and is therefore void."  360 F.3d at 1333 (citing *Int'l Air Response*, 324 F.3d at 1380).  It thus falls upon this court to determine whether the judgment of the D.C. Circuit in *Indiana Michigan*, at least insofar as it relates to the mandamus order at issue, was also void as issued in violation of the principles of sovereign immunity.

B.

As indicated, the validity of a mandamus writ is somewhat derivative – whether it is void depends on whether the judgment (or portion thereof) upon which it is predicated is void.  This symbiotic approach makes particular sense in the context of mandamus writs, which, after all, are issued in aid of jurisdiction.  *See Clinton*, 526 U.S. 534-35.  Ultimately, this court must determine whether the D.C. Circuit had jurisdiction over the issues that eventually gave rise to the mandamus, that is, whether it had jurisdiction to opine about the construction of various provisions in the Standard Contract, among them, the unavoidable consequences provision.  The latter question, in turn, requires this court to determine whether the exercise of jurisdiction in *Indiana Michigan* was supported by an appropriate waiver of sovereign immunity.

Since at least the venerable case of *Murray v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 283-84 (1855), it has been recognized that the United States is immune from suit save to the extent it consents to be sued.  "[S]overeign immunity goes to the issue of the court's

---

[10]  The Federal Circuit has not been the lone voice expressing concern for preserving the integrity of the Tucker Act.  *See Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C. Cir. 1982); *Graham v. Henegar*, 640 F.2d 732, 734 (5th Cir. 1981).

power to hear the case . . . ." *Humane Soc'y of the U.S. v. Clinton*, 236 F.3d 1320, 1326 (Fed. Cir. 2001); *see also Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994).  Regarding the application of this doctrine, the Federal Circuit has explicated –

> Resolving the question whether a party may maintain a suit against the United States in a specific court necessarily implicates inquiry into the scope of any applicable waivers of sovereign immunity.  To vest a particular court with power to adjudicate a claim against the United States requires not only an identifiable waiver of sovereign immunity for the party's asserted claim against the United States, but also a waiver of sovereign immunity authorizing that party to sue the United States in that particular court.

*Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1550 (Fed. Cir. 1991).[11]  Of course, this court's "jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear claims that may be decided by [this court]."  *Bowen v. Mass.*, 487 U.S. 879, 910 n.48 (1988).  Yet, in deciding whether that is the case, the general rule that waivers of sovereign immunity must be strictly construed applies, *Broughton Lumber*, 939 F.2d at 1552, a result particularly sensible where it is argued that a new statute, either directly or indirectly, effectively preempts the preexisting scope of the Tucker Act.  *See Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed. Cir. 2000); *see also Preseault v. ICC*, 494 U.S. 1, 12 (1990) (noting that repeals by implication are disfavored); *Traynor v. Turnage*, 485 U.S. 535, 547 (1988) (same).

In *Indiana Michigan* and *Northern States*, the D.C. Circuit invoked section 119 of the NWPA as the source of its jurisdiction, and, it is to that section that our focus is first drawn in determining whether the judgment and mandamus were supported by an appropriate waiver of sovereign immunity.  In relevant part, that section states: "the United States courts of appeals shall have original and exclusive jurisdiction over any civil action – for review of any final decision or action of the Secretary, the President or the Commission under this part."  42 U.S.C. § 10139(a)(1)(A).  The "part" referenced in this provision is Part A of Subchapter I of Chapter 108 of Title 42, codified at 42 U.S.C. §§ 10131-45, dealing with "Repositories for Disposal of High-Level Radioactive Waste and Spent Nuclear Fuel."  But, as this court noted in *Boston Edison*, 64 Fed. Cl. at 176-77, all the provisions that deal with the statutorily-mandated content and formation of contracts under the NWPA are not contained in this part, but rather in Part C of Subchapter I, principally section 302(a)(5)(B) of the NWPA, as amended, codified at 42 U.S.C. § 10222(a)(5)(B).  In *Boston Edison*, this court found that these references in section 119 of the NWPA "to specific portions of the Act are crucially significant for jurisdictional purposes," in concluding that "nothing in Section 119 of the NWPA purports to provide an alternative, exclusive jurisdictional path that would displace the otherwise generally applicable jurisdictional

---

[11]  *See also Minnesota v. United States*, 305 U.S. 382, 388 ("it rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought"); 14 Federal Practice and Procedure, *supra*, § 3654 at 307-08 ("an action against the government may be brought only in the particular court designated in the consent statute").

statutes, including especially the Tucker Act."  64 Fed. Cl. at 177; *see also Gen. Elec. Uranium Mgmt. Corp v. U.S. Dept. of Energy*, 584 F. Supp 234, 236-37 (D.D.C. 1984) (hereinafter *General Electric I*), *vacated*, 764 F.2d 896 (D.C. Cir. 1985) ("The flaw in defendant's argument is that § 302 does not fall within the same 'part' as § 119, *i.e.*, Part A of Subchapter I, but rather Subchapter III.").  For our purposes, the same analysis casts serious doubt on whether the D.C. Circuit had jurisdiction to review any aspect of the Standard Contracts here, let alone questions involving the interpretation of particular provisions therein.

Those doubts are confirmed by the recent decision in *PSEG Nuclear L.L.C. v. United States*, 2006 WL 2801877 (Fed. Cir. Sept. 29, 2006), in which the Federal Circuit conclusively determined that this court has jurisdiction, under the Tucker Act, to hear breach of contract actions involving the Standard Contracts.  That case had its genesis in another decision, *Fla. Power & Light Co. v. United States*, 64 Fed. Cl. 37 (2005), in which a judge of this court ruled that the court lacked jurisdiction over four breach of contract claims involving SNF.  She heavily relied upon *Gen. Elec. Uranium Mgmt. Corp. v. United States Dept. of Energy*, 764 F.2d 896 (D.C. Cir. 1985) (hereinafter *General Electric II*), in which the D.C. Circuit held that it had jurisdiction to review fee issues arising under section 302(a)(3), despite the fact that that provision fell within Part C, rather than Part A, of Subchapter I of the NWPA, as codified.  As the D.C. Circuit had done in *General Electric II*, 764 F.2d at 901, the *Florida Power* judge discounted the limiting language in section 119, and concluded that the D.C. Circuit had jurisdiction over breach of contract cases under the NWPA, based upon the structure and legislative history of the statute.  64 Fed. Cl. at 41.  Relying on *City of Burbank v. United States*, 273 F.3d 1370 (Fed. Cir. 2001), she further held that the D.C. Circuit had exclusive jurisdiction over any breach of contract claims because "[i]nclusion of these contract provisions pursuant to a statutory mandate is deemed to constitute action pursuant to the [NWPA]." *Fla. Power*, 64 Fed. Cl. at 40.  For this purpose, the judge in *Florida Power* held that it mattered not whether the specific issue raised was mandated by statute so long as the contract, as a whole, was thereby mandated. *Id*.

In *PSEG*, the Federal Circuit reversed a decision authored by the same judge, in which she had adopted her opinion in *Florida Power*.  Observing that "[b]y its terms, section 119 only refers to agency actions required under Title I, Subtitle A of the NWPA," 2006 WL 2801877, at *6, the court rejected the trial court's broad reading of that statute, ultimately concluding that only "agency actions mandated under Title III which relate to the creation of repositories for spent nuclear fuel fall within the class of actions subject to review by the courts of appeals under section 119." *Id*.[12]  The Federal Circuit also rejected the assertion that an action for a breach of

_____

[12]  Notably, while several courts have concluded, contrary to the explicit statutory language, that section 119 affords jurisdiction to courts to review agency decisions involving parts of the statute other than part A, *see, e.g.*, *Tenn. v. Herrington*, 806 F.2d 647-50 (6th Cir. 1986), other courts have rejected that interpretation, *see, e.g.*, *Natural Resources Defense Council v. Abraham*, 244 F.3d 742, 747 (9th Cir. 2001); *Nevada v. Herrington*, 827 F.2d 1394, 1400 (9th Cir. 1987).  Indeed, in *Public Citizen v. Nuclear Regulatory Comm'n*, 845 F.2d 1105, 1107 (D.C. Cir. 1988), the D.C. Circuit itself cast doubt on its decision in *General Electric II*

the Standard Contract's provisions was covered by section 119, noting that the subject provisions "require that the government begin SNF collection by the statutorily mandated date" and do "not challenge an agency action taken under the agency's statutory mandate." *Id*. Rejecting the trial court's reliance upon *Burbank*, the court of appeals found that while the D.C. Circuit had jurisdiction over whether DOE "properly incorporated . . . obligations" in the Standard Contract, this court had jurisdiction over "whether the DOE breached its contractual obligations, and, if so, to what damages, if any, PSEG is entitled for breach." *Id*. In particular, the Federal Circuit made short shrift of the notion that the D.C. Circuit had jurisdiction to consider contract claims because the DOE had arrived at the terms of the Standard Contract through an administrative process. *Id*. at *7. In this regard, it reasoned:

> The Court of Federal Claims in *Florida Power* [] seemed to reach this conclusion because DOE published its proposed Standard Contract in the Federal Register and used an administrative rulemaking to develop the terms of the contract. However, the DOE was not statutorily required to use the administrative rulemaking process or to even develop a Standard Contract. Rather, it did so because it preferred developing a contract with standard provisions that could be used with multiple contractees to the extent practicable. DOE cannot unilaterally confer jurisdiction over contract claims to the courts of appeals by its choice to develop a contract through administrative rulemaking.

*Id*. Based on this analysis, the court concluded that "there is no statutory provision conferring jurisdiction over PSEG's claims in another court." *Id*. at *8.

In *PSEG*, the Federal Circuit concluded that it "need not . . resolve" whether the D.C. Circuit properly exercised contract-related jurisdiction in its SNF cases. *Id*. at *5. Yet, despite this, the *PSEG* opinion in many ways answers that reserved question in the negative. Careful review, in fact, reveals irreconcilable differences not only between *PSEG* and the D.C. Circuit's cases leading up to, and including, *Northern States*, but also in the basic approach those respective circuits have taken in resolving jurisdictional disputes arising at the intersection between the Tucker Act and the Administrative Procedure Act (APA). As will be seen, three basic observations support this conclusion: (i) *PSEG* rejected many of the key jurisdictional concepts that underlie the relevant D.C. Circuit cases; (ii) the D.C. Circuit plainly exceeded the scope of section 119 in rendering its judgment in *Indiana Michigan* and the mandamus in *Northern States*, as revealed by that circuit's own precedent; and (iii) the only true waiver of sovereign immunity that could support the D.C. Circuit's action derives from section 702 of the

---

commenting that "[i]t is not altogether clear that this section supplies jurisdiction for any claim under § 306, for it appears in Subchapter I of the Waste Act, and refers to action and inaction under *'this part,'* while § 306 appears in Subchapter III." Although recognizing that *General Electric II* had found to the contrary, the court concluded that it "need not consider this point" because it found that the petitioner's case was not timely. *Id*.

APA, which waiver, under Federal Circuit precedent, is unavailable.  The court will address these points, in turn.

1.

First, the D.C. Circuit's SNF cases, particularly those leading up to *Northern States I*, share many of the jurisdictional premises that were set forth in *Florida Power* and ultimately rejected in *PSEG*.  This is no coincidence as a review of *Florida Power* readily reveals that those premises originated in the D.C. Circuit cases.  In many ways, the judge in *Florida Power* merely extended these premises to their logical conclusion – one that, importantly for our purposes, was soundly rejected by the Federal Circuit in *PSEG*.  As will be seen, bringing the relevant opinions into relief manifests their differences.

Supporting the crabbed vision of this court's jurisdiction exemplified by *Florida Power*, the D.C. Circuit, in its earlier SNF opinions, viewed its role as enforcing the terms of the Standard Contract – the same task that the Federal Circuit, in *PSEG*, indicated instead should be performed in the normal context of determining whether the contracts have been breached.  Thus, in *Northern States I*, the D.C. Circuit indicated that it was issuing the mandamus "to enforce the terms of the contract in a meaningful way," which it viewed as being threatened by DOE's "construction of the contract" and "current approach toward contractual remedies."  128 F.3d at 759.  And, it described its mandamus as preventing DOE from adopting particular interpretations of the contract language in "proceed[ing] with contractual remedies."  *Id*. at 760.  Accordingly, while the D.C. Circuit professed that its grant of mandamus relief did "not place the question of contract remedies in this court," the broad terms of its mandamus cannot be reconciled with that limitation.  Rather, the mandamus pretermits a key aspect of the contractual dispute before this court, a dispute that the Federal Circuit has now held to be squarely within this court's Tucker Act jurisdiction.

Although the Federal Circuit did not decide this, its opinion leaves little room for the D.C. Circuit to exercise what, in effect, would be overlapping jurisdiction with this court.  For example, the Federal Circuit made clear that the fact that DOE chose to use "administrative rulemaking" in developing the Standard Contract and in putting forth its interpretations thereof did not confer jurisdiction on the D.C. Circuit to resolve what are, in effect, contract claims.  *PSEG*, 2006 WL 2801877, at *7.  But, in the D.C. Circuit's view, the latter actions were precisely the events that triggered its jurisdiction under section 119 of the NWPA.  This view was first evidenced in *General Electric II*, where the D.C. Circuit opined that section 119 provided it with judicial review over every aspect of the waste disposal process, including contractual matters.  There, it stated that "[t]he mere fact that Congress granted the Secretary the authority to enter into contracts to provide for the payment of those disposal costs in different subchapter does not compel the conclusion that Congress thereby intended that there would be entirely different judicial review procedures for those contracts."  764 F.2d at 902.  It further indicated that it was "inconceivable that Congress intended to have review of all actions concerning waste disposal in the court of appeals . . . except for questions concerning the

-16-

composition of the Nuclear Waste Fund and a few other matters located in Subchapter III." *Id.* at 901. Of course, among the "few" other matters located in Subchapter III are ***all*** the matters that lie within this court's jurisdiction. Relying on *General Electric II*, the D.C. Circuit, in *Commonwealth Edison Co. v. U.S. Dept. of Energy*, 877 F.2d 1042, 1044-45 (D.C. Cir. 1989), went so far as to entertain a petition for review challenging a Board of Contract Appeal's interpretation of a provision of the Standard Contract. There, it explicitly found that "the Standard Contract into which the parties entered should be viewed as a regulation," *id.* at 1045, and thus subject to that circuit's plenary review under section 119. Lastly, in *Indiana Michigan*, 88 F.3d at 1274, which case ultimately led to the issuance of the mandamus at issue, the D.C. Circuit described its task as conducting a *Chevron*-type review of the "agency's construction of a statute entrusted to its administration." Accordingly, in a line of decisions beginning with *General Electric*, the D.C. Circuit has premised its jurisdiction under section 119 of the NWPA on a ground that the Federal Circuit, in *PSEG*, categorically rejected.

As the Federal Circuit further made clear in *PSEG*, to the extent that the D.C. Circuit's mandamus writ departs from resolving the validity of the provisions of the Standard Contract and instead enforces particular interpretations thereof, it plainly encroaches upon this court's jurisdiction and thus exceeds whatever jurisdiction is granted by section 119 of the NWPA. The D.C. Circuit all but admitted as much in *Northern States II*, in which that court first confronted the jurisdictional conflict presented here. There, the D.C. Circuit recognized that it had not "designated itself as the proper forum for adjudication of disputes arising under the Standard Contract," *Northern States II*, 1998 WL 276581, at *2, and that a contract "[b]reach by the DOE does not violate a statutory duty," *id*. Indeed, it is noteworthy that in *Wisconsin Elec. Power Co. v. United States Dept. of Energy*, 211 F.3d 646 (D.C. Cir. 2000), the D.C. Circuit retreated from the broad formulation, iterated in *General Electric II*, 764 F.2d at 901, that section 119 swept in "all actions concerning waste disposal." It concluded that it lacked jurisdiction to declare that the utility was entitled to both monetary and non-monetary relief for DOE's breach of contract, distinguishing between its mandates "prohibit[ing] the DOE from interpreting . . . its contracts with utilities in a manner that would relieve the Department of its unconditional obligation to begin disposing of SNF on January 31, 1998," and issues involving breaches of the contracts. 211 F.3d at 648; *see also Boston Edison*, 64 Fed. Cl. at 177.

But, the retreat in *Wisconsin Electric* did not go far enough. Any notion that there is a meaningful distinction between interpreting a statute or a regulation so as to control an agency's interpretation of a contract and interpreting the contract itself is belied by a legion of cases in this circuit that have construed contracts originating in legislation passed by Congress and done so by reference to the underlying statute.[13] Indeed, long ago the Court of Claims made clear that it had

---

[13] *See, e.g., Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1480-81 (Fed. Cir. 1997) (construing an agreement in light of the underlying legislation); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 731 (2004) ("Of course, unlike private contractual undertakings, the contracts here originated in legislation passed by Congress, requiring the court to consider that legislation in construing them."); *Cuyahoga Metr. Hous. Auth. v. United States*, 57 Fed. Cl.

jurisdiction, under the Tucker Act, over contract actions "founded upon statutes, rules and regulations." *Art Center Sch. v. United States*, 142 F. Supp. 916, 920 (Ct. Cl. 1956); *see also Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1059-60 & 1059 n.3 (Fed. Cir. 1995) (citing cases). These cases plainly suggest that the fact that a contract is underlain by a statute or regulation does not turn a contract interpretation question into one involving statutory or regulatory construction to be controlled by the administrative law decisions of other courts. Were the law otherwise, creative counsel would have only slight difficulty in metamorphosing this court into little more than the monetary enforcer of other court's mandates.

2.

Second, as hinted above, in deciding contract interpretation issues, the D.C. Circuit plainly exceeded the scope of section 119. To be sure, in *PSEG*, the Federal Circuit adopted a somewhat forgiving interpretation of that section. While noting that the section, by its terms, does not apply to any part of Title III, the court, nonetheless, held that it covered "agency actions mandated under Title III which relate to the creation of repositories for spent nuclear fuel." 2006 WL 2801877, at *6. Yet, the Federal Circuit plainly did not intend that any action that remotely related to the repository be within the purview of section 119, as that construction would sweep in all the issues pending before this court.

Critically, the actions that were the subject of *Indiana Michigan* and the *Northern States* decisions are not covered by the Federal Circuit's somewhat forgiving construction of section 119. They involve interpretations of contract provisions that have nothing to do with the "creation of repositories for spent nuclear fuel." *Id.* A careful review of the Standard Contract confirms this, as its provisions do not relate to the latter issue, but rather assume the existence of suitable repository. For example, Article II of the contract, which comprehensively describes its scope, states that "[t]his contract applies to the delivery by Purchaser of SNF . . . , acceptance of title by DOE to such SNF, subsequent transportation, and disposal of such SNF . . . , and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE." Likewise, Article IV of the contract, which maps out, in detail, DOE's responsibilities, basically requires that –

> DOE shall accept title to all SNF, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

---

751, 761 (2003) (same); *see also Bennett v. Kentucky Dept. of Educ.*, 470 U.S. 656, 669 (1985) ("Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."); *cf. Katz v. Cisneros*, 16 F.3d 1204, 1208-10 (Fed. Cir. 1994) (APA review of regulation appropriate where plaintiff not in privity with government, but with a local agency that administered a federal program).

The contract provisions that follow this provision describe the parties' responsibilities and obligations, the process for delivering SNF, the criteria for disposal and acceptance and fees. But, they say nothing nothing about the particulars of establishing the "DOE facility" referenced above, except to indicate that it will be "operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel."  Article I, para. 10.

The foregoing amply illustrates yet another reason why, in describing where this court's jurisdiction begins, the Federal Circuit *sub silentio* described where the D.C. Circuit's jurisdiction ends, *to wit*, that the latter court's jurisdiction does not extend beyond reviewing agency actions under Title III that relate to the creation of the repository.  The decisions in *Indiana Michigan* and *Northern States* bounded across the latter line, thereby intruding on this court's jurisdiction.  Indeed, the dialectic taken in these SNF cases starkly contrasts with the way the D.C. Circuit has dealt elsewhere with the issue whether a particular case properly should be brought under the APA or the Tucker Act.  Thus, in *Megapulse*, 672 F.2d at 967, that court agreed "that a plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA."  It explained that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)."  *Id.* at 968.  In concluding that the claimant there was not bringing a "disguised" contract claim, the court noted that: (i) the claimant "is not relying on the contract at all;" (ii) "[i]t does not claim a breach of contract;" (iii) "it seeks no monetary damages against the United States;" and (iv) "its claim is not properly characterized as one for specific performance."  *Id.* at 969; *see also North Star Alaska v. United States*, 14 F.3d 36, 37-38 (9th Cir. 1994), *cert. denied*, 512 U.S. 1220 (1994).

Applying this analysis, the D.C. Circuit, in *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), found that a contractor could not challenge the government's decision to terminate a contract as being contrary to several regulations and thus arbitrary and capricious under the APA.  In so concluding, the court rejected the notion that the action could be viewed as simply involving the agency's compliance with the regulations, stating –

> [I]t is possible to conceive of this dispute as entirely contained within the terms of the contract. . . .  That the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations.  Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action.

*Id*. at 78.  Turning to the relief requested, the court viewed the contractor's attempt to enforce the regulations as, in "essence, . . . a request for specific performance of the original contract," *id*. at 79, explaining that the contractor's "essential argument is that various regulations forbid the government from terminating this contract or putting it up for new bids."  *Id*. at 80.  Noting that

specific performance was not authorized under the Contract Disputes Act, the court, nonetheless, concluded that the action belonged in this court, stating that "[t]o hold that the CDA does not apply merely because, under that scheme, plaintiff cannot receive all its requested remedies, would intolerably upset the congressional purpose underlying the Act." *Id*.[14]

Application of the *Megapulse* factors here readily yields a conclusion that the D.C. Circuit should not have interpreted the Standard Contract. In *Indiana Michigan* and *Northern States*, the petitioners plainly were relying on the Standard Contract and claiming a breach thereof. Moreover, as their unsuccessful applications for mandamus illustrated, those same petitioners plainly sought monetary damages against the United States and relief in the form of what, outside the context of a mandamus petition, would be viewed as specific performance. *See also Roberts v. United States*, 242 F.3d 1065, 1068-69 (Fed. Cir. 2001); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985) ("Having determined that the contract provides the ultimate source of Spectrum's rights and that the relief sought is a typical contract remedy, we must conclude that Spectrum's claim is one founded upon a contract for purposes of the Tucker Act."). As in *Ingersoll-Rand*, where there D.C. Circuit concluded that it lacked jurisdiction, the mandamus dispute in *Northern States* could be conceived as "entirely contained within the terms of the contract," and should not have been viewed otherwise because the petitioners there framed their allegations by treating the Standard Contract essentially as a regulation asserted to be in conflict with the NWPA. *See also Albrecht v. Comm. on Employee Benefits*, 357 F.3d 62, 68-69 (D.C. Cir. 2004). Nor, again, is this conclusion altered by the fact that the contract *sub judice* necessarily must be construed by reference to an underlying statute. *See Brazos Elec. Power Coop., Inc. v. United States*, 144 F.3d 784, 788 (Fed. Cir. 1998) ("Moreover, that the contract between Brazos and the federal government incorporated certain terms and conditions from the Rural Electrification Act is irrelevant.

3.

Finally, lurking in this case are profound differences between the Federal Circuit and the D.C. Circuit's SNF cases, involving the scope of the Administrative Procedure Act (APA) and, specifically, the availability of the waiver in section 702 of that statute. But, first, why is the latter waiver relevant here?

The problem is that while section 119 of the NWPA plainly affords the D.C. Circuit (and other courts of appeals) jurisdiction over certain issues, it does not appear to contain a waiver of

---

[14]  *See also B& B Trucking, Inc. v. U.S. Postal Service*, 406 F.3d 766, 770 (6th Cir. 2005) (en banc) ("That the fuel plan might violate USPS regulations does not transform a claim into one that is regulatory and not contractual. Otherwise, because every government agency is bound to follow some set of regulations, every government contractor could recast its contract claims as regulatory claims."). While, on brief, plaintiff extensively discusses *Megapulse*, in which the D.C. Circuit ultimately determined that it had jurisdiction, it appears to have overlooked *Ingersoll-Rand*, in which that same court concluded that jurisdiction existed only under the Tucker Act.

sovereign immunity.  Such waivers must be "unequivocally expressed in statutory text" and "will be strictly construed in terms of its scope, in favor of the sovereign" of only an unequivocal and express act of Congress can act to waive sovereign immunity.  *Lane v. Péna*, 518 U.S. 187, 192 (1996).[15]  As this strict standard would suggest, statutes conferring jurisdiction on the courts often do not supply the requisite waivers.  "The fact that Congress grants ***jurisdiction*** to hear a claim does not suffice to show Congress has abrogated all ***defenses*** to that claim," the Supreme Court has emphasized, as the "issues are wholly distinct."  *Nordic Village*, 503 U.S. at 38 (emphasis in original).  As the Federal Circuit has further taught, "[a] grant of subject matter jurisdiction to a particular court, even one that grants jurisdiction over suits against the Federal Government itself, is not necessarily the same as a waiver of sovereign immunity."  *Clinton*, 236 F.3d at 1326; Moore's Federal Practice ¶ 105.21[1] (3d ed. 1998) ("[s]tatutes that create federal jurisdiction do not, in and of themselves, waive sovereign immunity").  A notable illustration of these principles is 28 U.S.C. § 1361, which has been construed not to supply a waiver, despite providing that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the plaintiff."  *See, e.g.*, *In re Russell*, 155 F.3d 1012, 1012 (8th Cir. 1998); *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3-4 (1st Cir. 1989); *Doe v. Civiletti*, 635 F.2d 88, 94 (2d Cir. 1980).[16]  But,  this is only one of many statutes assigning various Federal courts jurisdiction to review actions taken by Federal agencies that have been construed not to provide such a waiver.[17]

---

[15]  *See also Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).  A corollary to this rule provides that to the extent that the statutory language contains ambiguities concerning the waiver of sovereign immunity, the court should construe those "ambiguities in favor of immunity."  *United States v. Williams*, 514 U.S. 527, 531 (1995) (citing *United States* v. *Nordic Village, Inc.*, 503 U.S. 30, 33 (1992)).  These principles have been rigidly followed by the Federal Circuit and this court.  *See, e.g.*, *Novacor Chemicals. Inc. v. United States*, 171 F.3d 1376, 1382 (Fed. Cir. 1999) ("We must strictly construe the statute, for we may not imply a waiver."); *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998) ("Any statute which creates a waiver of sovereign immunity must be strictly construed in favor of the Government.") (citing *United States v. Sherwood*, 312 U.S. 584, 590 (1941)); *NEC Corp. v. United States*, 806 F.2d 247, 249 (Fed. Cir. 1986) ("The terms of the government's consent to be sued in any particular court define that court's jurisdiction to entertain the suit.").

[16]  Notably, in *Coggeshall*, the First Circuit held that "'Congress did not intend § 1361 to be interpreted so as to allow the extraordinary writ of mandamus to be converted into a device for obtaining piecemeal solution of contractual disputes to which the United States is a party.'" 884 F.2d at 4 (quoting *Doe*, 635 F.2d at 94); *see also S.J. Groves & Sons, Co. v. United States*, 495 F. Supp. 201, 209-10 (D. Colo. 1981).

[17]  *See also* as to 28 U.S.C. § 1337 (providing district courts with jurisdiction of any civil action or proceeding "arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies"): *Keene Corp. v. United States*, 700 F.2d 836,

Section 119 bears strong resemblance to many of the non-waiver, jurisdictional statutes. Like them, it defines the jurisdiction of the courts of appeals, but lacks any specific reference to what the decisional law views as the essential attribute of a waiver – some specification of the remedy or relief that may be awarded against the United States.  *See Lane*, 518 U.S. at 196; *Nordic Village*, 503 U.S. at 34; *Webman v. Federal Bureau of Prisons*, 441 F.3d 1022, 1025-26 (D.C. Cir. 2006); *Settles v. United States Parole Comm'n*, 429, F.3d 1098, 1105 (D.C. Cir 2005) ("consent to a particular remedy must be unambiguous"); *cf.* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States . . . ." ).  Accordingly, it appears clear that section 119 is not a waiver of sovereign immunity – and none of the D.C. Circuit's decisions suggest otherwise, as they simply refer to that statute as providing "subject matter jurisdiction.  *See General Elec. II*, 764 F.2d at 900-904; *Wisconsin Elec. Power Co. v. United States Dept. of Energy*, 778 F.2d 1, 2-3 (D.C. Cir. 1985).

So, if section 119 does not supply the requisite waiver, what provision does – if any? Plaintiff strongly contends that the waiver supporting the exercise by the courts of appeals of their NWPA jurisdiction derives from section 702 of the APA, 5 U.S.C. § 702.  As it points out, that section, by design, often provides the waiver of sovereign immunity where another statute authorizes review of an agency action.  *See* 5 U.S.C. § 704; *see also Bowen*, 487 U.S. at 891-92 ("it is undisputed that the 1976 amendment to § 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment").  While the appellate decisions in *General Electric, Indiana Michigan* and *Northern States* do not identify specifically the waiver under which they are

---

838 n.3 (2d Cir. 1983), *cert. denied*, 464 U.S. 864 (1983); as to 28 U.S.C. § 1340 (providing district courts with jurisdiction of any civil action arising under an Act of Congress providing for internal revenue): *Guthrie v. Sawyer*, 970 F.2d 733, 735 n.2 (10th Cir. 1992); *Arford v. United States*, 934 F.2d 229, 231 (9th Cir. 1991); *Geurkink Farms, Inc. v. United States*, 452 F.2d 643, 644 (7th Cir. 1971) ("grant[s] of general jurisdiction cannot be construed as authorizing suits of this character against the United States, else the exemption of sovereign immunity would become meaningless); as to 28 U.S.C. § 1343 (providing district courts with jurisdiction of certain civil rights actions): *Gray Moving and Storage, Inc. v. Fichback*, 516 F. Supp. 1165, 1166 n.1 (D. Colo. 1981); *Serv. Arms Co. v. U.S. Treasury Dept.*, 416 F. Supp. 2, 4 (D. Okl. 1975); as to 28 U.S.C. § 1362 (providing district court with jurisdiction of all civil actions brought by a recognized Indian tribe involving controversies arising under the Constitution, laws, or treaties of the United States): *Assiniboine & Sioux Tribes of Fort Peck Indian Reserv. v. Bd. of Oil & Gas Conservation of State of Mont.*, 792 D.2d 782, 792 (9th Cir. 1986); as to 28 U.S.C. § 2463 (involving property taken or detained under any revenue law of the United States): *McCarty v. United States*, 929 F.2d 1085, 1088 (5th Cir. 1991); *Lonsdale v. United States*, 919 F.2d 1440, 1443-44 (10th Cir. 1990).  Of course, numerous decisions hold that more general grants of jurisdiction, such as that of 28 U.S.C. § 1331, do not operate as waivers of sovereign immunity. *See, e.g., Cermak v. Babbitt*, 234 F.3d 1356, 1361 (Fed. Cir. 2000); *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994).

proceeding, they and other NWPA cases, including the district court's opinion in *General Electric*, suggest, in varying degrees, that section 702 of the APA supplies that waiver.[18]

Contrary to plaintiff's claims, however, there is strong indication that while the waiver in section 702 generally supports the exercise of jurisdiction under section 119, it did not support the portion of the judgment that, in turn, yielded the mandamus entered in *Northern States*. That is because, as the Supreme Court emphasized in *Bowen*, 487 U.S. at 892-93, the section 702 waiver applies only if certain statutory requirements are met, *inter alia*, the requirement in section 704 that there be "no other adequate remedy in a court." 5 U.S.C. § 704 (2000); *see also Doe v. United States*, 372 F.3d 1308, 1312 (Fed. Cir. 2004); *Commonwealth Edison Co. of New York, Inc. v. U.S. Dept. of Energy*, 247 F.3d 1378, 1382 (Fed. Cir. 2001); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1992).[19] Accordingly, if there is an adequate remedy in another court, via some other statute, such as the Tucker Act, section 704 precludes review. *See Hansson v. Norton*, 411 F.3d 231, 234 (D.C. Cir. 2005); *Albrecht*, 357 F.3d at 67. Such was the case in both *General Electric* and *Northern States*, at least to the extent those cases resolved questions of contract interpretation.

The D.C. Circuit and other appellate courts proceeding under section 119 seem to take the tack that the section 704 requirement is met in SNF cases interpreting the Standard Contract because a basic contract action in this court does not provide an "adequate remedy." *See, e.g.*, *Northern States II*, 1998 WL 276581, at *1 ("Suits based on the Contract may present issues of the permissible forms of equitable adjustment, and possibly the award of some forms of equitable adjustment would place the DOE in violation of the NWPA and again properly trigger our

---

[18]   *See Northern States II*, 1998 WL 276581 at *1; *General Electric II*, 764 F.2d at 903 n.38 (referencing the use of the "APA standard of review"); *General Electric I*, 584 F. Supp. at 236 (noting the plaintiff's reliance on "the Administrative Procedure Act, 5 U.S.C. § 702"); *see also Alabama Power Co. v. United States Dept. of Energy*, 307 F.3d 1300, 1311 (11th Cir. 2002); *Western Shoshone Nat'l Committee v. United States*, 408 F. Supp. 2d 1040, 1048 (D. Nev. 2005).

[19]   Section 704 states –

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

5 U.S.C. § 704.

jurisdiction (as opposed to that of the Court of Federal Claims) under either the NWPA or the APA."); *see also Alabama Power Co.*, 307 F.3d at 1311 (holding that APA did not preclude administrative challenge to DOE action under the NWPA because action in this court "provides an inadequate alternative remedy"). Acceptance of this view likely derives from several D.C. Circuit opinions in which that court has held that remedies in this court are inadequate because this court lacks the ability to award independent injunctive relief. *See Deaf Smith Cty. Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1211 (D.C. Cir. 1998); *Transohio Sav. Bank*, 967 F.2d at 608 (holding that "no alternative remedy" requirement of section 704 was met where plaintiff framed its contract relief in terms of specific performance or rescission); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1527 (D.C. Cir. 1984) (en banc), *vacated on other grounds*, 471 U.S. 1113 (1985) (district court permit to exercise jurisdiction over a takings claim for injunctive relief because compensation available from Court of Federal Claims wholly inadequate). But, whereas the D.C. Circuit, in construing section 704, has tended to focus on whether a party is seeking injunctive or declaratory relief, the Federal Circuit instead has considered the adequacy of available remedies by viewing, more practically, the impact of a judgment rendered by this court.

In the seminal Federal Circuit case on this issue, *Consolidated Edison,* the plaintiff challenged the constitutionality of the Energy Policy Act of 1992 (EPACT), which required domestic nuclear facilities to pay thirty-two percent of the costs of decontaminating and decommissioning the government's uranium process facilities. 247 F.3d at 1380-81. After making payments under EPACT, the plaintiffs brought two actions: an action against the government in this court seeking a refund of those payments and one in the district court for a declaration that EPACT was unconstitutional and for injunctive relief from future EPACT assessments. *Id.* at 1381. The Federal Circuit held that the plaintiff's second action in the district court should be transferred to this court. The court observed that "[plaintiffs'] case for retrospective monetary relief before the Court of Federal Claims overlaps with its claims for prospective monetary relief before the district court." *Id.* at 1385. The court found that the requirement of section 704 was not met because relief from the plaintiffs' "retrospective obligations will also relieve them from the same obligations prospectively." *Id.*[20] Commenting on the Supreme Court's decision in *Bowen,* the Federal Circuit declared that the former decision "does not enunciate a broad rule that the Court of Federal Claims cannot supply an adequate remedy in any case seeking injunctive relief." *Id.* at 1383. Reasoning further, the court stated that "[a] party may not circumvent the [Court of Federal Claims'] exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory, or mandatory relief where the thrust of the suit is to obtain money from the United States." *Id.* at 1385.[21]

---

[20]   Various courts, indeed, have emphasized that section 704 does not "require an equally effective remedy, only an adequate one." *Am. Disabled for Attendant Programs Today v. U.S. Dept. of Housing and Urban Dev.*, 170 F.3d 381, 390 (3d Cir. 1999).

[21]   *See also Kanemoto*, 41 F.3d at 646 ("Kanemoto cannot escape the conclusion merely by framing her claim for relief in declaratory or injunctive terms"); *Eagle-Picher Indus, Inc. v.*

Accordingly, the court concluded that because the nuclear power utilities could receive an adequate remedy in the Court of Federal Claims, section 704 deprived the plaintiff-utilities "of duplicative district court adjudication." *Id.* at 1386; *see also Dist. of Columbia v. United States*, 67 Fed. Cl. 292, 313-14 (2005).[22]

It was, of course, *Consolidated Edison*'s construction of section 704 that led the court in *Christopher Village* to conclude that "a litigant's ability to sue the government for money damages in the Court of Federal Claims is an 'adequate remedy' that precludes an APA waiver of

---

*United States*, 901 F.2d 1530, 1532 (10th Cir. 1990); *Marshall Leasing, Inc. v. United States*, 893 F.2d 1096, 1099 (9th Cir. 1990).

[22] Notably, several of the D.C. Circuit cases, in particular, *Transohio Savings*, specifically found that this court could not offer an adequate remedy because it could not order specific performance of a contract. 967 F.2d at 608 ("Because the Claims court cannot grant the equitable relief Transohio seeks – it cannot, for example, order specific performance or rescission – the 'adequate remedy' limitation on the APA's waiver of sovereign immunity does not interfere with district court jurisdiction over Transohio's claims."). This view of section 704, however, clashes with the legislative history of the 1976 amendments to the APA, which emphasized that the new waiver in section 702 was not designed to allow courts to provide relief unavailable under the Tucker Act. In this regard, the accompanying House Report stated –

> [T]he amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought. . . . For example, in the Court of Claims Act, Congress created a damage remedy for contract claims with jurisdiction limited to the court of Claims except in suits for less than $10,000. The measure is intended to foreclose specific performance of government contracts. In the terms of the proviso, a statute granting consent to suit, *i.e.*, the Tucker Act, 'impliedly forbids' relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts, as well as patent infringement, tort claims, and tax claims.

H.R. Rep. No. 94-1656, at 13-14 (1976). While the D.C. Circuit, in the *Northern States* cases, apparently did not view the mandamus as ordering specific performance, that is far from clear as the writ required the DOE to act in particular fashion in administering the Standard Contracts. *See Northern States*, 128 F.3d at 760 ("we order DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998"); *cf. Kulukundis Shipping Co., S/A v. Armstrong Trading Corp.*, 126 F.2d 978, 987 (2d Cir. 1942) (specific performance "affirmatively orders that someone do (or refrain from doing) some act outside the suit").

sovereign immunity in other courts." 360 F.3d at 1327.[23]  Plaintiff, however, asseverates that these cases are inapposite – that the "adequate remedy" limitation of section 704 does not apply here because section 119 makes the DOE interpretations "reviewable by statute."  But, it is far from clear that actions "reviewable by statute" are exempt from the section 704 limitation. Plaintiff cites cases that indicate that the "adequate remedy" requirement applies to so-called "non-statutory" reviews, *see, e.g., Doe*, 372 F.3d at 1312, reviews that the legislative history of the 1976 amendments references as arising under general statutes like 28 U.S.C. § 1331.  *See* H.R. Rep. No. 94-1656, at 5.  However, conspicuously absent from plaintiff's briefs is any case in which a court has refused to apply the "adequate remedy" limitation to a so-called "statutory review," at least where the waiver in section 702 was being invoked in support of the latter review – and research reveals none.[24]

Suggesting that the language of the statute is not as clear as plaintiff suggests, most cases, in fact, describe the "adequate remedy" limitation without ever mentioning the distinction plaintiff draws.  In *Bowen*, for example, the Supreme Court broadly stated that section 704 "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures."  *Bowen*, 487 at 903; *Bennett v. Spear*, 520 U.S. 154, 161-62 (1997) ("the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court'").  Likewise, in *Consolidated Edison*, Judge Rader, writing on behalf of the court, explained –

> In addition to § 702's "money damages" limitation, § 704 of the APA further excludes from the APA's sovereign immunity waiver those claims for which adequate remedies are elsewhere available.  5 U.S.C. § 704; *Transohio*, 967 F.2d at 608.  Section 704 states, in relevant part: "Agency action made reviewable by statute and final agency action for which there is ***no other  adequate remedy*** in a court are subject to judicial review."  5 U.S.C. § 704  (emphasis added).  In other words, a claimant with an alternative adequate remedy  in another court, such as

---

[23]  *See also Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005) ("The availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes."); *B & B Trucking*, 406 F.3d at 770; *Martinez v. United States*, 333 F.3d 1295, 1320 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004) ("Because there was an adequate remedy in the Court of Federal Claims for the claims set forth in Mr. Martinez's complaint, . . . the waiver of sovereign immunity under . . . the APA . . . would not have been available."); *Brazos*, 144 F.3d at 788; *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 139 n.10 (2004); *see generally*, *Western Shoshone Nat. Council v. United States*, 357 F. Supp. 2d 172, 176 (D.D.C. 2004).

[24]  Plaintiff suggests that the Federal Circuit recognized this distinction in *Doe*, *supra*, but that case merely recognizes the application of "adequate remedy" limitation to non-statutory reviews and said nothing whatsoever about statutory reviews.  *Id*. at 1312.

the Court of Federal Claims, cannot seek review of agency action in a district court under the APA.

Therefore, Con Ed must show that § 704 does not withdraw any waiver of sovereign immunity otherwise granted by § 702.  Section 704 codifies a requirement ensuring that the general grant of  review  in the APA does  not "duplicate existing procedures for review of agency action."  *Bowen*, 487 U.S. at 903, 108 S.Ct. 2722.  In effect, § 704 withdraws the limited waiver of immunity under § 702 if an  adequate judicial remedy is already available elsewhere.  5 U.S.C. § 704 . . . .

*Con. Ed.*, 247 F.3d at 1383 (emphasis in original).[25]  Accordingly, a review of the decisional law reveals that the distinction plaintiff draws has neither been specifically employed in any case nor even fully or uniformly described in the cases.  Contrary to plaintiff's importunings, then, this court obviously is not bound by precedent to adopt plaintiff's salvific interpretation of section 704.

As a matter of first impression, it cannot be denied that plaintiff's claim has some initial textual appeal – but the language of the statute is far from conclusive.[26]  Moreover, "statutory

---

[25]  In *Kanemoto*, 41 F.3d at 644, the Federal Circuit similarly opined –

Section 704 of the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704 (emphasis added).  The converse is that where agency action is otherwise reviewable in court and an adequate remedy is available in connection with that review, the APA's waiver of sovereign immunity under section 702 is not available.

*See also Telecare Corp.*, 409 F.3d at 1349 ("the APA waives sovereign immunity only if there is 'no other adequate remedy.'"); *Wash. Legal Found. v. Alexander*  984 F.2d 483, 486 (D.C. Cir. 1993) (claim "must fail, because a suit under section 702 is available only where 'there is no other adequate remedy in a court'"); *Beamon v. Brown*, 125 F.3d 965, 967 (6th Cir. 1997) ("Thus, the APA does not express the U.S. government's consent to suit if an alternative adequate remedy is available to review a final agency action."); *Mitchell v. United States*, 930 F.2d 893, 896 (Fed. Cir. 1991) ("Moreover, Section 704 of the APA limits Section 702's waiver of sovereign immunity to claims 'for which there is no other adequate remedy in a court.'").

[26]  Plaintiff proceeds almost as if the phrase "final agency action for which there is no other adequate remedy in a court" were either a separately numbered clause or at least set off by commas.  *Cf. United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).  But, it is not, leaving open the possibility that the phrase "no other adequate remedy" modifies the beginning part of the sentence, as well, and thus applies to statutory reviews.  Indeed, prior to

construction is a 'holistic endeavor,'" *Koons Buck Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988)), and plaintiff's interpretation makes little sense in terms of the structure of the APA waiver.[27]  For one thing, if this court were both to interpret section 704 in the fashion plaintiff contends and adopt its broad concept of what is waiver, then section 704 arguably would become its own independent statutory waiver.  The statute, sans the "adequate remedy" limitation, would simply read "[a]gency action made reviewable by statute . . . are subject to judicial review."  This "waiver" implausibly would arise from a provision that Congress passed, in part, to prevent the APA from duplicating preexisting statutory review mechanisms, among them, the Tucker Act.  *See Darby*, 509 U.S. at 146 ("Congress intended by [section 704] simply to avoid duplicating previously established special statutory procedures for review of agency actions."); *Bowen*, 487 U.S. at 903 ("the provision as enacted . . . makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action").[28]  Because of this, it is perhaps not surprising that there is not a shred of

---

1976, there was a comparable running debate as to the meaning of section 702, even though that provision was punctuated with commas.  *See* Kenneth E. Scott, "Standing in the Supreme Court – A Functional Analysis," 86 Harv. L. Rev. 645, 659 (1973) (discussing whether the phrase "by agency action" modifies the phrase "adversely affected").  Moreover, provisions that might be viewed as much clearer than section 704  have been held by the Supreme Court to be ambiguous.  *See, e.g., Evans v. United States*, 504 U.S. 255 (1992).  And as the foregoing suggests, and various courts have observed, various parts of the APA are not exactly models of the careful drafter's art.  *See, e.g., United States v. Yuzary*, 55 F.3d 47, 50 (2d Cir. 1995).

[27]  As the Supreme Court once observed –

The meaning – or ambiguity – of certain words or phrases may only become evident when placed in context.  *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . .").  It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989).  A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959).

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000) (parallel citations omitted).

[28]  In *Bowen*, the Supreme Court made clear that, in appropriate circumstances, this court could provide the "kind of 'special and adequate review procedures' that are needed to remedy particular categories of past injuries or labors for which various federal statutes provide compensation."  487 U.S. at 904 n.39.

legislative history – neither in the reports accompanying the original version of the statute nor in those associated with the 1966 and 1976 amendments – remotely suggesting that Congress intended section 704 to operate in the fashion plaintiff contends. *See*, *e.g.*, H.R. Rep. 94-1656, at 1-3, 10-13; Administrative Procedure Act, Legislative History, 79th Congress 37-38, 213, 230, 276-77 (1946).

Of course, even if plaintiff is correct, one still needs to decide whether section 119 is the sort of statute that can give rise to a statutory review. Several cases suggest that for an action to be "reviewable by statute" the review must be predicated upon "statutory provisions *other than the APA* that govern judicial review of those actions." *See Nat'l Wrestling Coaches Assn. v. Dept. of Education*, 366 F.3d 930, 946-47 (D.C. Cir. 2004) (emphasis added); *see also Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2003) (applying finality requirement of section 704 because "[t]here exists no statutory provision in the [Endangered Species Act] that authorizes judicial review of agency action beyond that provided for in the APA"); *Adams v. U.S. E.E.O.C.*, 932 F. Supp. 660, 664-65 (E.D. Pa. 1996). Under this reading, the "no other adequate remedy" clause in section 704 does not limit statutory reviews if Congress has specifically provided for such review in another statute, provided the latter statute contains or incorporates a waiver separate from the APA. Without that independent waiver, the subject agency action is not "reviewable" at all, within the meaning of section 704 or otherwise, as sovereign immunity would preclude such review. This view finds support in the Attorney General's Manual on the Administrative Procedure Act (1947), to which the Supreme Court has given some deference,[29] in which Attorney General Clark, in describing section 704, states that "[m]any statutes specifically provide for judicial review of particular agency action, and such action will continue to be reviewable." *See also Bowen*, 487 U.S. at 903-04 (explaining that the intent of the "adequate remedy" limitation was not to defeat "specific" or "special" statutory review).[30] It also makes sense given the history of the APA. Any notion that Congress intended actions to become "reviewable by statute" under section 704 via the waiver in section 702 is belied by the blunt fact that the former provision was enacted in the original version of section 10(c) of the APA, while the latter was not enacted until some thirty years later. Assuming that Congress was not prescient, it simply could not have had the section 702 waiver in mind when, in 1946, it referred to actions "reviewable by statute." Accordingly, in light of the language, history and structure of

---

[29]   *See, e.g., Darby*, 509 U.S. at 148 n.10; *Steadman v. SEC*, 450 U.S. 91, 103 n.22 (1981); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 546 (1978).

[30]   This view of section 704 is also consistent with the previously-quoted legislative history of section 702, which provides that the APA waiver does not apply where another statute forbids the relief sought and which treats the Tucker Act as "impliedly" forbidding relief in government contract actions "other than the remedy provided by the [Tucker Act]." *See* H.R. Rep. 94-1656, at 13-14. Plaintiff's interpretation of sections 702 and 704, of course, would totally undercut this intent. And the same is true of the mandamus itself, which clearly provided a contract remedy, *i.e.*, injunctive relief, beyond that provided by the Tucker Act.

the APA, this court holds that since section 119 of the NWPA lacks it own independent waiver, it cannot support the sort of statutory review that plaintiff claims is exempt from the "no adequate remedy" clause of section 704.[31]

Thus, one way or another, it would appear that the "no adequate remedy" limitation of section 704 conditions the availability of the section 702 waiver in cases under section 119 of the NWPA. Viewed in this fashion, section 704 functions as a useful stoplight at the crossroads of the NWPA and the Tucker Act, directing when a particular court in a given case should proceed *vel non*. In the D.C. Circuit cases at issue, that light shone red – because an adequate remedy was and is available in this court, section 704 precluded the D.C. Circuit in *Indiana Michigan* from relying on the section 702 waiver in issuing the judgment that, in turn, led it to issue in *Northern States* the mandamus at issue.[32] In the case *sub judice*, the lack of such a waiver provides yet another reason for concluding that, to the extent the judgment in *Indiana Michigan* covered areas within this court's jurisdiction, the judgment was void.[33]

---

[31] So revealed, plaintiff's argument is demonstrably circular – the "adequate remedy" limitation of section 704 does not apply, it says, because the section 702 waiver applies, even though the latter waiver is operative only where section 704 is satisfied. The way out of this loop, of course, is to require, as Congress apparently did, that the waiver which renders an action reviewable under section 704 derive from a statute other than the APA. Indeed, that requirement has essentially been applied in cases in which a party has sought to proceed under the APA via the mandamus statute, 28 U.S.C. § 1361, which, like section 119 provides for jurisdiction but lacks its own waiver. *See Nat'l Center for Mfg. Sciences v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997); *Kanemoto*, 41 F.3d at 643.

[32] It should be noted that plaintiff's invocation of section 702 to support the judgment in *Indiana Michigan* and mandamus in *Northern States* may run afoul of another APA requirement, *to wit*, that the waiver is available only for "relief other than money damages." 5 U.S.C. § 702. In *Blue Fox*, the Supreme Court held unanimously that the waiver in section 702 did not authorize a subcontractor to obtain an equitable lien on funds held by the government for work completed on a prime contract. It reasoned that the lien was "merely a means to the end of satisfying a claim for the recovery of money," thereby falling within the "money damages" exception in section 702. 525 U.S. at 262. To the extent the mandamus precludes defendant from raising a defense to plaintiff's claim for the recovery of money, it serves much the same purpose as the lien in *Blue Fox. See also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) ("Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.'") (quoting *Bowen v. Mass.*, 487 U.S. 879, 918-19 (1988) (Scalia, J., dissenting)).

[33] Of course, even if section 702 supplied a general waiver for the D.C. Circuit's exercise of jurisdiction under section 119, that waiver would not apply to the extent that the specific

## C.

Based on the foregoing, the court is left with the firm conviction that, in issuing the subject mandamus, the D.C. Circuit operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity. To the extent that, for this reason, the D.C. Circuit's judgment in *Indiana Michigan* was void, it may be collaterally attacked. And under the void order doctrine, it follows, *a fortiori*, that the *Northern States* writ of mandamus predicated upon that judgment is also void. As void, the mandamus is without binding effect and, in particular, cannot preclude defendant from raising defenses to the contract actions in this court. Though admittedly novel, this decision is anchored in sovereign immunity principles that, in turn, are firmly rooted in long-standing precedents, many of which originate in the D.C. Circuit itself. "To be observant of these restrictions is not to indulge in formalism or sterile technicality," *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673 (1950), or, as plaintiff states on brief, a "play on words." Rather, solemn observance of those sovereign immunity principles is essential to the proper exercise of limited jurisdiction, both in this court and the D.C. Circuit.

In closing, it must be emphasized that the burden of the mandamus order here is not trivial, as the writ frustrates the orderly progression of litigation in this court on at least three distinct planes. First, this ruling, which was rendered in response to an administrative position published by an agency, has essentially tied the hands of the Justice Department, preventing it from discharging its independent obligations to this court. *See* 28 U.S.C. §§ 516 and 519 (providing, respectively, that the "conduct of litigation [in this court] is reserved to the Department of Justice" and that the "Attorney General shall supervise" this litigation). The Department's discharge of those obligations should neither rise nor fall on whether, in the first instance, the government decided to express its views on the interpretation of the Standard Contract via an announcement in the Federal Register or a brief filed with this court (with the D.C. Circuit likely not exercising jurisdiction to review the latter). Second, if left intact, the mandamus would preclude this court from resolving an important liability issue on the merits, a contract issue that this court manifestly has jurisdiction to decide and whose resolution potentially impacts at least sixty pending cases, involving tens of billions of dollars in claims. Finally, it should not be overlooked that the mandamus derivatively threatens the jurisdiction of the Federal Circuit. Were the mandamus effective, the latter court would be frustrated in reviewing a liability issue not presented to this court, at least if it adhered to its normal practice regarding issues raised for the first time on appeal. *See, e.g., Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1377 (Fed. Cir. 2001); *James v. FERC*, 755 F.2d 154, 155-56 (Fed. Cir. 1985). At the least, if the circuit decided to invoke an exception to its normal practice, its review of this

---

judgment and order in question were not covered by the jurisdictional grant of section 119. In the latter instance, the judgment still would be void under sovereign immunity principles, leaving the mandamus void, as well.

liability issue would be hampered by an incomplete record and the absence of any prior findings by this court.  Indeed, it bears mention that were the mandamus enforced, the Federal Circuit's ruling in *Christopher Village* would mean little, as a ruling not entitled to preclusive effect under that decision could, nonetheless, obtain preclusivity via mandamus, the appropriateness of which writ neither this court nor the Federal Circuit would be able to review.

These considerations, of course, neither dictate nor even significantly impact the result reached here.  *Cf. General Electric II*, 764 F.2d at 903 (noting that "there are certain policy considerations that militate in favor of the judgment that we reach on the jurisdictional question").  They do, however, prevent this court from donning blinders either to the thorny issues presented by the mandamus or to the fact that it is void.  And it would be no less abdication for this court to avoid these issues because they impact the government than it would if, instead, the mandamus had closed the courthouse doors to a plaintiff.  This is not to say that defendant (or any other litigant) may simply disregard an order that it believes was issued without an appropriate abdication of sovereign immunity.  Indeed, it is well-recognized that an injunction that is ultimately invalidated is, while the question is pending, a lawful order that must be obeyed.  *See United States v. United Mine Workers of America*, 330 U.S. 258 (1947).  Nor should this court or any other seek out opportunities to declare another court's orders void.  In the end, however, the obligation to consider this issue essentially has been thrust upon the court and is unavoidable – defendant has sought relief in an effort to present fully its position in an important case, and this court ultimately must conclude that the relief requested is appropriate.  Therefore, notwithstanding the mandamus issued by the D.C. Circuit, briefing on the issues involving the unavoidable consequences clause of the Standard Contract will be ordered.[34]

## III.    CONCLUSION

Based on the foregoing, the court concludes that the D.C. Circuit's mandamus order in *Northern States I* is void and does not preclude defendant from arguing herein, *inter alia*, that it did not breach the Standard Contract based upon the unavoidable delays clause therein.  Briefing on the latter issue shall occur, as follows:

1.    On or before November 20, 2006, defendant shall file a brief on the unavoidable delays clause of the Standard Contract.

---

[34]  Plaintiff would have this court sidestep the mandamus issue on the grounds that the Federal Circuit has already concluded that the unavoidable delay clause does not provide defendant with a defense in the pending SNF breach cases.  To be sure, the latter issue is among those that this court needs to resolve – but, after appropriate briefing.  Indeed, if plaintiff is correct about the scope of the mandamus, it would appear that any prior comments made in cases in this circuit about the unavoidable delay clause in the Standard Contract were made without the benefit of full briefing.

2.      On or before December 15, 2006, plaintiff shall file its response to the defendant's brief.

3.      On or before January 5, 2007, defendant shall file its reply to plaintiff's response.

**IT IS SO ORDERED**.

                                        s/ Francis M. Allegra
                                        Francis M. Allegra
                                        Judge